IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATASHA STARK,                          :

        Plaintiff,                   :

v.                                      :        Civil Action No.: 07cv00553

ZETA PHI BETA SORORITY, INC.            :
          Defendants

                                  :

        Comes now the Defendant, ZETA PHI BETA, pursuant to the Federal Rule of Civil

Procedure 56, and respectfully moves this Court to enter summary judgment on its behalf

because there exists no question of material fact at issue in this matter, and Defendant is

entitled to Judgment as a matter of law.  In support hereof, defendant respectfully refers the

Court to the attached Statement of Material Facts Not In Dispute and Memorandum of

Grounds and Authorities.

                          MACLEAY, LYNCH, GREGG & LYNCH, P.C.


                  By:

                        John C. Lynch
                        1629 K Street, NW
                        Suite 802
                        Washington, DC 20006
                        (202) 785-0123
                        (202) 393-3390 (fax)
                        Attorneys for Defendant
                        Zeta Phi Beta, Inc.

<u>CERTIFICATE OF SERVICE</u>

        I hereby certify that a copy of the foregoing was provided, pursuant to the Rules of
this court on this 5th day of August, 2008, to the following:

Jimmy A. Bell, Esq.
9610 Marlboro Pike
Upper Marlboro, MD 20772

                          _____/s/ John Lynch_____
                          John C. Lynch

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATASHA STARK,                                    :

        Plaintiff,                              :

v.                                                :        Civil Action No.: 07cv00553

ZETA PHI BETA SORORITY, INC.                      :
        Defendants
                                                  :

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW, the Defendant, Zeta Phi Beta Sorority, Inc. by counsel and submits its

Statement of Material Facts Not in Dispute as follows:

At all times material hereto, Zeta Phi Beta Sorority (hereinafter "ZPB") is and has

been a private, voluntary organization whose objectives are to foster the ideals of service,

charity, civic and cultural endeavors, sisterhood, and finer womanhood. See Zeta Phi Beta

Sorority Constitution., Art. III, Section I (attached hereto as "Exhibit 1").  Plaintiff, Natasha

Stark, was an undergraduate member of ZPB, and a graduate member of the sorority from

1993 until her expulsion in 2007. See Deposition of Natasha Stark dated June 11, 2008

(attached hereto as "Exhibit 3"), at pp. 10-12.

The sorority is governed by its Constitution and Bylaws, as well as the policies and

procedures voted on by chapter delegates at the sorority's biennial convention. See Exhibit 1

at Art. II, Sect. 2; see also Handbook of Zeta Phi Beta Sorority, Incorporated at p. 11

(attached hereto as "Exhibit 4").  Additionally, the Handbook of ZPB provides guidelines for

effective functioning of the activities as they relate to the Operational Procedures for ZPB.

See Exhibit 4 at pp. 1-2.   At all times relevant to this litigation, the Sixth Edition of the ZPB

Constitution and Bylaws and the Eleventh Edition of the ZPB Handbook were in operative

effect.  Like many voluntary associations, ZPB's proceedings are also guided by Robert's

Rules of Order Newly Revised (hereinafter "Robert's Rules").  See Exhibit 1, at Art. II, Sect.

2.

> I.      ACTIONS GIVING RISE TO PLAINTIFF'S EXPULSION

The underlying grievance in this matter arises out of the alleged misuse of the

sorority's American Express card by its Grand Basileus, Barbara Moore, and the failure of the

sorority's National Executive Board to remove her from her office as a result of her alleged

misfeasance. Complaint at ¶ 4.  According to the Plaintiff, the alleged misuse of the sorority's

American Express card was resolved when Moore entered into "a promissory note to make

monthly payment to pay the money back over a five (5) year period."  Complaint at ¶ 4.

Plaintiff admits that she was dissatisfied with the resolution of the sorority's internal

financial matters and the Barbara Moore matter. See Exhibit 3 at pp. 49-52.  As of January of

2006, Plaintiff was no longer trying to work within the sorority regarding her objections and

had decided to go outside of the organization.  See Exhibit 3 at p. 50.  At the time Plaintiff

began making open disclosing information regarding Moore and ZPB, the issues regarding

the alleged use of the sorority credit card had already been openly discussed within the

Sorority. See Exhibit 3 at pp. 19-20, 29; see also Letter to Sorors from Sheryl Underwood

dated 3/12/2007 (attached hereto as "Exhibit 5[1]"); see also Letter to Sorors from Sheryl

Underwood dated March 16, 2006 (attached hereto as "Exhibit 6[2]").

Plaintiff maintains in her Complaint that she informed both the media and the United

States Attorney for the District of Columbia of the Barbara Moore matter. Complaint at ¶5.

---

[1] This document was previously marked for identification as "Stark Exhibit 21" to the Deposition of Natasha Stark dated June 10, 2008. See Exhibit 3, Stark Depo. at p. 95.
[2] This document was previously marked for identification as "Stark Exhibit 12" to the Deposition of Natasha Stark dated June 10, 2008. See Exhibit 3, Stark Depo. at p. 72.

However, during the course of her deposition, Plaintiff confessed that she did not in fact contact the U.S. Attorney's office, or any other law enforcement official, regarding Moore or ZPB. See Exhibit 3 at p. 59.

Plaintiff's frustration with how the Moore matter had been handled by the sorority's National Executive Board, lead her to disseminate the sorority's sensitive financial information to other members, as well as individuals and entities outside of the organization. See Exhibit 3, Stark Depo. at pp. 45-6.  Plaintiff's efforts in this regard began on or about August 1, 2005 with an electronic correspondence from her husband's email account, sent at the request of the Plaintiff, which attached copies of the internal communications of the sorority and the sorority's American Express account statements, containing the sorority's corporate account number. See Email to mspee58@aol.com from James Stark dated 8/1/05 (attached hereto as "Exhibit 7[3]").  In response, the sorority demanded that James Stark immediately cease and desist from the unauthorized publication, distribution and communication of the ZPB's business records. See Letter dated 11/16/05 to James Stark from Jonathan Charleston (attached hereto as "Exhibit 8[4]").  IN recognition of the unauthorized disclosure of the sorority's proprietary and confidential information, on or about November 11, 2006, James Stark, through his attorneys, advised that he had ceased publication, distribution and communication of any proprietary and confidential information regarding ZPB. See Letter dated 1/11/06 to Jonathan Charleston from Robin Colvin-Leary (attached hereto as "Exhibit 9[5]").

---

[3] This document was previously marked for identification as "Stark Exhibit 4" to the Deposition of Natasha Stark dated June 10, 2008. See Exhibit 3, Stark Depo. at p. 34.
[4] This document was previously marked for identification as "Stark Exhibit 7" to the Deposition of Natasha Stark dated June 10, 2008. See Exhibit 3, Stark Depo. at pp. 46-7.
[5] This document was previously marked for identification as "Stark Exhibit 5" to the Deposition of Natasha Stark dated June 10, 2008. See Exhibit 3, Stark Depo. at p. 41.

Despite the sorority's cease and desist demand,  on or about January 7, 2006 Plaintiff forwarded an e-mail to the South Carolina Black News alleging unlawful actions on the part of Barbara Moore and the sorority, and offering to provide documentation and information purportedly related to the same. See Email from Natasha Stark to the South Carolina Black News dated 1/7/06 (hereinafter "Exhibit 10[6]").  The same e-mail was sent to "an assortment of newspapers, radio stations and T.V. stations in D.C., Atlanta and South Carolina." See Exhibit 3, Stark Depo. at p. 52.  These communications prompted another letter from the sorority demanding that Plaintiff cease and desist further publication of defamatory statements regarding ZPB. See Letter to Natasha Stark from Jonathan Charleston dated 1/10/06 (attached hereto as "Exhibit 11[7]").  Despite the sorority's demand, Plaintiff participated in two (2) television broadcasts by WJLA T.V. in Washington, D.C. which aired on February 7 and 8, 2006. See WJLA transcript "I-Team: Sorority Spending" dated 2/7/06 and "I-Team: Sorority Spending Follow-Up" dated 2/8/06 (attached hereto as "Exhibit 12(a)" and "Exhibit 12(b)")[8].

## II.    THE GREIVANCE/COMPLAINT INVESTIGATION PROCESS

It is undisputed that the sorority is governed by its Constitution, Bylaws, Handbook and policies and procedures, under the guidance of Roberts Rules of Order.  The ZPB Constitution states that: "A chapter through its Regional and State Directors may request suspension of members for non-payment of the approved Local, State (where applicable), Regional and National taxation, *and for actions of misconduct and rules violations*." See Bylaws (attached hereto as "Exhibit 2"), Art. XIV, Section 2(a) (original emphasis).  Neither

---

[6] This document was previously marked for identification as "Stark Exhibit 6" to the Deposition of Natasha Stark dated June 10, 2008. See Exhibit 3, Stark Depo. at p. 43.

[7] This document was previously marked for identification as "Stark Exhibit 8" to the Deposition of Natasha Stark dated June 10, 2008. See Exhibit 3, Stark Depo. at p. 47.

[8] These documents were previously marked for identification as "Stark Exhibit 9" and "Stark Exhibit 10" to the Deposition of Natasha Stark dated June 10, 2008. See Exhibit 3, Stark Depo. at p. 59, 64.

the Constitution nor the Bylaws specify any disciplinary, suspension or expulsion proceedings

and/or guidelines to be followed.  However, the ZPB Handbook defines the

grievance/complaint investigation steps, activities and officer or governing body roles at

local, state, regional and national levels. See Exhibit 4 at p. 80.

   In pertinent part, the Handbook states that "[c]omplaints can arise from a Soror,

Chapter, State, Region  . . . against another Soror." Exhibit 4 at p. 80.  "Complaints may be

made on the basis of a violation or non-compliance with chapter, state, regional or national

Zeta Phi Beta Sorority Inc. Constitutions or By-Laws, policies, procedures or customs, school

policies, the Probate Bill of Rights, and/or applicable municipal, state or federal law." Exhibit

4 at p. 80.  "Complaints should me made within 45 days, as applicable, and in writing."

Exhibit 4 at p. 80.  Once a complaint has been made, the Grievance/Complaint Process

prescribes the following:

> Complaint investigations will be conducted at different
> steps that reflect the organization of the sorority.  It is the
> duty of all sorority officers to uphold the sorority
> Constitution and By laws.  Activities at each step should
> take place within 30 days, as applicable.
>
> Step 1: Chapter Basileus and/or Chapter Executive
>    Committee and/or Undergraduate Chapter Sponsor
>    or Advisor
> Step 2: State Director or her designee
> Step 3: Regional Director or her designee
> Step 4: National Executive Board or its designee
> Step 5: Grand Basileus or her designee
> Step 6: Appellate Hearing: (Boule Interim Periods) Grand
>    Basileus and Appeals Team, no less the 3, no more
>    then 5, to mediate final conflict review with
>    outcomes reported to the National Executive Board
>    and Chapters.  Final decisions binding on all parties
>    concerned.
>
> The investigations of complaints that arise against a soror
> or governing body at any one level will begin at the next

8

> step.  The investigation of officers by the Executive Board
> will remain as detailed in the National Handbook.
>
> At each step, an investigation or review of the complaint
> facts occurs to determine if governing rules, policies or
> laws have been followed or violated.
>
> Investigation activities may include, but are not limited to:
> procuring statements, written or verbal; making telephone
> calls or onsite visits; convening meetings or hearings;
> and/or procuring and reviewing documents.

See Exhibit 4 at p. 81. The Grievance/Complaint Process further requires that:

> All determinations will be in writing.  Records of
> complaints at Steps 3-5 should be filed at the National
> Headquarters or with other officers as applicable.
>
> Complaint determinations may include the following
> corrective actions at Steps 1-4: cease and desist orders;
> reversals of decisions; withholding membership
> privileges (voting, attending or participating in
> meetings/programs or holding office); and at Step 5,
> suspension of sorors or chapters or revocation of
> membership.

See Exhibit 4 at p. 81.

In the present matter, the initial complaints against Plaintiff were made via written memorandum dated September 27, 2006 by members of the Ad Hoc Committee of Plaintiff's local Epsilon Zeta Chapter. See Memorandum to Chrislyn Turner from the Ladies of Epsilon Zeta Chapter dated 9/27/2006 (attached hereto as "Exhibit 13[9]"). The memorandum is directed to Chrislyn Turner, in her capacity as ZPB Georgia State Director. Exhibit 13.  The memorandum sets forth a litany of alleged activities undertaken by Plaintiff, and requests the removal of Plaintiff from the Epsilon Zeta Chapter and ZPB. Exhibit 13.

---

[9] This document was previously marked for identification as "Stark Exhibit 3" to the Deposition of Natasha Stark dated June 10, 2008. See Exhibit 3, Stark Depo. at p. 25.

Between September 30, 2006 and October 8, 2006, Ms. Turner, acting within her capacity as Georgia State Director, conducted an investigation into the allegations made by the aforementioned members of the Epsilon Zeta Chapter. See Letter to Natasha Stark from Chrislyn Turner dated 10/8/06 (attached Hereto as "Exhibit 14[10]"); see also Affidavit of Chrislyn Turner (attached hereto as "Exhibit 15[11]").  Following this investigation, Ms. Turner determined that the complaints against Plaintiff were "valid and warrant further scrutiny by our Regional Director." Exhibit 14.  As a result, Ms. Turner suspended all of Plaintiff's Zeta activities, pending further investigation and recommended Plaintiff's expulsion. See Exhibit 14.  On October 8, 2006, Plaintiff was advised, of the charges that had been made against her and the suspension of her ZPB activities.  The matter was then forwarded to Southeast Regional Director, Scarlet Black, for further review. See Exhibit 14.

Plaintiff hired the law offices of Deming, Parker, Hoffman, Green & Campbell to respond to the October 8, 2006 correspondence. See Complaint at ¶ 8[12].  On November 26, 2006, Plaintiff, through her attorneys, notified Barbara Moore, in her capacity as National President of ZPB, of her objections to the suspension of her activities and responded to the specific allegations set forth in the October 8th letter. See Letter to Barbara Moore from Ryan Goldstein dated 11/28/2006 (attached hereto as "Exhibit 16"[13]).

Scarlet Black, acting within her capacity as the Southeastern Regional Director of ZPB, conducted a further investigation into the charges made against the Plaintiff. See Letter of Scarlet Black to Plaintiff dated 11/15/2006 (attached hereto as "Exhibit 17"); see also

---

[10] This document was previously marked for identification as "Stark Exhibit 13" to the Deposition of Natasha Stark dated June 10, 2008. See Exhibit 3, Stark Depo. at p. 76.
[11] The attached affidavit is unexecuted.  However, an executed Affidavit, with no changes, will be submitted as soon as possible.
[12] Plaintiff's Complaint erroneously references the Turner correspondence as being dated September 8, 2006. The correct date is October 8, 2006.
[13] This document was previously marked for identification as "Stark Exhibit 15" to the Deposition of Natasha Stark dated June 10, 2008. See Exhibit 3, Stark Depo. at p. 80-1.

Affidavit of Scarlet Black (attached hereto as "Exhibit 23").  Following her investigation, Ms.

Black made the determination that the complaints against Plaintiff were valid and that the

case warranted further investigation. <u>See</u> Exhibit 17; <u>see also</u> Exhibit 23.  Ms. Black

forwarded the matter to the National Executive Board for further review.

     The National Executive Board conducted a further review of the issues. <u>See</u> Affidavit

of Sheryl Underwood (attached hereto as "Exhibit 18"). Following this review, the National

Executive Board made the determination that the complaints against Plaintiff were valid and

recommended the expulsion of the Plaintiff.  Exhibit 18. The matter was next forwarded to

the Grand Basileus, Barbara Moore.

     Barbara Moore recused herself and designated the Chair of the National Executive

Board, Sheryl Underwood, to act upon the charges brought against the Plaintiff and to

recommend appropriate disciplinary action. <u>See</u> Letter to Natasha Stark from Sheryl

Underwood dated 2/8/07 (attached hereto as "Exhibit 19").  After review, Underwood

determined that it was appropriate to accept the recommendation to expel Plaintiff from

membership in ZPB. Exhibit 19.  On February 8, 2007, Plaintiff was notified of her

expulsion. Exhibit 19.  The letter clearly advised Plaintiff of the charges and specifications

against her, that she had the right to appeal the expulsion, that a formal appellate hearing

would be held on March 9, 2007, that Plaintiff had the right to be represented by counsel, and

that Plaintiff had the right to speak and produce witnesses in her own defense. <u>See</u> Exhibit 19.

Plaintiff was further advised to contact Underwood regarding her participation in the

Appellate Hearing within ten (10) days off the date of the letter. Exhibit 19.  The letter also

expressly advised the Plaintiff, in bold, capitalized font, that should she fail to appear at the

hearing, the hearing would proceed in her absence. Exhibit 19.

In a letter dated March 6, 2007, which was not received until March 8, 2007, Plaintiff advised Underwood and the members of the National Executive Board, that she chose not to personally attend the appellate hearing. See Letter to Sheryl Underwood from Natasha Stark dated March 6, 2007 (attached hereto as "Exhibit 20[14]"); see also Exhibit 5.  Between February 8, 2007 and March 9, 2007 did not Plaintiff request a continuance or postponement of the March 9, 2007 proceeding.

On March 9, 2007, the Appellate Hearing was held in executive session before an Appeals Team consisting of six (6) Sorors in accordance with formal trial procedures set forth in Robert's Rules. See Exhibit 5.  After hearing witness testimony and evidence, the Appeals Team, by unanimous vote, found Plaintiff guilty of the charges and specifications set forth in the February 8, 2007 Notice of Expulsion. See Exhibit 5; see also Exhibit 18.

On or about March 12, 2007, the Sisterhood of  ZPB was advised, via written correspondence, by Underwood, acting within her capacity as Chair of the National Executive Board, of Plaintiff's expulsion.  The letter details the outcome of the Appellate Hearing and responds to the allegations made by the Plaintiff to various media outlets.

Respectful submitted,
MACLEAY, LYNCH, GREGG & LYNCH, P.C.


By:

John C. Lynch
1629 K Street, NW
Suite 802
Washington, DC 20006
(202) 785-0123
(202) 393-3390 (fax)
Attorneys for Defendant
Zeta Phi Beta, Inc.

---

[14] This document was previously marked for identification as "Stark Exhibit 17" to the Deposition of Natasha Stark dated June 10, 2008. See Exhibit 3, Stark Depo. at p. .

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATASHA STARK,                          :

       Plaintiff,                   :

v.                                      :          Civil Action No.: 07cv00553

ZETA PHI BETA SORORITY, INC.            :
       Defendants

                             :

## MEMORANDUM OF GROUNDS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

      Plaintiff is a former member of a sorority who seeks the intervention of this Court to overturn her expulsion.  Plaintiff has failed to present any basis that would warrant judicial intervention into the internal affairs of the Defendant.  Plaintiff cannot establish any failure on the part of the Defendant to follow its internal disciplinary guidelines, and the procedures followed by the Defendant were fundamentally fair.  Furthermore, Plaintiff also cannot establish that the statements made by the Defendant were false or that were made with the requisite degrees of malice to prevail on a claim of defamation.  Finally, Plaintiff has failed to reference any duty owed to her by the Defendant, or any breach thereof.  As such, Plaintiff cannot maintain a claim for negligence.  In light of the above, and as there are no material facts in dispute, Defendant is entitled to judgment as a matter of law.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is warranted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  To defeat a motion for summary judgment, a party "may not rest upon the mere allegations or denials of his pleading, but the plaintiff's response… must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); see also Celotex, 477 U.S. at 322.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986) (emphasis in original); see also Holcomb v. Powell, 433 F.3d 889, 896 (D.C. Cir. 2006).

"A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law; factual disputes that are irrelevant or unnecessary do not affect the summary judgment determination." Holcomb, 433 F.3d at 896.  "An issue is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.  If there are no genuine issues of material fact and the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party bears the burden of proving at trial, then the moving party is entitled to judgment as a matter of law. Id.

**ARGUMENT**

Plaintiff has set forth three (3) claims against Defendant: breach of contract; defamation; and negligence.  As set forth below, Plaintiff has failed to carry her burden on each claim.

I.      BREACH OF CONTRACT

In her Complaint, the Plaintiff asserts that "ZPB suspended and expelled the Plaintiff without due process of the policies and procedures outlined in the ZPB Constitution." Complaint at ¶ 15.  The Plaintiff did not have a separate written contract with the Defendant. Rather, Plaintiff alleges that the "Constitution and policies and procedures are contracts between ZPB and Plaintiff." Complaint at ¶16.  Plaintiff claims that "ZPB breached its contract or contracts with Plaintiff (sic) by its failures to abide by the terms of such contract or contracts." Complaint at ¶17.  Specifically, Plaintiff alleges that her ZPB activities were suspended without providing her an opportunity to rebut the charges in violation of the sorority's own policies and procedures. See Complaint at ¶8.  Plaintiff further claims that prior to her expulsion she was not made aware of the charges against her nor did a formal hearing take place. Complaint at ¶10.

A.    JUDICIAL INTERVENTION IS NOT APPROPRIATE IN THIS MATTER

As stated above, ZPB proceedings are subject to Robert's Rules of Order.  See Exhibit 1, Const., Art. II, Section 2.  Robert's Rules states:

> Although ordinary societies seldom have the occasion to discipline members, an organization or assembly has the ultimate right to make and enforce its own rules, and to require that its members refrain from conduct injurious to the organization or its purposes.  No one should be allowed to remain a member if his retention will do this kind of harm.

See Robert's Rules at §61, p. 624.  Robert's Rules further states:

> Frequently an article on discipline provides for [the] imposition [of penalties] on any member found guilty of conduct described, for example as 'tending to injure the good name of the organization, disturb its well-being, or hamper it in its work.' In any society, behavior of this nature is a serious offense properly subject to disciplinary action, whether the bylaws make mention of it or not.

Id. at p. 630.

At the heart of this litigation lies the Plaintiff's dissatisfaction with the handling of the aforementioned internal sorority matter involving the ZPB Grand Basileus, Barbara Moore. Discontented with the way sorority officials were dealing with the issue, Plaintiff took matters into her own hands by attacking Moore and the sorority in the media and disclosing the sorority's sensitive financial information to individuals outside of the sorority.   As a result of these actions, as well as numerous other incidents, Plaintiff's sorority activities were suspended and, after further investigation, Plaintiff was expelled for actions of misconduct and rules violations.

Plaintiff now seeks judicial intervention to remedy what she alleges is a violation of her "due process" rights.  In the District of Columbia, "courts ordinarily will not interfere with the management and internal affairs of a voluntary association." Levant v. Whitley, 755 A.2d 1036, 1043 (D.C. 2000) (quoting Avin v. Verta, 106 A.2d 145, 147 (D.C. 1954)); see also National Association for the Advancement of Colored People v. Golding, 342 Md. 663, 679 A.2d 554, 558 (Md. 1996) ("as a general rule, courts will not interfere in the internal affairs of a voluntary membership organization")).  "[W]hen a party comes into court for relief it is incumbent upon him to show the existence of facts to justify the interference of the court." United States ex rel. de Yturbide v. Metropolitan Club, 11 App. D.C. 180, 201 (1897).


In Jolevare v. Alpha Kappa Alpha Sorority, Inc., the U.S. District Court for the District of Columbia recently considered issues similar to the present case. 521 F. Supp. 2d 1 (D.D.C. 2007).  In Jolevare, plaintiffs, sorority members, filed suit against their sorority for breach of contract, violations of the D.C. Human Rights Act, defamation and negligence. Id.

Regarding their breach of contract claim, plaintiffs alleged that the sorority had violated its own polices and procedures when it suspended the plaintiffs for violations of the sorority's anti-hazing policy. Id. at 21-2.  In ruling on the case, the court noted the great reluctance of courts to involve themselves in the internal affairs of a voluntary association. Id. at 22-3(citing Levant, 755 A.2d at 1043; Golding, 342 Md. 663; Yturbide, *supra*).  Ultimately, the court in Jolevare declined to intervene because the Plaintiffs had failed to fully avail themselves of the appellate process.

In this case, Plaintiff has presented no basis for judicial intervention into the internal affairs of ZPB.  The fact that Plaintiff is unhappy with her expulsion from ZPB and disagrees with the application and outcome of the ZPB disciplinary investigation and procedures is irrelevant.  In litigating this case, Plaintiff is seeking to have the court act as an appellate panel for the actions taken by ZPB.  Under District of Columbia law, Plaintiff is not entitled to such review and has provided no legal basis to warrant the Court's intervention into what amounts to nothing more than a dispute between the sorority and one of its members.  As such, Defendant is entitled to judgment as a matter of law.

B.    SUMMARY JUDGMENT IS APPROPRIATE BECAUSE ZPB COMPLIED WITH ITS OWN INTERNAL POLICIES AND PROCEDURES

Pursuant to the ZPB bylaws, a members' suspension may be requested for actions of misconduct and rules violations." See Exhibit 2 at Article XIV, Section 2(a).  The ZPB Handbook was adopted in 1997 with the purpose of providing guidelines to serve as standardized Operation Procedures for the sorority by "plac[ing] the Sorority in focus with present day interests and demands and yet adhere[ing[ to the aims, and actions developed by it during its history, without being in conflict with [ZPB's] National Constitution and By-

Laws." Exhibit 4 at p. 1. The Handbook provides a detailed investigation and disciplinary process for handling charges that arise against individual sorors, chapters or governing bodies within or outside the sorority. Exhibit 4 at pp. 80-1. Complaints may arise from an individual soror against another soror. Exhibit 4 at p. 80. Once a complaint is made against a soror, investigations will be conducted at different steps that reflect the organization of the sorority. Exhibit 4 at p. 80.

In the instant matter, members of Plaintiff's local chapter made various allegations against Plaintiff involving actions of misconduct, rules violations, and conduct unbecoming a soror that occurred over an approximate eighteen (18) month period. See Exhibit 13. Following the filing of the grievance complaint, Chrislyn Turner conducted an investigation into the charges made against the Plaintiff. This investigation included reviewing the allegations, reading various documents and correspondence relating to the alleged conduct of the Plaintiff, and interviewing members of Zeta Phi Beta Sorority with respect to the allegations against the Plaintiff. See Exhibit 15. Upon concluding her investigation, Ms. Turner determined that the charges against the Plaintiff were valid and warranted further scrutiny. See Exhibit 15; see also Exhibit 14. Turner notified Plaintiff of the charges against her, as well as of the suspension of her Zeta activities. See Exhibit 14. Plaintiff complains that she was never given the opportunity to be heard prior to the suspension of her activities. Complaint at ¶8. Contrary to Plaintiff's contentions, there is no requirement in the Constitution, the Bylaws or the Handbook, that Plaintiff be given the right to be heard prior to the suspension of her Zeta activities. The Handbook states only that at each step an investigation or review of the Complaint process must be conducted to determine if governing rules, policies or laws have been followed or violated. See Exhibit 4 at 80. The only hearing

or opportunity to be heard provided for is the final Appellate Hearing. Exhibit 4 at 81. Furthermore, the Handbook specifically permits the "withholding of membership privileges" as a corrective measure at Steps 1-4. Exhibit 4 at p. 81.  Accordingly, Ms. Turner abided by the rules and procedures set forth in the Constitution, Bylaws and Handbook.

On November 26, 2006, Plaintiff notified the sorority of her objections to the suspension of her activities and responded to the specific allegations set forth in the October 8th letter. See Exhibit 16.  At that time, it is clear that Plaintiff was made aware of the charges against her, had obtained legal advice and representation, and was preparing to defend herself, consistent with her rights under the sorority's guidelines. Exhibit 16; see also Exhibit 3 at pp. 82

The Southeastern Regional Director conducted a further investigation into the charges made against the Plaintiff. See Exhibit 14; see also Exhibit 17.  Ms. Black affirmed the withholding of Plaintiff's membership activities as permitted under the Handbook at Steps 1-4 and forwarded the matter to the National Executive Board for further determination. See Exhibit 17.

In January of  2007,  the National Executive Board met to review the complaints made against Plaintiff. See Exhibit 18.   After considering the investigation and recommendations of the complaining members of the Epsilon Zeta Chapter, the Georgia State Director, and the Southeast Regional Director, the board voted to recommend the expulsion of the Plaintiff. Exhibit 18.  The matter was forwarded to the Grand Basileus, Barbara Moore.

Barbara Moore recused herself from reviewing the matter and designated the Chair of the National Executive Board, Sheryl Underwood, to act upon the charges brought against the Plaintiff and to recommend appropriate disciplinary action. See Exhibit 19.  Pursuant to the

Handbook, Step 5 specifically authorizes the Grand Basileus *or her designee* to conduct further investigation and review. See Exhibit 4 at p. 81.  Underwood found the charges against the Plaintiff valid and accepted the recommendation of the members of the Epsilon Zeta Chapter, the Georgia State Director, the Southeastern Regional Director, and the National Executive Board to expel Plaintiff. See Exhibit 18; see also Exhibit 19.

Plaintiff was notified of her expulsion via written correspondence on February 8, 2007. See Exhibit 19.  Pursuant to Robert's Rules, the notice advised Plaintiff of the charges and specifications against her, that an appellate hearing would be held on March 9, 2007, and further advised Plaintiff's of her rights at the appellate hearing. Exhibit 19; see also Robert's Rules at §61, p. 636.

Following receipt of the Notice, Plaintiff did not contact the sorority to advise whether she would participate in the hearing until a letter dated March 6, 2007, which was not received until one (1) day prior to the scheduled hearing. See Exhibit 20.  At that time, Plaintiff advised that she would be unable to be present and requested permission to attend the hearing by telephone. See Exhibit 20.  Given the sensitivity of the hearing and the recommendation by Robert's Rules that the hearing be held in executive session, the request was denied. See Exhibit 5; see also Robert's Rules at §61, p. 638.

The hearing was held on March 9, 2007 as scheduled.  The Appeals Team unanimously found Plaintiff guilty and voted to uphold Plaintiff's expulsion. See Exhibit 5.

In Blodgett v. The University Club, 930 A.2d 210 (D.C.App. 2007), the District of Columbia Court of Appeals considered a case similar to the case at bar.  In Blodgett, plaintiff was expelled by his private club for using club facilities and resources to conduct business with individuals who publicly expounded racists and anti-Semitic views. Id.  Plaintiff filed

suit for defamation, false light, breach of contract, fundamental unfairness, violation of due process, invasion of privacy, intentional infliction of emotional distress, and violations of the DC Human Rights Act. Id.  The trial court granted summary judgment to the Defendants on all counts and the Court of Appeals affirmed. Id. at 215.

In support of his breach of contract claim, the plaintiff claimed that the club violated its own bylaws when it temporarily suspended him pending its investigation because the bylaws required the Board to "give notice and an opportunity to be heard before 'a member may be reprimanded, suspended, or expelled for cause…'" Id. at 225.  However, the Court found that the bylaws "specifically authorize the Executive Committee to suspend a member temporarily 'pending action by the [Board], and such suspension may be without notice to the member if, in the opinion of the Executive Committee, the exigencies of the case so require.'" Because the bylaws neither defined exigency nor forbid the action taken, the court held that the plaintiff had failed to establish that the club had violated its own rules.  Id. at 227.

Like Blodgett, in this case the investigation, suspension and expulsion took place in strict accordance with ZPB's rules and procedures.  The Handbook specifically authorizes the withholding of membership privileges at Steps 1-4 of the Grievance/Complaint Investigation Process and revocation of membership at Step 5. See Exhibit 4 at p. 81.  Plaintiff was given the opportunity to be heard and to appeal her expulsion.  Plaintiff refused to participate in the appellate hearing or to avail herself of the appeals process.  Plaintiff cannot not now claim that her rights to be heard and to defend herself have been violated.

In light of the above, Defendant is entitled to judgment as a matter of law.

C.    SUMMARY JUDGMENT IS APPROPRIATE BECAUSE THE PROCEDURES FOLLOWED BY DEFENDANT WERE FUNDAMENTALLY FAIR

Even if Plaintiff could show that that Defendant did not adhere strictly to its own rules and procedures, Plaintiff's claim would still fail because the proceedings followed by the Defendant were fundamentally fair.  In the District of Columbia, the law remains unclear when, if ever, judicial interference is appropriate in matters involving the internal proceedings of a private voluntary organization.  As stated above, Courts are generally hesitant to interfere with the management and internal affairs of a voluntary association. See Levant, 755 A.2d at 1043.  However, in Levant v. Whitley, the District of Columbia Court of Appeals assumed, without deciding, that "intervention would be appropriate when an organization failed to follow its own rules." Id. at 1044.

It is important to note, members of a private organization facing discipline are not entitled to the same type of process afforded by our civil and criminal justice systems. Blodgett, 930 A.2d at 227 (citing National Collegiate Athletic Ass'n v. Tarkanian, 488 U.S. 179 (1988).  "[W]hen courts do interfere they look to common law concepts of fundamental fairness." Id.  "The common law of a fair procedure does not compel formal proceedings with all the embellishments of a court trial, nor adherence to a single mode of process." Id. at 230 (quoting Pinsker v. Pacific Coast Society of Orthodontists, 526 P.2d 253, 263 (1974) (citation omitted)). Instead, "[i]t may be satisfied by any one of a variety of procedures which afford a fair opportunity for [an individual] to present his position." Id.  Courts thus do not affix a rigid procedure that must invariably be observed. Id. "In some cases, for example, it may be adequate to provide an opportunity for 'a mere written response'; in other circumstances, 'a personal appearance by the adversely affected individual and a more extensive hearing [may be] required." Id. (quoting Ezekial v. Winkley, 572 P.2d 32, 39 (1977)).

In <u>Levant</u>, the plaintiff challenged her expulsion as an officer in a private voluntary association. 755 A.2d 1038.  The trial court granted summary judgment in favor of the defendant, and plaintiff appealed. <u>Id</u>.  On appeal, plaintiff argued, that she was entitled to judicial remedy in connection with her expulsion from office, that unfair procedures were followed by the defendant, and that her contractual rights had been breached. <u>Id</u>. at 1039.  The Court of Appeals for the District of Columbia held that the plaintiff had failed to establish a sufficient basis for judicial intervention. <u>Id</u>.  In so holding, the court examined the proceedings leading up to the expulsion of the Plaintiff.

At the outset, the court noted that the only provision directly relating to the removal of plaintiff appeared in the association's constitution, which granted the head of the association the power to arrest or remove any officer or subordinate pending the next session of the Grand Lodge or a Masonic trial assembled for that purpose, whichever is earlier. <u>Id</u>. at 1044-5.  Because the Plaintiff's appeal of her removal was considered at the next session of the Grand Lodge, the requirements were met. <u>Id</u>.  The court held that there had been no deliberate attempt to avoid a trial, and an examination of the procedures revealed no procedural unfairness. <u>Id</u>.

The court also found that following plaintiff's removal, she was provided a detailed written notice of the charges and reasons for her removal. <u>Id</u>.  She was given her first opportunity to be heard when she was asked to specify the reasons for her appeal. <u>Id</u>.  She responded in a detailed letter to the Grievance Committee. <u>Id</u>.  She was given a second opportunity to be heard when she was interviewed. <u>Id</u>.  In addition to speaking with plaintiff, the Grievance Committee interviewed witnesses prior to rendering its decision. <u>Id</u>.  The court thus concluded that the decision was fundamentally fair and not in conflict with designated

procedures, and tainted neither by fraud, nor bad faith, nor arbitrary action. Id. Judicial

intervention was therefore deemed inappropriate. Id. The court noted that its decision was in

accord with Grand Chapter, Order of the Eastern Star v. Klutch, 125 A. 72 (Md. 1924), a

Maryland Court of Appeals case. The court cited with deference the following language from

Klutch: "The judgment of the tribunal created by the Order [of the Eastern Star] should be

regarded as final and conclusive in the absence of any suggestion that the right of the appellee

to a fair and regular hearing was not duly protected. Id. at 74.

In Blodgett, the District of Columbia Court of Appeals again considered the

fundamental fairness in a proceeding involving the expulsion of a member from a private

voluntary organization. In holding judicial intervention inappropriate, the court first reviewed

whether Plaintiff was provided with notice and an opportunity to be heard, as required by the

bylaws. Id. at 226. The court found that both requirements were honored. Id. The court noted

that the investigation committee spoke with several witnesses, including Plaintiff and his

counsel, and that Plaintiff was notified in writing of the specific charges against him. Id.

Plaintiff was also provided a copy of the investigative report, which included a summary of

the interviews conducted by the investigative committee. Id. at 228. A hearing was held on

the matter, where Plaintiff was present, represented by counsel, and given an opportunity to

present a defense. Id. at 226, 228.

Despite this, Plaintiff argued that the proceedings lacked fundamental fairness because

the investigation was pre-determined to result in expulsion. The court held that the evidence

of bias presented by the plaintiff, primarily that two of the members of the Board had made

their decision regarding plaintiff's expulsion prior to the investigation, did not to support a

sufficient factual allegation of bias to warrent judicial intervention. Id. at 228-9. The court

noted that "[m]embers of a voluntary association cannot always expect to find, and more importantly are not entitled to, the type of neutral and disinterested arbiters provided for in judicial proceedings." Id. at 228.  "[I]t is widely accepted that members of a board considering disciplinary charges may have prior involvement in the case. Id. (citation omitted).  Furthermore, a finding of mere bias in the proceedings of social organization is insufficient, without more, to justify judicial intervention. Id. (quoting Werst v. Three Fires Counsil of the Boy Scouts of America. 805 N.E.2d 79, 718 (Ill. App. Ct. 2004) (holding that judicial intervention was not appropriate even where the primary accuser was on the committee that decided to revoke the individual's membership)).

Blodgett also complained that the Board had withheld the identities of witnesses that spoke with the investigating committee. Id. at 229.  "In this context, however, the right to know the identity of one's accusers, or to confront and cross-examine them, is not so well-established as to be a requirement of fundamental fairness." Id.  Although it might have been helpful for plaintiff to know the names of those who had been interviewed, the court found that it was not a requirement of basic fairness. Id. at 230.  As in Levant, the court held that the process was fundamentally fair and that the Plaintiff has failed to present facts that would allow the court to intervene. Id.

More recently, in Jolevare this court considered the suspension proceedings of sorority members who were suspended on allegations of hazing. 521 F.Supp.2d 1.  The court analyzed both whether the sorority had followed its own guidelines in suspending the plaintiffs, as well as whether the procedure was fundamentally fair.  After reviewing the record, the court first found that the sorority had followed its Constitution, Bylaws and Anti-Hazing Policy. Id. at 9-10. The court next found that the plaintiffs were provided notice of the charges, an

investigation was conducted, plaintiffs were given the opportunity to be heard, and were afforded the right to appeal. <u>Id</u>. at 10-1. The plaintiffs had filed suit in the case before the appeal could be conclusively determined. <u>Id</u>. at 11. Thus, the Court held that the plaintiffs could not legitimately complain that they had not been provided fundamental procedural fairness, and that they had failed to raise a genuine issue of material fact as to the breach of contract claim. <u>Id</u>.

Like <u>Levant</u>, <u>Blodgett</u>, and <u>Jolevare</u>, in the instant matter the process leading up to Plaintiff's expulsion from ZPB was fundamentally fair, not in conflict with designated procedures, and free from the taint of fraud, bad faith or arbitrary action. <u>See</u> <u>Levant</u>, 755 A.2d at 1045. The policies and disciplinary proceedings set forth in the ZPB guidelines were complied with at every level. Moreover, the Plaintiff was expressly provided with written notice of the specific charges on at least two (2) occasions, plaintiff provided a formal written response to the charges against her, under the advice of counsel, and she was provided with an opportunity to appear and defend herself via formal hearing. Plaintiff chose not to participate in the hearing or the appellate process. Plaintiff cannot now legitimately claim that the process lacked fundamental fairness.

In light of the above, Plaintiff cannot present sufficient facts that warrant this Court's intervention in the disciplinary decisions of ZPB. As such, Defendant is entitled to judgment as a matter of law.

II.    DEFAMATION

In her Complaint, Plaintiff complains that several statements set forth in a four (4) page letter written by Sheryl Underwood on or about March 12, 2007 constitute defamation. In the area of defamation law, given the risk that even an unmeritorious defamation action

could stifle the open and robust exchange of ideas inherent in the First Amendment, the early sifting of groundless allegations from meritorious claims is an appropriate and necessary judicial function. Meyers v. Plan Takoma, Inc., 472 A.2d 44, 50 (D.C. App. 1983). At this threshold, it is the court's duty to vigilantly stand guard against any encroachment on the fundamental constitutional right of all citizens to speak out on public issues without fear of reprisal. Id.; see also Milkovich v. Lorain Journal Co., 497 U.S. 1, 17 (1990).

Under District of Columbia law, a statement is defamatory if "it tends to injure the plaintiff in her trade, profession or community standing, or lower her in the estimation of the community." Smith v. District of Columbia, 399 A.2d 213, 220 (D.C. 1979) (citations omitted). "A plaintiff bringing a defamation action must show: (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." Beeton v. District of Columbia, 779 A.2d 918, 923 (D.C. 2001). For public figures, the fault element is more stringent. Such plaintiffs must show, by clear and convincing evidence, that a defendant published the defamatory statements with "actual malice--that is, with knowledge that it was false or with reckless disregard of whether it was false or not." New York Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964) (internal quotations omitted); see also Curtis Pub. Co. v. Butts, 388 U.S. 130, 164 (1967) (extending the New York Times actual malice standard for public officials to "public figures"); Tavoulareas v. Piro, 817 F.2d 762, 788 (D.C. Cir. 1987) (finding that actual malice turns on "whether there is clear and convincing evidence to permit the conclusion that the defendant in fact entertained serious

doubt as to the truth of [their] publication") (quoting <u>St. Amant v. Thompson</u>, 390 U.S. 727, 731 (1968)).

In her Complaint, Plaintiff specifically objects to the following statements:

1. "the recommendation to expel Ms. Stark was 'properly' made by members of the Epislon Zeta Chapter." <u>See</u> Complaint at ¶20.

2. "Plaintiff made statements with 'disregard for the truth'"; and

3. Plaintiff was not a whistle-blower because a whistle blower is a person who provides truthful information to a law enforcement officer [in] relation to the commission or possible commission of a federal offense." arise from, acting within the scope of her position with ZPB.

<u>See</u> Complaint at ¶¶20-1.

While it may be convenient to cherry-pick isolated statements, "[t]he truth or falsity of a[n] [alleged] defamatory publication is determined by considering the publication as a whole." <u>Joseph v. Xerox Corp.</u>, 594 F. Supp. 330, 332 (D.D.C. 1984); <u>see</u> <u>also</u> <u>Hoffman v. The Washington Post Co.</u>, 433 F.Supp 600, 602 (D.D.C. 1977). A court should not consider alleged statements as discrete units. <u>Hoffman</u>, 433 F.Supp at 602. The court's function is to determine whether the publication taken as a whole is defamatory, not whether isolated statements, if published by themselves, might be defamatory. <u>Id</u>.

In the instant matter, the complained of statements arise from a March 12, 2007 letter that was written by the Chair of the National Executive Board, Sheryl Underwood, to the Sisterhood of ZPB. The purpose of the letter was to address and clarify the misrepresentations and misunderstandings surrounding the disciplinary action taken against the Plaintiff. <u>See</u> Exhibit 5. The correspondence sets forth the facts giving rise to Plaintiff's expulsion, specifically addresses the Plaintiff's solicitation and involvement with various

media outlets, and responds to the accusations made by Plaintiff to the media and others.  <u>See</u> Exhibit 5.

    A.     <u>PLAINTIFF CANNOT PREVAIL ON HER DEFAMATION CLAIM BECAUSE THE ALLEGED DEFAMATORY STATEMENTS ARE TRUE</u>

Plaintiff has the burden of establishing that the published statement is false.  Truth is a complete defense to a defamation claim. <u>Farrington v. Bureau of National Affairs, Inc.</u>, 596 A.2d 58, 59-60 (D.C. 1991).  Minor inaccuracies do not amount to falsity. <u>Moldea v. New York Times Co.</u>, 22 F.3d 310, 318 (D.C. Cir. 1994).  If the gist or sting of the statement is true, then the statement is justified and the defendant cannot be liable for defamation. <u>Id</u>.

The correspondence in which the statements at issue arise, when taken as a whole, is substantially true.  Plaintiff does not deny that she disclosed the sorority's financial information and information pertaining to Barbara Moore to the media and others. <u>See</u> Exhibit 3 at pp. 43, 52.  She does not deny that she sent members of the media copies of the sorority's credit card statements and financial information. Exhibit 3 at pp. 53.  Plaintiff does not deny that at the time she disclosed such information to individuals outside the sorority that the Barbara Moore matter had been widely discussed within the sorority, that the matter had been the subject of deliberations by the National Executive Board, that NEB had agreed to accept a promissory note from Moore to resolve the issue of repayment, and that the acceptance of the promissory not was ratified by the NEB in a meeting open to all Sorors. Exhibit 3 at pp. 19-20, 29, 55-7.  She does not deny that her disclosures held the sorority up to public ridicule, that they made the sorority the focus of negative media publications, or that the disclosures jeopardized long standing business relationships. Exhibit 3 at pp. 69-70.  Thus, the correspondence, when considered as whole, is substantially true under the law.

Even if the court were to address the complained of statements individually, as they are set forth in Plaintiff's Complaint, the Plaintiff cannot establish a claim for defamation.

Plaintiff alleges that the statement that "the recommendation to expel Ms. Stark was 'properly' made by members of the Epsilon Zeta Chapter" is false because other members of Epsilon Zeta Chapter sent a letter disavowing the recommendation of the suspension. See Complaint at ¶21.  Plaintiff further alleges that ZPB knew the recommendation to expel Plaintiff was not properly made because the Bylaws state "A chapter through its Regional and State Directors [may] request suspension of members…for actions of misconduct and rules violations." Complaint at ¶21.  Plaintiff ignores the fact that the Handbook permits a soror to make a grievance complaint against another soror. Exhibit 4 at p. 80.   Furthermore, Robert's Rules, state that no one should remain a member if his conduct is injurious to the organization. Robert's Rules at §61, p. 624.

As set forth fully above, members of the Ad Committee of the Epsilon Zeta Chapter of ZPB made a formal written grievance complaint alleging acts of misconduct and rules violations on the part of the Plaintiff to the Georgia State Director. Exhibit 13.  This complaint and recommendation was made in strict accordance with the disciplinary proceedings set forth in the ZPB Handbook. See Exhibit 4 at pp.80-1.  Accordingly, the recommendation was proper and the statement that "the recommendation to expel Ms. Stark was 'properly' made by members of the Epsilon Zeta Chapter" is true, and therefore not actionable.

Plaintiff further complains that the statement that "Plaintiff 'was not a whistle-blower' because a 'whistle blower is a person who provides truthful information to a law enforcement officer [in] relation to the commission or possible commission of a federal offense'" is false.

See Complaint at ¶¶11, 21.  Plaintiff's allegations in this regard appear to be based on

Plaintiff's involvement in a Federal Grand Jury Investigation. Complaint at ¶¶11, 21.

However, the statement is qualified by the next sentence in the publication, which states:

"Ms. Stark's disclosure of confidential business information to the media, publication of

confidential business records on the internet, and disclosure of such information in internet

chatrooms does not qualify for whistleblower protection." See Exhibit 5.  The statement is

further qualified by the fact that it states that Plaintiff is not a whistle-blower "as that term is

defined by federal law."  See Exhibit 5.

   In her Answers to Interrogatories, Plaintiff defines a whistle-blower is one who

provides "law enforcement authorities with truthful information relating to the commission,

or possible commission, of any federal offense[15].  See Plaintiff's Answers to Interrogatories

No. 24 (attached hereto as "Exhibit 21").  Plaintiff admits that she never contacted any law

enforcement official regarding Barbara Moore or ZPB. See Exhibit at pp. 59.  Instead, she

chose to disclose the matter to various media outlets and individuals outside the sorority. See

Exhibit 3 at pp 45-6, 52.  Thus, under the Plaintiff's own definition, Plaintiff's actions would

not qualify her for whistle-blower status under federal law.  The statement is therefore true

and not actionable.

   Last, Plaintiff complains that the allegation that she "made statements with 'disregard

for the truth'" is false. Complaint at ¶21.  The Plaintiff fails to identify what statements, if

any, this allegation refers to.  In fact, Plaintiff admits to various statements that she made that

---

[15] According to the Plaintiff, ZPB is subject to the whistle-blower provisions of the Sarbanes-Oxley Act §1107.
Defendant denies that the Sarbanes-Oxley Act would be applicable to it.  The Sarbanes-Oxley Act of 2002,
§1107 (e), actually states: "Whoever knowingly, with the intent to retaliate, takes any action harmful to any
person, including interference with the lawful employment or livelihood of any person, for _providing to a law
enforcement officer any truthful information relating to the commission or possible commission of any Federal
offense_, shall be fined under this title or imprisoned not more than 10 years, or both."

were untrue, including the letter she sent, through her attorney's, to ZPB on November 28, 2006 which denied her participation in the 2/7/2006 and 2/8/2006 WJLA broadcasts. See Exhibit 16.  Plaintiff later admitted that this denial was false. Exhibit 3 at pp. 51-54; see also "I-Team: Sorority Spending Follow-Up" dated March 8, 2007 (attached hereto as Exhibit 22(a)) & "I-Team: Sorority Spending Follow-Up 2" dated March 9. 2007 (attached hereto as "Exhibit 22(b)").

Furthermore, an evaluation of the letter reveals that the Plaintiff once again took the statement out of context.  The statement made by Ms. Underwood was actually as follows: In an unauthorized press release issued by Soror Edda R. Pittman on February 15, 2007 and entitled 'Zeta Phi Beta Sorority, Inc. Expels Whitleblower,' Ms. Stark's quoted statements disregard the truth and confidentiality of Sorority business records." It is clear, that the meaning of the statement is that Plaintiff had ignored the truth and confidentiality of the sorority's own records in her quoted remarks.

In light of the above, it is clear that the alleged defamatory statements  are substantially true and therefore are not actionable.  As such, Defendant is entitled to judgment as a matter of law.

B.    PLAINTIFF CANNOT PREVAIL ON HER DEFAMATION CLAIM BECAUSE THE ALLEGED DEFAMATORY STATEMENTS WERE PRIVILEGED

The District of Columbia recognizes the common-law qualified privilege of self-defense as a complete defense to a defamation claim. Mosrie v. Trussell, 467 A.2d 475, 477 (D.C. 1983); see, also Novecon Ltd. v. Bulgarian-American Enter. Fund, 190 F.3d 556, 566 (D.C. Cir. 1999).  "When the author of a [defamation] writes…for the protection of his own rights or interests, that which he writes is a privileged communication." Id.  "Although the

District of Columbia cases do not expressly set out the requirements for coming within the protection of the self-defense privilege, they do establish the elements of the related "common interest" privilege." <u>Novecon</u>, 190 F.3d at 567 n. 5.   "To be protected by that privilege, 'the statement must have been (1) made in good faith, (2) on a subject in which the party communicating has an interest . . . , (3) to a person who has such a corresponding interest.' <u>Id</u>. (quoting <u>Moss v. Stockard</u>, 580 A.2d 1011, 1024 (D.C. 1990)).

In <u>Novecon</u>, the plaintiff sent letters to members of Congress and was involved in the publication of various media articles alleging theft of business ideas, breach of fiduciary duties, incompetent management, and more on the part of the defendant.  Defendant responded immediately by publishing a letter to the editor illustrating the factual inaccuracies of the plaintiff's allegations. 190 F.3d at 562.  Thereafter, defendant sent a package of materials to 570 individuals and organizations with whom it had dealings. <u>Id</u>. at 563.  A letter included with the materials characterized plaintiff's attacks as an attempt to "extort $200,000 of U.S. Tax payer money" because of a failed business transaction that the defendant rejected because it "turned out to be a veritable 'Brooklyn Bridge' of misrepresentation. <u>Id</u>.  Given the severity of plaintiff's attacks against the defendant, the Court of Appeals for this Circuit held that the defendant was "privileged to respond to those attacks in self defense." <u>Id</u>. at 567; <u>see also</u> <u>Mosrie</u>, 467 A.2d at 479 ("The defendant had the right to repel the attack upon it and to retort upon the assailant if such retort was a necessary part of its defense and fairly arose out of the charges made against it…" (citations omitted).

In this case, it is clear that a qualified privilege exists on the part of ZPB. As stated above, the complained of correspondence was written to the ZPB Sisterhood. The purpose of the correspondence was to address and clarify the misrepresentations and misunderstandings

surrounding the disciplinary action taken against the Plaintiff and to respond to the serious

attacks, including allegations of criminal activity and cover-up, made by the Plaintiff in

various venues, including television broadcasts, news articles, and on the internet.  ZPB had a

duty to its members to provide a thorough explanation and response, defending itself and its

leaders against Plaintiff's allegations.  ZPB published the letter in the good faith belief that it

was necessary to protect the interests of the sorority from what it saw as a false and damaging

attack on its reputation.

Once the privilege is asserted, Plaintiff bears the burden of producing "sufficient

evidence of malice to overcome the privilege. <u>Id</u>. at 566 (citations omitted).  Malice is the

"doing of an act without just cause or excuse, with such conscious indifference or reckless

disregard as to its results or effects upon the rights or feelings of other as to constitute ill will.

<u>Moss</u>, 580 A.2d at 1024.  "District of Columbia law makes it very difficult for a plaintiff to

overcome qualified privilege." <u>Novecon</u>, 190 F.3d at 567.  "[T]he mere existence of ill will

on the part of the publisher toward the subject of the publication does not defeat the

publisher's privilege if the privilege is otherwise established by the occasion and a proper

purpose." <u>Mosrie</u>, 467 A.2d at 477.  Instead, the "court looks to the primary motive by which

the defendant is apparently inspired; and, the fact that [the defendant may feel] resentment

and indignation towards the plaintiff and enjoys defaming him will not forfeit the privilege so

long as the primary purpose is to further the interest which is entitled to protection." <u>Id</u>. at

477-78.  Plaintiff cannot present sufficient evidence to overcome this privilege.

The statements at issue are not "so excessive, intemperate, unreasonable, and abusive

as to forbid any other reasonable conclusion than that the [Defendant] was actuated by

express malice." <u>Novecon</u>, 190 F.3d at 568.  In <u>Novecon</u>, the complained of statement was

that plaintiff attempted to extort $20,000 from of U.S. taxpayer money" for a field business transaction which was a "veritable 'Brooklyn Bridge' of misrepresentations." Id. at 567. Although the court found the statement "harsh and intemperate, it held that it was not so "excessive, intemperate, unreasonable, and abusive" to establish malice by the author. Id.

Similarly, in Mosrie the District of Columbia Court of Appeals held the statements alleging of dereliction of duty and possible criminal abuse, although found to be exaggerated and reckless, to be insufficient to establish malice. 467 A.2d at 477-8.  Despite the fact that the court found evidence that the communications had been inspired by resentment and indignation, the court held that any finding of malice would be based only on speculation, which is not sufficient to send the issue to the jury. Id. at 478.

The same result is warranted here.  The particular publication at issue reflected ZPB's concerns with respect to Plaintiff's attacks in the media and to members outside of the sorority, and reflected ZPB's good faith attempt to respond to what it considered false and injurious attacks on its reputation.  Even if the statements at issue were as harsh or excessive as the statements at issue in Novecon and Mosrie, Defendant's statement was not so "excessive, intemperate, unreasonable, and abusive" to be malicious.

In light of the above, the alleged defamatory statements are protected by privileged. As Plaintiff cannot establish the required degree of malice to overcome the privilege, Defendant is entitled to judgment as a matter of law.

C.    DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFF CANNOT SHOW ACTUAL MALICE

In the instant matter, the Plaintiff is a limited public figure and therefore must show, by clear and convincing evidence, that the Defendant published the alleged defamatory statements with "actual malice." New York Times Co. , 376 U.S. at 279-80.

A limited public figure is an individual who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." Gertz v. Robert Welch, 418 U.S. 323, 352 (1974). Whether a defamation plaintiff is a public figure is a question of law for the court to decide. Dresbach v. Doubleday & Co., 518 F. Supp. 1285, 1294 (D.D.C. 1981). In Waldbaum v. Fairchild Publications, 627 F.2d 1287, 1297-98 (D.C. Cir. 1980), the D.C. Circuit set out a three-part inquiry to determine whether a plaintiff is a limited public figure: (1) whether there is a public controversy, (2) whether the plaintiff played a sufficiently central role in that controversy, and (3) whether the alleged defamation was germane to the plaintiff's involvement in the controversy. See, e.g., Rosenblatt v. Baer, 383 U.S. 75, 88 (1966); Tavoulareas, 817 F.2d at 772; Waldbaum, 627 F.2d at 1293 n.12.

In order to determine whether a public controversy existed, the court must examine if "the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants." Waldbaum, 627 F.2d at 1297. Courts have consistently held that wide-ranging debates concerning national policy questions constitute public controversies. See Tavoulareas, 817 F.2d at 762; see also Lohrenz v. Donnelly, 223 F. Supp. 2d 25 (issue of the role of women in the combat was "public controversy for purposes of evaluating public figure status); Foretich v. Advance Magazine Publishers, 765 F. Supp. 1099 (D.D.C. 1991) (child abuse, women's rights, the intrusion of the state into private affairs, and the limits of punishment for contempt of court are public controversies).

In the instant matter, ZPB is a non-profit organization with over 125,000 members throughout the United States. See Official site of Zeta Phi Beta Sorority-International Website, *available at* http://www.zphib1920.org/leadership/index.htm. "Zeta's national and

local programs include endowment of its National Educational Foundation, community

outreach services and support of multiple affiliate organizations. Id.  Zeta's partnerships and

affiliations include numerous national organizations such as The March of Dimes, American

Red Cross, and NAACP. Id. at http://www.zphib1920.org/partnerships/index.html.

     In this era of Enron, Worldcom, and even Martha Stewart, it is undisputable that corporate

corruption and executive malfeasance are ongoing topics of discourse in the public domain.

Plaintiff's accusations that ZPB and its leaders were guilty of criminal misappropriation of funds,

obstruction of justice, and criminal cover up, places ZPB within that same ambit in the mind of the

general public.  Prior to Defendant's March 12, 2008 correspondence at issue, there were four (4)

separate television reports[16] devoted to the Plaintiff's accusations against ZPB in the Washington,

DC metro area, where ZPB is headquartered. See Exhibits 12(a), 12(b), 22(a), 22(b); Exhibit 4 at p.

7; see also Edda R. Pittman, *Zeta Phi Beta Sorority, Inc. Expels Whistleblower* (February 15,

2007), *available at* http://www.prlog.org/10008282-zeta-phi-beta-sorority-inc-expels-

whistleblower-refuses-to-cooperate-with-federal-investigation.html.  Additionally, transcripts of

the television are readily available on the internet[17].  Plaintiff had also contacted various other

media outlets throughout South Carolina, D.C. and Georgia, and was the primary interviewee in at

least one subsequent article. See Exhibit 3 at p. 52; see also Edda R. Pittman, *Zeta Phi Beta*

*Sorority, Inc. Expels Whistleblower* (February 15, 2007), *available at*

http://www.prlog.org/10008282-zeta-phi-beta-sorority-inc-expels-whistleblower-refuses-to-

cooperate-with-federal-investigation.html.  Through the media coverage, the matter has extended

beyond just the parties involved and has become known not just by Zeta members, but also it

---

[16] In addition to the February 7 & 8, 2006 WJLA broadcasts previously cited, follow-up broadcasts regarding Plaintiff's expulsion, and reiterating the accusations made by Plaintiff regarding criminal activity on the part of Moore and ZPB were aired on March 8 & 9, 2007.

[17] See http://www.wjla.com/news/stories/0307/403930.html; see also http://www.wjla.com/news/stories/0307/404285.html.

partnerships and affiliates, as well as members of the public.  Accordingly, there was a clear public controversy involving the alleged criminal actions of ZPB.

Most limited purpose public figures are designated as such because they "voluntarily inject" themselves into the particular public controversy. <u>Gertz</u>, 418 U.S. at 351. In the instant matter, it is clear that Plaintiff took an active role in bringing this matter to the attention of the public.  She admits that she personally contacted numerous outlets in the hopes of prompting further investigation. Exhibit 3 at p. 63.  She espoused her accusations in on air television reports, on the internet, and in other media outlets. Plaintiff was purposely trying to influence the outcome on issue involving Barbara Moore and ZPB.  <u>See</u> <u>Waldbaum</u>, 627 F.2d at 1297; <u>see also</u> <u>Perks v. Town of Huntington</u>, 251 F. Supp. 2d 1143, 1168 (E.D.N.Y. 2003) (district court found that plaintiff, through his own voluntary and repeated contact with the media, rendered himself a public figure for the purpose of commenting on his lawsuit against the defendants).

Last, as the comments complained of specifically refer to the Plaintiff's participation with the media and her dissemination of the sorority's confidential financial information, they clearly are germane to the plaintiff's involvement in the controversy.  In light of the above, Plaintiff qualifies as a limited-purpose public figure and therefore must show that the Defendant acted with actual malice in the publication of its statements.

Once a district court reaches the issue of "actual malice", it should decide the issue in the first instance on the basis of pretrial affidavits, depositions, or other documentary evidence and grant summary judgment to the defendant unless the court finds that the plaintiff can prove actual malice. <u>Hoffman</u>, 433 F.Supp. at 604 (citing <u>Wasserman v. Time, Inc.</u>, 424 F.2d 920, 922 (1970)). In the summary judgment context, the nonmoving party's burden is to come forward with "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). As a public figure, the plaintiff can survive the defendants' motion for summary judgment only if he can point to record facts from which a reasonable jury could find pursuant to the clear and convincing standard that the defendants published the alleged defamatory statements with actual malice. Id. at 255-56; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Curtis Publishing Co. v. Butts, 388 U.S. 130, 162 (1967) (extending New York Times test to public figures).

A defendant publishes a statement with "actual malice" if it knowingly or recklessly disregards the truth. New York Times Co., 376 U.S. at 279-80 (1964). The standard for actual malice is subjective; "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." St. Amant v. Thompson, 390 U.S. 727, 731 (1968). The court should look to the defendant's own actions and statements, the nature of defendant's sources, and other circumstantial evidence to determine whether defendant entertained a "high degree of awareness of . . . probable falsity." Garrison v. Louisiana, 379 U.S. 64, 74 (1964). The court must focus on the publisher's subjective belief in the truth or falsity of his or her statements. Pearce v. E.F. Hutton Group, Inc., 664 F. Supp. 1490, 1511 (D.D.C. 1987).

In the instant matter, there are no facts on the record to support a finding of actual malice. The publication which contains the alleged defamatory statements was Defendant's attempt to address and clarify the facts surrounding the disciplinary action taken against the Plaintiff and to respond to Plaintiff's attacks upon its reputation. Moreover, the statements contained in the letter were true. Plaintiff has not, and cannot show, the requisite degree of malice to overcome summary judgment. As such, Defendant is entitled to judgment as a matter of law.

III.    NEGLIGENCE

In her Complaint, Plaintiff contends that the Defendant had a duty to abide by its Constitution and policies and procedures, and Defendant negligently breached the same. Complaint at ¶27.   Under District of Columbia law, a plaintiff asserting a claim of negligence must establish that: (1) the defendant owed a duty to the plaintiff; (2) defendant breached its duty; and (3) the breach was the proximate cause of (4) damages sustained by the plaintiff. Jolevare, 521 F. Supp. 2d at 15 (citing District of Columbia v. Cooper, 483 A.2d 317, 321 (D.C. 1984); see also Trifax Corp. v. District of Columbia, 53 F. Supp. 2d 20, 29 (D.D.C. 1999) (applying District of Columbia law and granting a defendant's motion to dismiss a negligence claim where the plaintiff could not demonstrate the existence of a duty)).   Plaintiff has not presented any evidence that raises a genuine issue of material fact that the ZPB owed a duty to her and that such duty was breached.

A.    DEFENDANT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW BECAUSE IT DID NOT OWE A DUTY TO THE PLAINTIFF

The duty owed by the defendant to the plaintiff is the foundation negligence. Id. (quoting N.O.L. v. District of Columbia, 674 A.2d 498, 499 n.2 (D.C. 1995).  If there is no duty, there can be no breach, and therefore no negligence. Id.   Thus, one of the essential elements of a negligence claim is that the complained of conduct invaded some interest of the plaintiff, whether created by common law or statute, which entitles the plaintiff to protection from the defendant. Id. (quoting Wooldridge Mfg. Co. v. United States, 235 F.2d 513, 513 (D.C. Cir. 1956)).   The plaintiff "must specify a negligent act and characterize a duty whose breach might have resulted in negligence liability." Id. (citations omitted).   A "complaint alleging negligence may not rest on mere 'conclusory assertions' as to the existence of any

element of the claim, including duty." <u>Id</u>.   Thus, the plaintiff must allege facts which show that the defendant breached a duty owed to the plaintiff. <u>Id</u>. (internal citations omitted).

In the instant case, the only allegation is that Plaintiff failed to abide by its Constitution and policies and procedures.  Plaintiff has failed to allege any duty owed by ZPB to the Plaintiff, or to cite any authority that establishes a standard of care.  As such, Defendant is entitled to judgment as a matter of law.

> B.    <u>DEFENDANT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW BECAUSE PLAINTIFF CANNOT ESTABLISH A BREACH OF ANY DUTY OWED BY THE DEFENDANT</u>

Even if Plaintiff could establish a duty owed to her, she cannot establish a breach of such duty.  As previously discussed, the record clearly demonstrates that ZPB complied with all of its policies and procedures at every level and that the disciplinary process followed by the Defendant was fundamentally fair As such, Defendant is entitled to judgment as a matter of law.

## CONCLUSION

Plaintiff is the former member of a private voluntary organization who was expelled as a result of conduct that was injurious to the organization.  Plaintiff now seeks the intervention of this Court to overrule the final determination of the Defendant.  However, Plaintiff has presented no basis for judicial intervention into the internal affairs of the Defendant.  Plaintiff cannot establish any deviation from the guidelines, policies or procedures of Defendant that warrant the Court's intervention and the disciplinary procedures followed by the Defendant were fundamentally fair.  Plaintiff also cannot establish the requisite degree of falsity or malice to prevail on her defamation claim.  Finally, Plaintiff

cannot establish a duty owed to her by the Defendant or any breach of a duty, to maintain a claim for negligence.

WHEREFORE, for the foregoing reasons, Defendant, Zeta Phi Beta, Inc., respectfully requests that its Motion for Summary Judgment be granted, and the judgment be entered against the Plaintiff.

MACLEAY, LYNCH, GREGG & LYNCH, P.C.

By:_____/s/ John Lynch_____

John C. Lynch
1629 K Street, NW
Suite 802
Washington, DC 20006
(202) 785-0123
(202) 393-3390 (fax)
Attorneys for Defendant
Zeta Phi Beta Sorority, Inc.

## CERTIFICATE PURSUANT TO LCvR 7(m)

I hereby certify that my office made good faith efforts contact counsel for the Plaintiff, Jimmy Bell, via electronic correspondence on August 4 and 5, 2008, to discuss the foregoing Motion. Counsel for the Plaintiff did not consent to the filing of the Motion.

_____/s/ John Lynch_____
John C. Lynch

## CERTIFICATE PURSUANT TO LCvR 7(f) REQUEST FOR ORAL HEARING

Pursuant to LCvR7(f) of the Local Rules, Defendant Requests an Oral Hearing on its Motion for Summary Judgment.

_____/s/ John Lynch_____
John C. Lynch

| | EXHIBITS TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
|---|---|
| 1. | Zeta Phi Beta Sorority, Incorporated Constitution |
| 2. | Zeta Phi Beta Sorority, Incorporated  Bylaws |
| 3. | Deposition of Natasha Stark dated June 11, 2008 |
| 4. | Handbook of Zeta Phi Beta, Incorporated (11th Ed. 1997) |
| 5. | Letter to Sorors from Sheryl Underwood dated 3/12/2007 |
| 6. | Letter to Sorors from Sheryl Underwood dated March 16, 2006 |
| 7. | Email to mspee58@aol.com from James Stark dated 8/1/05 |
| 8. | Letter to James Stark from Jonathan Charleston dated 11/16/05 |
| 9. | Letter to Jonathan Charleston from Robin Colvin-Leary dated 1/11/06 |
| 10. | Email from Natasha Stark to the South Carolina Black News dated 1/7/06 |
| 11. | Letter to Natasha Stark from Jonathan Charleston dated 1/10/06 |
| 12(a). | WJLA T.V. I-Team: Sorority Spending dated 2/7/2006 |
| 12(b). | WJLA T.V. I Team: Sorority Spending Follow-Up dated 2/8/06 |
| 13. | Memorandum to Chrislyn Turner from members of Epsilon Zeta Chapter dated 9/27/2006 |
| 14. | Letter to Natasha Stark from Chrislyn Turner dated 10/8/06 |
| 15. | Affidavit of Chrislyn Turner |
| 16. | Letter to Barbara Moore from Ryan Goldstein dated 11/28/06 |
| 17. | Letter of Scarlet Black to Plaintiff dated 11/15/2006 |
| 18. | Affidavit of Sheryl Underwood |
| 19. | Letter to Natasha Stark from Sheryl Underwood dated 2/8/07 |
| 20. | Letter to Sheryl Underwood from Natasha Stark dated March 6, 2007 |

| 21. | Plaintiff's Answers to Interrogatories No. 24 |
| 22(a). | WJLA T.V. "I Team: Sorority Spending Follow-Up" dated 3/8/06 |
| 22(b). | WJLA T.V. "I-Team: Sorority Spending Follow-up 2" dated 3/9/07 |
| 23. | Affidavit of Scarlet Black |

# EXHIBIT 1

# CONSTITUTION AND BY-LAWS
OF
## ZETA PHI BETA SORORITY, INCORPORATED

### PREAMBLE

We, a group of college women, organized as the sister Greek letter Sorority to Phi Beta Sigma Fraternity, do hereby bind ourselves together for the purposes of promoting the cause of education by encouraging the highest standards of scholarship through scientific, literary, cultural and educational programs; promoting charitable projects on college campuses and within the community; fostering the spirit of sisterly love and promoting the ideal of Finer Womanhood.

### ARTICLE I
Name

The name of the Organization shall be ZETA PHI BETA SORORITY, INCORPORATED.

### ARTICLE II
Authority

**Section 1. CORPORATE**
Zeta Phi Beta Sorority, Incorporated, shall maintain a non-profit corporate status with perpetual terms to pursue its educational and charitable purposes.

**Section 2. PARLIAMENTARY**
The Constitution and Bylaws govern the proceedings of Zeta Phi Beta Sorority, Incorporated, and is subject to Robert's Rules of Order and the Laws of Incorporation of the District of Columbia and the State of Illinois.

### ARTICLE III
Objectives

**Section 1.**
Zeta Phi Beta Sorority, Incorporated, shall have as its objectives: The fostering of ideals of *Service, Charity, Scholarship, Civic* and *Cultural* endeavors, *Sisterhood* and *Finer Womanhood.*

1

---

1970-1974
Constitution Review and Revision
**ISABEL M. HERSON**
*Grand Basileus*

August 1, 1980
Constitution Revised and Adopted
In Memphis, Tennessee
**JANICE G. KISSNER**
*Grand Basileus*

August 4, 1984
Constitution Revised, Edited and Published
Adopted in Detroit, Michigan
**EDITH V. FRANCIS, Ed. D.**
*Grand Basileus*

July 1990
Constitution Revised and Adopted
in St. Louis, Missouri
**EUNICE S. THOMAS**
*Grand Basileus*

July, 1996
Constitution Revised and Adopted
In Dallas, Texas
**JYLLA M. FOSTER**
*International Grand Basileus\**

July, 1998
Constitution Revised and Adopted
In Atlanta, Georgia
**BARBARA W. CARPENTER, Ph. D.**
*International Grand Basileus*

July, 2000
Constitution Revised, Edited and Adopted
In Philadelphia, Pennsylvania
**BARBARA W. CARPENTER, Ph. D.**
*International Grand Basileus*

January- July, 2001
Researched and Published
In Washington, DC
**BARBARA W. CARPENTER, Ph. D.**
*International Grand Basileus*

v

\*The term "International" was added to the Grand Basileus title in 1996.

**Section 2.**

The implementation of these objectives shall be reflected in national programs that provide training, scholarships, counseling services and project the image of finer womanhood through community action.

To further the objectives of providing scholarships, services and charity, the Organization shall serve in an advocacy role to enhance the service of community programs, by way of volunteer task groups and provide financial assistance to vocational and college students.

**Section 3.**

To assist in carrying out its objectives, the Organization may establish one or more Foundations, separate and apart from its other funds, exclusively for religious, charitable, scientific, literary, cultural and educational purposes, and/or for the prevention of cruelty to animals.

These separate Foundations shall be established by guidelines that will qualify the Organization for exemption under the Internal Revenue Code and contributions to such entities will be tax deductible.

## ARTICLE IV
### Membership

The Sorority membership shall include Undergraduate students matriculating in accredited colleges or universities having programs leading to a bachelors degree; and, graduates from accredited colleges and universities. Persons who have achieved national and/or international distinction and honor through services may also be eligible for honorary membership.

## ARTICLE V
### Chapters and Regions

**Section 1. GRADUATE CHAPTERS**

There shall be chapters in cities and communities known as graduate chapters. They shall be comprised of college and university graduates.

**Section 2. MILITARY GRADUATE CHAPTERS**

Chapters may be formed in a province, territory, country or non-contiguous State.

2

**Section 3. UNDERGRADUATE CHAPTERS**

There shall be chapters located on college campuses.

They shall be comprised of currently matriculating undergraduates.

These chapters shall be known as undergraduate chapters and shall have a graduate advisor within close proximity of the campus for counseling. Their constitution must not conflict with campus rules or sorority guidelines.

**Section 4. METROPOLITAN UNDERGRADUATE CHAPTERS**

A metropolitan chapter of undergraduate status may be authorized upon request for a graduate chapter, in a city where one or more colleges are in operation, but where stipulations prevent the establishment of campus chapters. Applicants must be currently matriculating undergraduates.

**Section 5. REGIONS**

The national constituency shall be divided into nine regions comprised of the representative States and countries.

**Section 6. BYLAWS**

Each region, State (where applicable), and local chapter shall adopt bylaws that are consistent with the National Constitution and Bylaws.

## ARTICLE VI
### Officers and Elections

**Section 1. OFFICERS**

The National Officers of Zeta Phi Beta Sorority, Incorporated are the International Grand Basileus; National First Anti-Basileus; National Second Anti-Basileus; National Third Anti-Basileus; National Grammateus; National Tamias; National Phylacter; Chairman of the National Executive Board; National Chairman of Trustees; four National Trustees; National Graduate Member-at-Large; National Undergraduate Member-at-Large; National Graduate Member to the Executive Committee; National Undergraduate Member to the Executive Committee, Undergraduate Representative, National Nominating Committee, and Regional Directors

**Section 2. ELECTIONS**

a. National officers holding elected positions shall be elected at at a regular meeting the Grand Boulé' (National Leadership Conference) by secret ballot, and shall hold office until respective successors qualify and are elected.

b. Each Region shall have no more than two (2) elected national officers. The office of National Graduate Member-at-Large, National Undergraduate Member-at-Large, Graduate Member to the Executive Committee, Undergraduate Member to the Executive Committee, and the National Undergraduate Representative to the National Nominating Committee are not included, these offices may be filled from any region.

3

c. A term is two (2) years

d. Elected national officers may serve only two (2) consecutive terms in the same office and only three (3) consecutive terms on the board, unless she becomes International Grand Basileus. Members of the Trustee Board are elected for two (2) terms. The International Grand Basileus may serve three (3) terms.

## Section 3. EXECUTIVE BOARD / TRUSTEE BOARD / EXECUTIVE COMMITTEE

a. There should be an Executive Board comprised of the national officers and three (3) most recent past International Grand Basilei.

b. There shall be a Board of Trustees, comprised of the National Chairman of the Trustee Board and four (4) National Trustees, three (3) of whom shall be elected during one Boule' term and two (2) of whom shall be elected during the alternate Boule' term. Each Trustee shall serve for two (2) consecutive Boule' terms and shall not be eligible for re-election.

c. There shall be an Executive Committee comprised of the International Grand Basileus, National First Anti-Basileus, National Grammateus, National Tamias, National Phylacter, Chairman of the National Executive Board, Graduate Member to the Executive Committee, and the Undergraduate Member to the Executive Committee.

## ARTICLE VII
### National Appointments

### Section 1. REGIONAL DIRECTORS
Regional Directors are appointed by the International Grand Basileus. Recommendations may come from the Chapters.

### Section 2. OTHER NATIONAL APPOINTMENT
The International Grand Basileus makes all appointments that are related to the National programs including: national program chairman, legal counsel, resident agents, editor (Antapokritis) and historian (Epistoleus).

## ARTICLE VIII
### Meetings

### Section 1. NATIONAL CONVENTION
a. There shall be a National Convention known as the Zeta Phi Beta Sorority, Incorporated, Grand Boule' (National Leadership Conference). The Grand Boule' shall be held at two (2) year intervals or eighteen months when expediency indicates.

b. The Grand Boule' shall be comprised of financial chapters represented by delegates, National Officers, Life Members and State Directors of Zeta Phi Beta Sorority, Incorporated.

### Section 2. OTHER MEETINGS
There shall be Regional, State (where applicable), chapter, committee and board meetings for the purpose of effectuating sorority policies and programs.

## ARTICLE IX
### Committees

The International Grand Basileus shall appoint all standing committees except the Nominating Committee. She shall be ex-officio of all committees except the Nominating Committee.

### Section 1. STANDING COMMITTEES
Standing Committees are constituted to perform a continuing function. Committee assignments shall be made at the beginning of each administration. There shall be following standing committees:

a. **CREDENTIALS COMMITTEE**
The Credentials Committee shall be responsible for supervising the accreditation and registration of delegates to the Boule' or to the Regional Conferences.

b. **NOMINATING COMMITTEE**
The Nominating Committee shall be comprised of one graduate representative elected by each region. One national undergraduate member-at-large in the nominating committee shall be elected at the Grand Boule' (National Leadership Conference) to serve the ensuing Boule' term. The chairman of the committee shall be responsible for overseeing all nominations of candidates for national office and shall provide guidelines for inherent procedures. No representative shall serve more than two (2) consecutive Boule' terms. The committee shall be responsible for providing profiles of candidates for national offices to all chapters at least sixty (60) days prior to the Grand Boule'.

c. **BOULE' PLANNING COMMITTEE**
The Boule' Planning Committee is comprised of the International Grand Basileus, National First Anti-Basileus, Chairman of the National Executive Board, a Past Grand Basileus, the National Third Anti-Basileus, Boule' Marshal, the host Regional Director, Director of Publicity, and the Basileus of the Boule' host chapter.

d. **ELECTION COMMITTEE**
The Election Committee is responsible for providing guidelines for the efficient operation of voting. Guidelines shall be subject to approval of the Grand Basileus and the Executive Board.

e. **BUDGET AND FINANCE COMMITTEE**
The Budget and Finance Committee shall be comprised of the Budget Director, the National Tamias and the immediate past National Tamias for advisory purposes.

The Budget and Finance Committee shall prepare a budget for the year based upon the income and expenditures of the previous year and give consideration to new requests and anticipated/projected activities. The committee shall make a periodic check of expenditures and compare them to the budget accepted by the membership. The committee shall monitor financial investments of the sorority and make recommendations based on current market trends.

f. CONSTITUTION AND BYLAWS COMMITTEE

The Constitution and Bylaws Committee shall be comprised of the National Phylacter, National Undergraduate Member-at-Large, and a representative from each region. This committee shall have the responsibility to review and recommend revisions to the sorority's Constitution and Bylaws, prepare and amendments for the Constitution and Bylaws approved at Boulé' for publishing and review and approve regional and state bylaws.

g. MEMBERSHIP COMMITTEE

The Membership Committee shall be comprised of the National First Anti-Basileus, the National Directors of Life Members and Reclamation and appointees. The Membership Committee shall have the responsibility for coordinating and disseminating information for life, new, reclaimed, members-at-large and honorary members through their respective subcommittees.

h. EDUCATION AND TRAINING COMMITTEE

The Education and Training Committee shall be comprised of the National Director of Education and representatives from each region. The Education and Training Committee shall pan workshops and conferences as authorized by the Executive Board/Boulé'. It shall be the responsibility of this committee to recommend the site and make all other arrangements as deemed necessary.

## Section 2. BOARD COMMITTEES

The Executive Board is empowered to establish committees to carry out certain functions of the Board.

## Section 3. AD HOC COMMITTEES

Ad Hoc Committees may be established on the National and Regional levels for a specific need or purpose and shall cease to exist when said need or purpose has been served. These committees are appointed by the International Grand Basileus, the Chairman of the National Executive Board and the Regional Directors respectively on the national and regional levels.

## ARTICLE X
### National Educational Foundation

## Section 1. FOUNDATION

The National Educational Foundation is an appendage of and is under the umbrella of Zeta Phi Beta Sorority, Incorporated.

## Section 2. PURPOSE

The sorority shall develop policies that will promote the purposes and activities of the National Educational Foundation, as provided for in the Trust Agreement and Bylaws of the Foundation. The purpose of the Foundation includes encouragement and promotion of education and scholarship, educational research, community service and educational programs.

## Section 3. ORGANIZATION

The National Educational Foundation is governed by its own Trust Agreement and Bylaws which was adopted August 23, 1975 and April 9, 1976. This agreement respectively provides for:

a. A Board of Managers comprised of nine (9) Trustees; four of which are elected by the Sorority and five (5) of which are appointed by the National Executive Board. Of the sorority, preferably Past Grand Basilei. The ex-officio members of the Board of Managers consist of the International Grand Basileus, the National Second Anti-Basileus and the National Third Anti-Basileus of the Sorority.

b. The National Educational Foundation must assume its own financial obligation of printing and dissemination of its material to the constituency as well as all other expenses incurred by it.

c. The Board of Managers shall render accounts of its financial transactions to the sorority annually for approval by the National Executive Board.

d. The sorority shall transfer funds annually to the foundation for scholarships from chapter tax received annually from its chapters.

## ARTICLE XI
### Amendment of the Constitution

## Section 1. REVISIONS

a. Proposed amendments shall be submitted, in writing, by an active chapter. The proposed changes must be set forth in detail and sent to the Executive Board, through the office of the Executive Director, sixty (60) days prior to the Boulé' in session.

b. The Executive Director shall immediately send each chapter copies of the proposed changes or changes thirty (30) days before the opening of Boulé'.

## Section 2. ADOPTION

The proposed amendments or amendments shall be read and voted upon by the assembled delegation at the Boulé' in session. A two-thirds (2/3) vote of the Boulé' assembled shall be necessary to pass the amendment or amendments.

# EXHIBIT 2

# BYLAWS
## OF
## ZETA PHI BETA SORORITY, INCORPORATED

### ARTICLE I
Motto, Colors, Emblem, Badges

**Section 1. MOTTO**
The motto shall be "Omnia Vinci Labore".

**Section 2. COLORS**
The colors shall be Royal Blue and White.

**Section 3. EMBLEM**
The emblem shall be a shield, two flaming torches, the dove of peace, nineteen rays, and five stars to represent the Founders.

**Section 4. BADGES**
a. **The Badge**
The badge shall be the overbar of the Greek Letter Monogram ZΦB and is to be worn only by sorors.

b. **The Guard**
The guard shall be a monogram of the chapter of which the soror is a part.

c. **The Zeta Bar Pin**
The Zeta bar pin is the property of the chapter and must be returned to the chapter after Ritual 2.

d. **The International Grand Basileus Badge**
The International Grand Basileus shall wear a special badge belonging to Zeta Phi Beta Sorority, Incorporated. At the expiration of the tenure, the badge shall be transferred from the retiring International Grand Basileus to the newly elected International Grand Basileus.

### ARTICLE II
Membership

**Section 1. PREREQUISITES**
Intake of perspective members should follow the guidelines as set forth in the handbook under the Membership Selection/Intake Program section.

**Section 2. UNDERGRADUATE MEMBERS**
Members of undergraduate chapters shall be full-time matriculating students in accredited colleges pursuing coursed leading to a baccalaureate degree. They shall have at the time of membership intake a minimum overall average of 2.3 on a 4.0 scale or the average required by the college, whichever is higher.

**Section 3. GRADUATE MEMBERS**
Members of Graduate Chapters shall be comprised of college and university graduate women who have been affiliated with an undergraduate chapter of Zeta Phi Beta Sorority, Incorporated, or who shall be selected from women graduates of accredited colleges or universities. They must be rendering service in their respective communities.

**Section 4. ASSOCIATE MEMBERS**
a. A graduate Soror may be an "associate member" of an undergraduate chapter, if there is no graduate chapter within a 25-mile radius. She must, however, pay graduate per capita fees and be listed as an "associate" member on the financial report of the chapter. A graduate soror may never hold office in an undergraduate chapter.

b. An undergraduate soror may be an "associate member" of a graduate chapter and may be permitted to pay undergraduate per capita tax, for no longer that five (5) years, after which time she must assume full graduate financial responsibilities. No associate member may serve in any basilei position in a graduate chapter.

c. A Soror in a graduate chapter may not serve in any basilei position who does not possess a baccalaureate degree. She must also pay graduate per capita.

**Section 5. LIFE MEMBERS**
a. A Soror seeking life membership must be a financial member of a chapter for a minimum of at least five (5) consecutive years. She must be active with her local chapter and must be recommended by her chapter.

b. A Life Member is entitled to one full vote which may be exercised either as a life member or as a delegate to the National, Regional or State (where applicable) leadership conferences or area meetings.

**Section 6. INACTIVE MEMBERS**
a. Inactive sorors are those who are not financial with their chapter.

b. All Zeta activities for inactive and/or unfinancial Zetas will be limited to the local chapter's discretion.

**Section 7. HONORARY MEMBERS**
a. Women who have achieved national or international distinction and honor, and who are accepted by a majority vote at the Boule', may become National Honorary Members. Honorary membership is awarded only on the national level of Zeta Phi Beta Sorority, Incorporated.

b. Upon acceptance, she becomes a member of Alpha Omega Chapter and is presented a certificate and pin of special design. She may not belong to any other sorority within the Greek Pan Hellenic Counsel.

## Section 8. MEMBER-AT-LARGE

a. A Member-at-Large is a soror who lives more than twenty-five (25) miles from the nearest chapter and pays only national fees.
b. The International Grand Basileus may grant this status to other sorors with extenuating circumstances.
c. She is eligible to receive the Archon, newsletters and periodic communications from National Headquarters that are mailed to the general constituency.
d. She can contribute to the National Educational Foundation.
e. She can register and participate in National, Regional and State (where applicable) Conferences, but *will not* have delegate and/or voting status (even if she is a life member).
f. She can purchase paraphernalia and jewelry from and through National Headquarters.

## Section 9. TRANSFER OF MEMBERSHIP

a. A soror may not hold membership in more than one chapter at a time. They must transfer.
b. Upon graduation from college, an undergraduate member must affiliate with a graduate chapter within one year, in order to maintain active status. She must present a transfer card and a copy of her degree to the membership chair of the graduate chapter into which she is transferred.
   A transfer will be issued to a soror upon written request for transfer to a current chapter. Presentation of a Transfer Reference Card from that chapter and the required fee(s) should be mailed to the Office of Executive Director by the chapter where she seeks affiliation.
c. If a soror's chapter is inactive or if she is unknown to that chapter because of a long absence, she must go before a notary public and swear that she was in good standing at the time she left said chapter. This notarized statement along with written approval from the State (where applicable) and Regional Directors where said chapter was located may be used in lieu of a Transfer Reference Card.
d. A soror must be financial with the National, Regional, State (where applicable) and local levels of the sorority before she can be transferred to another chapter. If unfinancial, she must reinstate with the national office and pay all financial obligations including transfer fees, before she can transfer.

# ARTICLE III
National Officers

## Section 1. POSITIONAL NAMES OF NATIONAL OFFICERS

National Officers of Zeta Phi Beta Sorority, Inc. are: International Grand Basileus; National First Anti-Basileus; National Second Anti-Basileus; National Third Anti-Basileus; National Grammateus; National Tamias; National Phylacter; Chairman of the National Executive Board; National Chairman of Trustees; four National Trustees;

National Graduate Member-at-Large; National Undergraduate Member-at-Large; National Graduate Member to the Executive Committee; National Undergraduate to the Nominating Committee; and the Regional Directors.

## Section 2. QUALIFICATIONS OF NATIONAL OFFICERS

All candidates for national elected positions must be graduates except the following offices: Undergraduate Member-at-Large; Undergraduate Member to the Executive Committee; and National Undergraduate Representative to the National Nominating Committee. All candidates must be active on the local, state and regional levels.

a. **International Grand Basileus / National First Anti-Basileus / National Second Anti-Basileus**
A member nominated or elected to the office of International Grand Basileus, member of the sorority for at least five (5) years preceding her nomination and/or election. She shall at some time have held an elective office in the sorority, have had at least two (2) years of Boule' experience, along with having been elected Basileus, First Anti-Basileus, Second Anti-Basileus, or Third Anti-Basileus of her chapter. She shall have held leadership positions in her region and at least one regional office. The candidate(s) must be involved in community activities unrelated to Zeta Phi Beta Sorority, Incorporated.

b. **National Third Anti-Basileus**
A member nominated or elected to the office of National Third Anti-Basileus must be a recent graduate of not more than two (2) years since her BA or BS degree was awarded. She must be financial and an active member of a chapter prior to nomination or election. She shall have held an office in a chapter and have at least one year regional experience. She shall have had attended at least one regional and one Boule'.

c. **National Grammateus / National Tamias / National Phylacter / Chairman of the National Executive Board / National Chairman of the Board of Trustees / National Trustees**
A member nominated or elected to the office of National Grammateus, National Tamias, National Phylacter, Chairman of the National Executive Board, National Chairman of the Board of Trustees, or National Trustee must be an active member office for which she is nominated. She shall have had at least three (3) years of the Sorority for at least five (5) years, and has had training or experience in the active regional experience.

d. **National Graduate Member-at-Large**
A member nominated or elected to the office of National Graduate Member-at-Large must have been a financial and active member of the sorority for at least five (5) years, and has had experience as an officer of her chapter and region and in other leadership roles. She shall remain affiliated with a graduate chapter for the tenure of her office.

been disclosed or known to the Executive Board at the meeting at which the contract is authorized.

b. The Executive Board may authorize any officer(s), agent(s) of the sorority, in addition to the officers so authorized by the bylaws, to enter into any contract or to execute and deliver any instrument in the name and on behalf of the sorority and to perform other duties deemed necessary. Such authority may be general or may be confined to specific instances.

## ARTICLE IV
### Duties of National Officers

### Section 1. INTERNATIONAL GRAND BASILEUS

The International Grand Basileus shall perform the following duties in addition to those prescribed in Parliamentary Authority adopted by the Sorority and under the laws on Incorporation of Illinois and the District of Columbia. She shall sign all documents and countersign all checks, authorize travel expenses for all officers, authorize expense vouchers for attending Board meeting. She shall approve all applications for charters, and authorize the establishment of chapters. She shall appoint immediately after Boule': Organizations and State Directors. She shall serve as Chairperson of the Executive Committee and ex-officio member of Zeta Phi Beta Sorority's National Educational Foundation Board of Managers. She shall carry out all other duties inherent in her position and any other actions necessary to effectuate the position.

### Section 2. NATIONAL FIRST ANTI-BASILEUS

The National First Anti-Basileus shall assume all duties and responsibilities of the International Grand Basileus in her absence, in addition to prescribed duties as listed by Parliamentary Authority and Laws of Incorporation. She shall receive, examine and approve all applications and transcripts for aspirants. She shall assist in the establishment of new chapters. She shall serve as Membership Chairman and disseminate information relative to reclamation of inactive and unfinancial Sorors through the Regional Directors.

### Section 3. NATIONAL SECOND ANTI-BASILEUS

The National Second Anti-Basileus shall assume the duties and responsibilities of the International Grand Basileus or National First Anti-Basileus in the even of their absence. She shall be an ex-officio member of Zeta Phi Beta Sorority's National Educational Foundation Board of Managers and a member of its Scholarship Committee. She shall carry out all tasks inherent in her position and committee membership.

13

---

e. **National Undergraduate Member-at-Large**
   A member nominated or elected to the office of National Undergraduate Member-at-Large must have been financial and an active member of the sorority for at least one (1) year, and has had experience as an officer of her chapter and other leadership experience. She shall remain affiliated with an undergraduate chapter for the tenure of her office.

f. **National Graduate Member to the Executive Committee**
   A member nominated or elected to the office of National Graduate Member of the Executive Committee shall be a financial and active member of the sorority for five (5) years. She shall remain affiliated with a graduate during the tenure of her office.

g. **National Undergraduate Member to the Executive Committee**
   A member nominated or elected to the office of National Undergraduate to the one (1) year. She shall remain affiliated with an active member of the sorority for tenure of her office.

h. **National Undergraduate Representative to the National Nominating Committee**
   A member nominated or elected to the office of National Undergraduate Representative to the National Nominating Committee shall be a financial and active member of the sorority for one (1) year. She shall remain affiliated with an undergraduate chapter for the tenure of her office.

### Section 3. INSTALLATION OF OFFICERS

Installation of newly elected officers shall take place before the close of the Boule'.

### Section 4. TENURE OF OFFICE

a. **The International Grand Basileus**
   The International Grand Basileus is elected for two (2) consecutive terms in the office without regard to other offices she may have held. She may run for re-election, but shall serve no more than three (3) terms in the office.

b. **Other Elected National Officers**
   All other National Officers, except the National Third Anti-Basileus, may serve on the Executive board no more than two (2) consecutive terms in the same elected office. The National Third Anti-Basileus may only serve one (1) term in the National Executive Board unless they become International Grand Basileus.

### Section 5. CONFLICT OF INTEREST

a. Members, Directors, Officers or Staff Members of Zeta Phi Beta Sorority, Incorporated, should not have interests directly or indirectly in any contracts relating to the operations conducted by the sorority. Nor shall they have any interest directly or indirectly relating to any contracts, furnishing services or supplies to the organization. Contracts may be authorized if such interest have

12

## Section 4. NATIONAL THIRD ANTI-BASILEUS

The National Third Anti-Basileus shall initiate and direct the general program for the undergraduate chapters. She shall coordinate activities and work cooperatively with the faculty advisors and sponsors. She shall assist the International Grand Basileus, National First Anti-Basileus and National Second Anti-Basileus in promoting the welfare of Zeta Phi Beta Sorority, Inc. She shall be ex-officio member of Zeta Phi Beta Sorority's National Educational Foundation Board of Managers.

## Section 5. NATIONAL GRAMMATEUS

The National Grammateus shall be the recorder of the proceedings of the sorority. She shall take the minutes at each Boule'. She shall send copies of the minutes of the Boule' to all chapters within ninety (90) days following the close of the Boule'. She shall take minutes at each meeting of the Executive Board. A copy of the minutes shall be sent to each member of the board within sixty (60) days after the close of the board meeting. All records shall be filed securely at National Headquarters.

## Section 6. NATIONAL TAMIAS

The National Tamias shall be custodian of all monies of the Sorority received from the Executive Director. She shall disburse monies only on approved forms with vouchers countersigned by the International Grand Basileus. She shall keep an accurate record in a ledger of all financial transactions of the Sorority. She shall be bonded under a joint bond with the Executive Director within thirty (30) days after taking office. She shall be a member of the Executive Committee and the Budget and Finance Committee. The records of the Tamias shall be audited annually by a Certified Public Accountant, and this report shall be distributed to all financial chapter of Zeta Phi Beta Sorority, Inc.

## Section 7. NATIONAL PHYLACTER

The National Phylacter shall be present at all meetings of the National body. She shall advise members of the rules and regulations governing the body according to the Constitution and Bylaws of Zeta Phi Beta Sorority, Inc., Robert's Rules of Order (Newly Revised) and the Laws of Incorporation in the State in which incorporated. She to maintain order at all times. She shall serve as ex-officio member for all meetings relative to the Constitution, Bylaws and rules of the Executive bodies of the Sorority (Executive Board/Boule'). She shall be a member of the Committee on Internal Structure, comprised of Regional representatives appointed by the International Grand Basileus. She shall be present and available for consultative services to the International Grand Basileus, National, Regional, State (where applicable) and local officers in activities pertaining to Constitution and policy matters.

## Section 8. CHAIRMAN OF THE NATIONAL EXECUTIVE BOARD

The Chairman of the National Executive Board shall preside at all meetings of the Executive Board, unless circumstances prevent such, thereby empowering the Board to select a temporary Chairman from its members. She shall call meetings of the Board for matters of vital importance between Boule's. She shall approve all bills of expenditures budgeted to the office of International Grand Basileus and in conjunction with the Executive Committee, review the budget of the International Grand Basileus' office as it related to program and budget. She shall carry out all other duties her position and any other actions necessary to effectuate the position.

## Section 9. NATIONAL TRUSTEES

The National Trustees shall perform the duties and responsibilities prescribed in the Laws of Incorporation and Parliamentary Authority adopted by the sorority. They shall care for and administer the National Headquarters in Washington, DC and all other real and personal property heretofore and hereinafter purchased or otherwise acquired by Zeta Phi Beta Sorority, Incorporated.

## Section 10. NATIONAL GRADUATE MEMBER-AT-LARGE

The National Graduate Member-at-Large shall have the responsibility of implementing the directives from the national office. She shall work with the National First Anti-Basileus and graduate chapters in interpreting the national programs for graduate participation. She shall also work with the National Third Anti-Basileus and the Undergraduate Member-at-Large to foster consistency and uniformity between graduate and undergraduate activities. The Graduate Member-at-Large shall the have the responsibility of voicing the concerns of the graduate members.

## Section 11. NATIONAL UNDERGRADUATE MEMBER-AT-LARGE

The National Undergraduate Member-at-Large shall have the responsibility of implementing the directives from the national office. She shall use creative efforts in working with the National Third Anti-Basileus and undergraduate chapters in interpreting the national programs for undergraduate participation. The Undergraduate Member-at-Large shall the have the responsibility of voicing the concerns of the undergraduate members.

## Section 12. NATIONAL GRADUATE MEMBER TO THE EXECUTIVE COMMITTEE

The National Graduate Member to the Executive Committee shall be available to act in matters of the sorority, when the presence of the National Executive Board is not obtainable. She shall work along with the International Grand Basileus, National First Anti-Basileus, National Grammateus, National Tamias, National Phylacter, Chairman of the National Executive Board and the National Undergraduate Member to the Executive Committee, to exercise such powers and functions of the board as provided in the resolution which creates the committee.

### Section 13. NATIONAL UNDERGRADUATE MEMBER TO THE EXECUTIVE COMMITTEE

The National Undergraduate Member to the Executive Committee shall be available to act in matters of the sorority, when the presence of the National Executive Board is not obtainable. She shall work along with the International Grand Basileus, National First Anti-Basileus, National Grammateus, National Tamias, National Phylacter, Chairman of the National Executive Board and the National Graduate Member to the Executive Committee, to exercise such powers and functions of the board as provided in the resolution which creates the committee.

### Section 14. NATIONAL UNDERGRADUATE REPRESENTATIVE TO THE NATIONAL NOMINATING COMMITTEE

The National Undergraduate Representative to the National Nominating Committee shall serve on the National Nominating Committee, which verifies all national nominee credentials.

## ARTICLE V
### Administrative Powers of the National Executive Board

### Section 1. AUTHORITY OF THE NATIONAL EXECUTIVE BOARD

The Executive Board, shall be the supreme authority of the sorority during the interim of a Grand Boule'.

The administrative powers of Zeta Phi Beta Sorority, Incorporated, shall be vested in the National Executive Board which shall be comprised of all elected officers, three (3) most recent past International Grand Basilei and Regional Directors.

### Section 2. DUTIES

a. The Executive Board shall approve the Sorority's annual budget, the budget of all elected officers, project directors, and the office of the Executive Director. It shall be vested with the authority to employ an Executive Director with an adequate staff. It shall maintain and have general supervision of the operation of the National Headquarters, approve all investments of funds of the Sorority, approve all expenditures of the Executive office and other officer not included in the sorority budget.

b. The National Executive Board shall be authorized by resolution adopted by the Board, to appoint an Executive Committee, when deemed necessary to effectuate the purposes of the Sorority. The National Executive Committee is empowered to act in matters of expediency where the presence of the whole National Executive Board is not obtainable. The committee shall exercise the powers and functions of the Board as provided in the resolution, which creates the committee. Delegation of authority to the Executive Committee does not absolve the Board of its responsibilities. The National Executive Committee shall report directly to the National Executive Board.

16

c. The Executive Board may remove any officer for misfeasance, malfeasance, or non-feasance in office; or for conduct that will hold the Sorority up to ridicule or contempt, or bring discredit upon the Sorority. Written charges against the officer shall have been made by registered mail at her last known address and she shall have thirty days to answer the charges prior to any removal action by the National Executive Board. No officer shall be removed from an office unless the accused has been given a hearing before the National Executive Board and her removal in approved by at least two-thirds (2/3) of the elected members.

## ARTICLE VI
### Executive Director

### Section 1. EXECUTIVE DIRECTOR

The Executive Director shall serve as Chief Operating and Administrative Officer of the Sorority. She provides services for the organization in the following area:

a. total management of office operations at the National Headquarters and other administrative needs of the organization

b. professional support services to the International Grand Basileus and members of the National Executive Board as outlined in the job description. The Executive Director is accountable and responsible to the International Grand Basileus and the National Executive Board.

### Section 2. QUALIFICATIONS

a. She must be a member of the sorority in good standing for at least five (5) years.

b. She must possess a bachelors degree (masters preferred) with executive and management skills pursuant to her job description.

c. She must demonstrate the ability to supervise, manage and evaluate a staff

d. She must coordinate, implement and monitor concurrent administrative functions and activities of a complex organization

e. She shall have knowledge of the interrelationship of the Sorority at the Local, State (where applicable), Regional and National levels (based upon experience).

### Section 3. RESPONSIBILITIES

The Executive Director shall coordinate and administrate all activities relative to the implementation of the administrative functions of the organization in compliance with the basic principals and policies of the organization. She shall give specific attention to the development and implementation of procedures to ensure timely responses to incoming correspondence and requests. She shall perform all duties listed in her job description, and institute actions necessary to effectuate her position and maintain efficient procedural operations.

17

## ARTICLE VII
### National Appointments – Administrative

**Section 1. RESIDENT AGENTS**

Zeta Phi Beta Sorority, Incorporated shall maintain a Resident Agent in the State of Incorporation, in the Washington, District of Columbia and in Idlewild, Michigan, having the same status as a State Director. The qualifications shall include legal residency.

**Section 2. LEGAL COUNSEL**

Zeta Phi Beta Sorority, Incorporated shall empower its National Executive Board to engage a legal advisory counsel. Legal counsel shall be present at National Executive board meeting to provide legal advice and handle the various legal matters pertaining to the sorority. This counsel may be comprised of members (lawyers) of the organization. The National Executive Board shall also be empowered to use other legal services if necessary or expeditious.

**Section 3. HISTORIAN**

There shall be an historian of the Sorority whose task is to prepare a narrative account of the Sorority's activities during her term of office. The information will become a part of the Sorority's official history after the National Board and the constituency has approved it. All accounts are the property of Zeta Phi Beta Sorority, Incorporated.

a. Historians are to serve two (2) full terms (four years) and are to be assigned by the Executive Board.
b. Expenses incurred in the presentation of the historical narrative will be borne by Zeta Phi Beta Sorority, Incorporated.

## ARTICLE VIII
### National Appointments – Regional and State Directors

**Section 1. REGIONAL DIRECTORS**

The International Grand Basileus shall appoint the Regional Directors at the end of Boule.

a. QUALIFICATION
i. The Regional Director must be a college/university graduate and have attended three (3) Regional Conferences and two (2) Boule's prior to her appointment.
ii. She must have served on Regional and/or State (where applicable) committees and must have been an elected Regional/State officer.
iii. She must have been an active and financial member in her local chapter for a minimum of seven years.
iv. She must have the ability to organize and coordinate activities within a timetable and must promote implementation of the National Theme.

18

v. She should be affiliated with several charitable, educational and religious organizations.

b. DUTIES
i. She shall perform any duty assigned by the International Grand Basileus, thereby implementing, executing and emphasizing the Sorority's programs.
ii. She shall provide the Region with the dated of Regional and State (where applicable) meetings six months to one year prior to the date of the activity and include a draft of the program, location of events and other logistics.
iii. She shall develop objectives based on National themes and prepare reports for Regional and National meetings.
iv. She is to maintain information on activities, handle problem issues and/or provide technical assistance where necessary to establish open lines of communication within the Region while keeping the International Grand Basileus informed.
v. She shall disseminate information announcing National policy changes and program highlights.

**Section 2. CHAIRMAN OF THE REGIONAL DIRECTORS**

The International Grand Basileus shall select the Chairman of the Regional Directors from within the Regional Directors after Boule'. She shall perform all duties assigned within the perimeters of her position.

a. QUALIFICATIONS
i. She must have one full term of service as a Regional Director within a four (4) year period.
ii. She must have been an active and financial member of the sorority for a minimum of seven (7) years.
iii. She must be involved in activities in the community and the sorority that demonstrates leadership ability.
iv. She must be thoroughly familiar with the Constitution and Bylaws of the sorority and other regulations and procedures at each level of the sorority.

b. DUTIES
The International Grand Basileus will assign duties that are to be performed in conjunction with her duties as a Regional Director.

**Section 3. STATE DIRECTORS**

The State Directors shall appointed by the International Grand Basileus at the end of the Boule' session. Consideration shall be given to the recommendations from the Regional Directors and chapters of the particular state.

a. QUALIFICATIONS
She must have attended at least two (2) Regional Conferences and one Boule' prior to her appointment. Remaining qualifications are the same as those listed under Regional Directors.

b. DUTIES

19

i. The State Director is under the direction of the Regional Director's Office and the Regional Director should approve all planning pertaining to the State's affairs. A draft of the State program must be sent to the Regional Director seven months to one year prior to the event. The State Director shall not implement any projects within the Region without notifying the Regional Director.

ii. On request of the International Grand Basileus and/or Regional /Director, the State Director may be assigned to serve in the place of the Regional Director. The State Director shall assume and perform all responsibilities and tasks inherent in her position.

## ARTICLE IX
### Vacancies – National Officers

Should an elected officer find it necessary to vacate her office, she must submit a letter of resignation to the Chairman of the National Executive Board and the Upon motion and acceptance of the resignation at a Board meeting, the International Grand Basileus shall appoint a person to fill the unexpired term.

## ARTICLE X
### Elections

### Section 1. NATIONAL OFFICERS
Election of National Officers shall be done by secret ballot. All candidates must, meet the qualifications so described in the Constitution and Bylaws of Zeta Phi Beta Sorority, Incorporated and must satisfy credential requirements. Names on ballots for persons in absentia at the Boule' must be eliminated form that ballot and the election.

### Section 2. VOTING
All financial chapters are entitled to voting privileges at Boule'. All chapters vote through their delegates. Alternates do not vote unless delegates are absent at the time of vote. Votes are not transferable and only one is allowed per Soror.

### Section 3. DELEGATES
Apportionment of votes is predicated upon financial membership of chapters and graduate chapter tax.

Members:    up to 4 = 1 vote
5 to 25 = 2 votes
26 to 50 = 4 votes
51 and above = 6 votes

### Section 4. ELECTION COMMITTEE
After the presentation of the slate by the National Nominating Committee, the Election Committee shall be responsible for all details involved in the election process.

## ARTICLE XI
### Meetings

### Section 1. GRAND BOULE'
The National Meeting of Zeta Phi Beta Sorority, Incorporated is called the "The Grand Boule'" (National Leadership Conference). The Boule' is held every two (2) years unless the Executive Board call for an emergency meeting or receives requests from twenty five (25) financial chapter.

### Section 2. EXECUTIVE BOARD MEETINGS
The Executive Board shall meet at least twice (2) between Boule's, six (6) months after and six (6) months before the next Boule'. Five (5) elected members shall constitute a quorum for the Executive Board. All session of the Executive Board shall be open to all financial members except during Executive Session.

### Section 3. TRANSITIONAL BOARD MEETING
A Transitional Board Meeting is to be held in conjunction with the closing Executive Board Meeting at the end of the Boule'. All outgoing Board members must tender all properties belonging to the Sorority to the incoming Board members. Tender or transfer of all properties and records must occur within thirty (30) days of the close of the Boule'. The newly elected and installed officers will begin the new administration at the close of the Transitional Board Meeting.

### Section 4. REGIONAL CONFERENCE MEETING
Regional Conferences shall be held annually. They may be omitted during a Boule' year, if necessary.

### Section 5. STATE MEETINGS
State meetings may be held at least biennially at a time when the Regional Conferences are not in session.

### Section 6. CHAPTER MEETINGS
Graduate Chapters shall hold meetings at least once a month, except during the months of July and August when they may recess. An Advisor or a member of the sponsoring chapter must be present during Undergraduate meetings. Undergraduates holding a meeting without notification and without supervision may be recommended to the State Director for suspension.

# ARTICLE XII
## Organizational Structure

**Section 1. REGIONS**

Zeta Phi Beta Sorority, Incorporated is divided into the following Regions: Atlantic Region, Eastern Region, South Eastern Region, Mid-Western Region, South Central Region, Great Lakes Region, Southern Region, Pacific Region and the West African Region.

**Section 2.**
## UNDERGRADUATE CHAPTERS

a. Undergraduate chapters may be established at accredited colleges within the area in which they located. There must be five (5) or more applicants who meet the requirements for membership into Zeta Phi Beta Sorority, Incorporated.

b. An undergraduate metropolitan chapter may be established in cities when approved by the International Grand Basileus and sponsored by a graduate chapter.

c. An undergraduate chapter may function as long as two (2) or more members remain in good standing with the college and with the National Office.

d. Each undergraduate chapter must adhere strictly to the regulations of sponsoring graduate chapters and the National Constitution and Bylaws. They must not sponsoring any programs or activity without the knowledge and approval of the sponsoring chapter and the graduate advisor.

e. Each undergraduate chapter shall have its own bylaws and shall elect its own officers. They shall have a campus advisor and graduate advisor. The advisor is for the purpose of advising and with the National Office of the sorority registered with the college authorities and assisting the undergraduate chapters in its academic, social and community activities.

**Section 3. GRADUATE CHAPTERS**

a. A graduate chapter may be established when there are two (2) or more Zeta women who have established permanent residence in a community and who will secure permission three (3) or more graduate of accredited colleges and universities who meet the requirements of Zeta Phi Beta Sorority, Incorporated.

b. A graduate chapter may be formed in any city. If the financial membership of the functioning chapter exceeds forty-five (45), a second graduate chapter can be formed, upon recommendation by the International Grand Basileus and with special permission granted by the national executive board. A graduate chapter may not function with less than five (5) financial members on the National roster.

c. Military graduate chapters formed in a province, territory, county, or contiguous State may be established when there are two or more Zeta women who will secure for membership three or more graduates of accredited colleges and universities who meet the requirements of Zeta Phi Beta, Incorporated. A military chapter may not function with less than two (2) financial members on the National roster.

j. Graduate and military chapters will not be allowed to split and form new chapters because of internal problems.

**Section 4. CHAPTER NAMES**

Chapters shall be given single or compound Greek letter names and the name names in sequence as they are chartered. Chapters shall be assigned by the name assigned by National Headquarters.

"Zeta" shall be the last name of every graduate chapter. Chapters shall be identified only by the name

# ARTICLE XIII
## Charters

## ESTABLISHMENT AND PREENTATION OF NEWLY CHARTED CHAPTERS

Chapter can not be officially established or presented until all requirements are met and the charter is received from the International Grand Basileus.

# ARTICLE XIV
## Suspensions

**Section 1. CHAPTER SUSPENSION**

a. Chapters are subject to suspension if there is any infraction of the Bill of Rights or violation of the Constitution and Bylaws or other standard rules and regulations of the sorority.

b. All undergraduate chapters are subject to the rules and regulations of the school in which they are located. Failure to comply with such rules and regulations constitutes an act of misconduct for which the penalty may be invoked by the school authorities, and the chapter is then subject to suspension by the International Grand Basileus, the only officer empowered to suspend.

**Section 2. MEMBERSHIP SUSPENSIONS**

a. A chapter through its Regional and State Directors may request suspension of members for non-payment of the approved Local, State (where applicable), Regional and National taxation, and for actions of misconduct and rule violations.

b. The Executive Board may recommend removal or suspension of any officer for just cause and proof thereof.

**Section 3. HAZINGAND PENALTY**

Physical and corporal punishments are *emphatically prohibited*. If any Chapter or actions against sorors(s) who precipitated and participated in the act and suspend the chapter. Soror engages in such acts or violates the *Bill of Rights* the sorority may take legal

# ARTICLE XV
## Financial Obligations

### Section 1. CHAPTER TAX
Each Chapter is required to pay a yearly National Chapter Tax, due in October, to be used for National scholarships, projects and general expenses. Failure to pay National obligations for two (2) consecutive years will result in Chapter suspension. A Chapter must them pay the required reinstatement fee plus National per capita for each Soror on its roster.

**a. Delinquent Chapters**
Delinquent Chapters are not permitted to vote at the Boule' or Regional and State (where applicable) Conferences.

**b. Initial Chapters**
Chapters do not pay Chapter tax in the year in which they are organized.

### Section 2. PER CAPITA TAX
a. Each Soror must pay National Per Capita tax each year in October (unless she is a Life Member) through her Chapter to be used to defray expenses incurred by National Headquarters.
b. Failure to pay the per capita tax renders a Soror "unfinancial" and she must be listed so on the financial report to the Executive Director.
c. She will not be entitled to any of the privileges of the National body. She may not attend the Boule' as a delegate. She will not be issued a financial card. She may not be appointed to represent Zeta in State (where applicable), Regional or National meetings of any kind. She will not receive the ARCHON.

### Section 3. LIFE AND GOLDEN LIFE MEMBERSHIP FEES
a. All Life Members are assessed a standard annual fee which is expended for publications, scholarships and operational funds for Life Members.
b. Life Members must be financial on all levels.
c. A financial Life Member may obtain Golden Life Membership by paying the entire additional fee to the National Office through her local chapter.

### Section 4. NATIONAL FEES
All National financial obligations shall be paid during the ensuing term. Honorary members are not obligated to pay dues on any level but can make financial contributions to the sorority.

### Section 5. REINSTATEMENT FEE
**a. Local Taxation**
The local chapter has the right to determine its local reinstatement fees, separate and apart from National Reinstatement.

**b. National Taxation – Graduates**
The National body's reinstatement fee is based on the current fees established by the Executive and the National Constituency. The standard rate of per capita tax must also be included in the process of reinstatement and both fees are to be mailed simultaneously through the chapter.

### Section 6. LOCAL CHAPTERS
Each Chapter shall make its own budget and establish local fees within the framework of its bylaws. The Chapter has a right to classify its members as "active" or "inactive" according to chapter bylaws.

### Section 7. REGIONAL FINANCE
Each Chapter is to pay a chapter tax to the Region and each Soror is to pay a Regional tax as stipulated by the Regional constituency according to the Regional needs and the Regional Constitution and Bylaws.

### Section 8. NATIONAL OFFICERS BUDGETS
All National Officers must submit a proposed budget foe their office, subject to approval by the Executive Board.

# ARTICLE XVI
## Bank Accounts

### Section 1 CHECKING AND SAVINGS ACCOUNTS
The National Executive Board is empowered to maintain checking and savings accounts for the National body, and whenever possible, establish investment plan. The Sorority must maintain a voucher system by which all withdraws is made and all expenditures are paid.
a. Three officers' signatures shall be on file, any two (2) of which shall validate checks.
b. The officers to validate checks shall be the International Grand Basileus, First Anti International Grand Basileus and the Tamias. The primary officers for validating all checks shall be the Basileus and the Tamias. The First Anti-Basileus validates checks only when the International Grand Basileus is unavailable.
c. All elected officers or employees receiving or disbursing corporate funds shall be bonded for the total value of the Organization within thirty (30) days of their election or employment.

## Section 2. SPECIAL ACCOUNTS

**a. Boule' Fund**

A special Boule' account is to be opened each Boule' year by National Headquarters, for the express purpose of depositing income and paying all Boule' expenses. As soon as all expenses have been paid, the account shall be closed under the authorization of the National Executive Board. Host chapters will be responsible for operating their own accounts, but must maintain accurate records of all monies pertaining to the Boule'.

**b. Special Restricted Funds**

All restricted funds must be deposited in a special restricted account to be disbursed when required and authorized by the National Executive Board.

## ARTICLE XVII

Auxiliaries

### Section 1. AMICAE

Amicae is the name given to the organized group of woman interested in Zeta's ideals and activities. The Amicae, Friends of Zeta, serve as an auxiliary to one or more local Graduate Chapters of Zeta Phi Beta Sorority, Incorporated and are designated by the name of the city. There shall be only one auxiliary in a city and all chapters in the city will cooperate as sponsors. Amicae auxiliaries are comprise of non-degrees women who have participated in and contributed to charitable, religious and educational activities.

**a. Dues**

The Amicae shall pay no dues to Zeta Phi Beta Sorority, Incorporated, except special fees established by the Executive Board. They shall establish their own financial system of operation, and can make contributions to the Sorority and its foundations.

**b. Government**

i. The Amicae shall be governed by the rules and regulations prescribed by the National body and a Local sponsoring chapter of Zeta Phi Beta Sorority, Incorporated, and the Local constitution of Amicae according to Robert's Rules of Order.

ii. They shall formulate and adopt a Local constitution, which shall be in accordance with national regulations and which shall be approved by the sponsoring Zeta chapter.

iii. There must be at least one Zeta appointed to advise the group, be present at all meetings and be responsible for clearing all activities of the Amicae through the sponsoring chapter.

iv. The Amicae should participate in and be acknowledged at all public Zeta affairs. Amicae shall not sponsor any public affairs without the approval and cooperation of the sponsoring chapter.

v. Amicae are not to participate in Zeta meetings of any kind unless by special invitation and for some specific purpose.

**c. National Director**

i. A National Director of Amicae Affairs shall be appointed each Boule' term by the International Grand Basileus. The Regional Director shall appoint a Regional Director of Amicae Affairs where there are at least five (5) organized groups of Amicae. The Directors of Amicae Affairs shall be members of Zeta Phi Beta Sorority, Incorporated.

ii. Amicae shall not meet on a National level unless such a meeting is approved by the National Executive Board and held in concurrently with a Boule'.

### Section 2. YOUTH GROUPS

Youth Groups consist of young people pre-kindergarten to grade 12, who have become identified with Zeta Phi Beta Sorority, Incorporated. These groups, recognized by the names Archonettes, Amicettes, and Pearlettes, are organized where there is an active Zeta Chapter and shall function with an advisor from that chapter.

**a. Objective**

The objective of the youth groups is to introduce young people to the ideals of Zeta Phi Beta Sorority, Incorporated, and ensure the continued growth of the Sorority.

**b. Potential Members**

Potential members are youth who, after an introduction to the program, express interest in belonging while striving for the ideals of Zeta Phi Beta Sorority, Incorporated, demonstrates potential for good citizenship, scholarship and leadership.

## ARTICLE XVIII

Amendment and Suspension of Bylaws

### Section 1. AMENDMENT OF BYLAWS

The Bylaws may be amended at a regular business meeting of the Boule' by a two-thirds (2/3) vote. Notice of amendments shall be submitted in writing to the members through the office of the Executive Director sixty (60) days prior to the regular meeting of the Boule'.

### Section 2. SUSPENSION OF BYLAWS

The Bylaws may be suspended at a regular business meeting of the Boule' by two-thirds (2/3) vote. Bylaws relating to business procedures, transaction of business, rules of order and other standing rules not requiring a ballot vote, may be suspended.

# EXHIBIT 3

## Capital Reporting Company

Page 10

1          THE WITNESS:  This is the current

2     constitution and bylaws of Zeta Phi Beta

3     Sorority, Incorporated.

4          Q     (By Mr. Lynch)  Thank you.  And I have

5     taken a portion -- I have the entire copy here, just

6     by virtue of comparison, but can you identify that

7     document?

8          A     This is the current handbook of Zeta Phi

9     Beta Sorority, Incorporated.

10          Q     Okay.  In referring to Stark Exhibit No.

11     1, I believe this was the Sixth Edition of

12     Constitution and Bylaws which was in effect as of

13     2001.  Do you concur with that?

14          A     Yes.

15          Q     And with regards to Stark Exhibit No. 2,

16     this is the Eleventh Edition, 1997, which has been

17     in effect since that date; is that correct?

18          A     Yes.

19          Q     When did you become a member of the

20     Epsilon Zeta Chapter?

21          A     January 1993.

22          Q     Was this before or after you graduated

23     from Georgia State?

24          A     Immediately upon graduation.

25          Q     Was that a requirement that you be a

## Capital Reporting Company

1    graduate, or could you have joined during your

2    undergraduate years?

3         A     I joined during my undergraduate years.

4         Q     Okay.  Can you explain the difference to

5    me between a financial member and a nonfinancial

6    member?

7         A     A financial member is a member who pays

8    their dues by October 31st of every year.  A

9    nonfinancial member is a member who has not paid

10   their dues by October 31st of every year.

11        Q     With regards to undergraduates, are

12   undergraduates required to pay dues?

13        A     Yes.

14        Q     So if you're a nonfinancial member, does

15   that mean that you're a member in good standing, or

16   does that mean that you're a member that has not

17   paid their dues?

18        A     It means you are a member who has not paid

19   the dues.

20        Q     And you can correct or change the status

21   from nonfinancial to financial really by paying your

22   dues; correct?

23        A     Yes.

24        Q     In the last four or five years, what were

25   the annual dues to be a member of the Epsilon Zeta

## Capital Reporting Company

Page 12

1    Chapter?

2         A      $250.

3         Q      And you became a member in 1993, and at

4    all times you were a financial member of the

5    sorority since that date and up until 2007?

6         A      A member of what?  The sorority or the

7    chapter?

8         Q      Okay.  The chapter is a branch of the

9    national sorority; is that a fair statement --

10        A      Yes.

11        Q      -- for me to make?  Okay.  Were you a

12   member of the chapter from -- a financial member of

13   the chapter from 1993 on?

14        A      A financial member of the graduate

15   chapter.

16        Q      Of the graduate chapter.  Okay.  Now, did

17   you ever hold any leadership positions within the

18   chapter?

19        A      Yes.

20        Q      Okay.  Would you tell me about those?

21        A      I was the Archonnette youth advisor 1993

22   to 1994.  I was the chapter second vice president

23   from 2003 to 2005.

24        Q      At the national level did you ever hold

25   positions of authority?

## Capital Reporting Company

1   all?

2        A       There would have been in regards to

3   typical Zeta business, but as far as what those

4   communications consisted of, you would have to

5   contact the president and the secretary for those

6   records.

7        Q       Okay.  Was any communication made by

8   Sister Black to the chapter pertaining to the issues

9   surrounding Barbara Moore?

10       A       You would have to ask the president and

11  the secretary.

12       Q       You don't have any individual recollection

13  of a contact being made?

14       A       Not in 2005.

15       Q       Okay.  When did you first become aware of

16  any issues surrounding Barbara Moore?

17       A       Me personally?

18       Q       Yes.

19       A       Away from the chapter or as part of the

20  chapter?

21       Q       Either way.  Both.

22       A       I became aware in January of 2004 at the

23  national executive board meeting.

24       Q       And what did you learn at that time?

25       A       That Barbara Moore had used the American

**Capital Reporting Company**

Page 20

1    Express card for personal use.

2        Q    Now, does that help to refresh -- now,

3    outside of the sorority, did you learn anything more

4    with regards to Barbara Moore?

5        A    Not outside of the sorority.

6        Q    You learned within the sorority that there

7    had been an alleged misuse of the American Express

8    card by the grand basileus?

9        A    She stated it herself.

10       Q    Okay.  All right.  And what meeting was

11   it, again, that you learned that in?

12       A    The national executive board meeting in

13   January of 2004.

14       Q    What is the Virtual Volunteer fund?

15       A    I do not know.

16       Q    You do not know?  You do not recall that

17   in March of 2005 Scarlet Black contacted your local

18   chapter pertaining to the Barbara Moore issue?

19       A    No.

20       Q    In September 2005, did you have an

21   encounter with the chapter basileus pertaining to

22   the Virtual Volunteer fund?

23       A    No.

24            MR. BELL:  Objection.  What chapter?

25            MR. LYNCH:  Ms. Stark's local chapter.

# Capital Reporting Company

1           MR. BELL:  We can (inaudible) hard copy, I

2       have no problem.  We can move on.

3           MR. LYNCH:  Okay.  Could you hear him?

4           (Discussion off the record.)

5       Q       (By Mr. Lynch)  What do you remember about

6    your interactions with the local chapter basileus in

7    2005?

8       A       There's nothing remarkable about them in

9    2005.  There's nothing in 2005 that was problematic.

10       Q       Okay.  I'm going to show you what has

11    been -- what I will have marked as Stark Exhibit No.

12    3.

13           (Defendant's Exhibit Stark 3 was marked

14       for identification purposes.)

15       Q       (By Mr. Lynch)  Have you ever seen this

16    document before?

17       A       No.

18       Q       You never have?

19       A       No.

20       Q       Okay.  It contains a listing of various

21    incidents and activities that occurred between you

22    and various members of your local chapter during the

23    course of 2005 and 2006, but you have not seen this

24    before?

25       A       No.

**Capital Reporting Company**

Page 29

1        Q      And who did you give them to?

2        A      I gave them to the secretary to give back

3    to the chapter in 2006.

4        Q      Did you send any e-mails to the tamias

5    pertaining to the financial records?

6        A      Yes.

7        Q      Okay.  Do you have copies of those

8    e-mails?

9        A      No.

10       Q      Why not?

11       A      I didn't keep it.

12       Q      They have been deleted from your files?

13       A      Yes.

14       Q      Okay.  Do you recall the chapter basileus

15   suggesting that the local chapter not get involved

16   in the matters pertaining to Barbara Moore unless

17   the request came from the Southeast regional

18   director?

19       A      Yes.

20       Q      Okay.  What do you recall about that?

21       A      There was a discussion at one of the

22   meetings.  I believe that it was a blanket statement

23   that the chapter would not, and the basileus

24   continued on with business.

25       Q      Well, how did you feel about that?

## Capital Reporting Company

Page 34

1      A      Board of Regents, University System of

2      Georgia.

3      Q      How long did he have -- what position did

4      he hold there?  I'm sorry.

5      A      Internal auditor.

6      Q      How long did he hold that position?

7      A      Three and a half years.

8      Q      Who or what is mspee@aol.com?

9      A      That is Pauline Gibson.

10     Q      Who is Pauline Gibson?

11     A      The New Jersey state director.

12     Q      New Jersey state director for the

13     sorority?

14     A      Yes.

15            MR. LYNCH:  This will be Stark's Exhibit

16     4.

17            (Defendant's Exhibit Stark 4 was marked

18     for identification purposes.)

19     Q      (By Mr. Lynch)  I want to show you what

20     has been marked as Stark Exhibit 4 and ask you if

21     you can identify that document.

22     A      It is an e-mail from James Stark to

23     mspee58@aol.com.

24     Q      Why was that e-mail sent?

25     A      I asked that it be sent.

# Capital Reporting Company

Page 41

1  broken out and sent in a series of e-mails.

2      Q      Okay.  Now, was your husband helping you

3  to investigate the financial matters pertaining to

4  the national sorority?

5      A      No.

6      Q      So his involvement extended solely to

7  sending these two e-mails out?

8      A      Yes.

9      Q      You just may have saved your husband

10 having to be deposed today, so at least something

11 good came out of it.

12          MR. LYNCH:  Could you mark this.  I think

13     we're at -- this will be Stark 5.

14          (Defendant's Exhibit Stark 5 was marked

15     for identification purposes.)

16     Q      (By Mr. Lynch)  I'm going to show you a

17 copy of what has been marked as Stark Exhibit No. 5.

18 Can you identify that document?

19     A      No.

20     Q      Okay.  This is a letter that comes from

21 the law firm of Deming Parker, D-e-m-i-n-g,

22 addressed to Jonathan Charleston, and in it it says

23 in the second paragraph that in response to a cease

24 and desist letter from Mr. Charleston on behalf of

25 the sorority, it states, "Mr. James D. Stark II has

**Capital Reporting Company**

Page 43

1    shared any of this information with any federal or

2    local authorities, had you?

3          A     No.

4          Q     Okay.  All right.  I'm going to mark -- I

5    will take that back.  Thank you.

6                MR. LYNCH:  Could you mark this as No. 6,

7          please.

8                (Defendant's Exhibit Stark 6 was marked

9          for identification purposes.)

10         Q     (By Mr. Lynch)  I'm going to show you what

11   has been marked as Stark Exhibit No. 6 and ask you

12   if you can identify that.

13         A     Yes.  It is an e-mail that I sent to South

14   Carolina Black News.

15         Q     Okay.  Were you a subscriber to the South

16   Carolina Black News?

17         A     No.

18         Q     Okay.  Did the South Carolina Black News

19   have anything to do with regards to the sorority?

20         A     No.

21         Q     Okay.  Who did you know at the South

22   Carolina Black News?

23         A     No one.

24         Q     All right.  Why did you feel it was

25   necessary to contact the South Carolina Black News

**Capital Reporting Company**

Page 45

1    board to enforce the policies and procedures

2    outlined in the financial procedures manual.

3         Q    Okay.  Now, at this time you hadn't

4    contacted any local or federal authorities, had you?

5         A    No.

6         Q    Okay.  What additional information did you

7    provide to the South Carolina Black News, other than

8    this e-mail?

9         A    None.

10        Q    Did anyone from the South Carolina Black

11   News contact you?

12        A    No.

13        Q    So this e-mail went off into the Internet,

14   and you got no response to it whatsoever?

15        A    Not from the South Carolina Black News.

16        Q    Who did you get contacted by?

17        A    Jonathan Charleston.

18        Q    Okay.  And do you know how Mr. Charleston

19   came into or became aware that this e-mail had been

20   sent?

21        A    No.

22        Q    So no one contacted you from the South

23   Carolina Black News?

24        A    No.

25        Q    You received no correspondence back from

Page 46

1    them?

2          A      No.

3          Q      No telephone calls?

4          A      No.

5          Q      Okay.  Did you send anything additional,

6    other than this e-mail, to the South Carolina Black

7    News?

8          A      No.

9          Q      You did not send any of the financial

10   records that you had?

11         A      No.

12         Q      Okay.  Why not?

13         A      I received no response.

14         Q      Okay.  Now, where was this e-mail sent

15   from?

16         A      It was sent from my home computer.

17         Q      Okay.  You sign it -- well, to the extent

18   that e-mails are signed, you sign it Natasha W.

19   Stark, ICD Project Coordinator, Department of

20   Criminal Justice, College of Health and Human

21   Sciences, Georgia State University.  Is that

22   typically the way you would sign e-mails coming from

23   your home?

24         A      The e-mail server that I used was the work

25   e-mail server.

## Capital Reporting Company

1              MR. LYNCH:  Okay.  Now, I will have this

2       number -- would you have this marked as 7, and

3       this is Stark 8.

4              (Defendant's Exhibit Stark 7 and 8 were

5       marked for identification purposes.)

6       Q    (By Mr. Lynch)  All right.  I'm going to

7    show you what has been marked as Stark Exhibit No.

8    7, and I'm going to ask you if you can identify

9    that.

10       A    No.

11       Q    Okay.

12       A    Yes.

13       Q    You can identify it?

14       A    Yes.

15       Q    What do you recognize about that?

16       A    This is a letter that was sent to my

17    husband by Jonathan Charleston.

18       Q    All right.  Why was that letter written to

19    your husband?

20       A    You would have to ask him, but I presume

21    in response to the e-mail that he sent to Pauline

22    Gibson.

23       Q    And that e-mail was the one pertaining to

24    having information pertaining to Barbara Moore; is

25    that correct?

## Capital Reporting Company

Page 49

1    A    The letter is written to my husband, who

2  is not a member of the organization.  This did not

3  come to me.

4    Q    The letter -- you already testified the

5  e-mail was sent at your request.  You said your

6  husband was home and you asked him to do it.  The

7  letter was sent to your husband.  You did not

8  interpret that to mean that it was directed at you

9  as well?

10    A    No.

11    Q    Okay.  Let me show you what is marked as

12  Stark Exhibit 8.  I will take that one back.  Okay.

13  Do you recognize that letter?

14    A    Yes.

15    Q    Okay.  And for the record, that's a letter

16  dated January 10th, 2006, from The Charleston Group

17  directed to you; correct?

18    A    Yes.

19    Q    Okay.  Now, what is the import of this

20  letter?  Why was this letter written?

21    A    This letter was written in response to the

22  e-mail that I sent to South Carolina Black News.

23    Q    Okay.  And what did you understand

24  Mr. Charleston wanted you to do with regards to the

25  topic of this letter?

**Capital Reporting Company**

Page 50

1    A    He -- my understanding was that he was

2    accusing me of distributing false, malicious libel

3    and defamatory statements and that I would be sued

4    if I did not stop doing so.

5    Q    Okay.  And what effect, if any, did this

6    letter have on your future activities?

7    A    None.

8    Q    Okay.  Why didn't it have any effect on

9    you?

10    A    Because I was not distributing false,

11    malicious libel -- libelous or defamatory

12    statements.

13    Q    But you were no longer trying to work

14    through this problem, this problem that you

15    perceived within the organization itself; is that

16    fair for me to say?

17    A    Yes.

18    Q    You had decided it was necessary to go

19    outside the organization in order to effectuate what

20    you hoped to effectuate, which was the removal of

21    Barbara Moore; is that correct?

22    A    Yes.

23    Q    All right.  I will take that back.  Thank

24    you.  Prior to your husband's contact with

25    Ms. Gibson and your effort to contact the South

# Capital Reporting Company

1    Carolina Black News, had you contacted anybody else?

2         A    No.

3         Q    All right.  Had you spoken with anybody

4    outside of the sorority about the internal financial

5    matters of the national chapter?

6         A    No.

7         Q    After you sent the letter to -- or the

8    e-mail to the South Carolina Black News, did you

9    contact any other media outlets?

10        A    Several.

11        Q    Okay.  Who were they?

12        A    I do not know that specifically.  I do not

13   recall that.

14        Q    You do not recall that?

15        A    No.

16        Q    Was one of them WJLA in Washington, D.C.?

17        A    Yes.

18        Q    Okay.  And who did you deal with there?

19   Who did you speak to?

20        A    I received a -- I believe a phone call

21   from an Andrea McCarren.

22        Q    How did Andrea McCarren know to contact

23   you?

24        A    The TV station in Washington, D.C.,

25   received the same e-mail that was sent to South

## Capital Reporting Company

Page 52

1    Carolina Black News.

2         Q    Okay.  So when we're talking about that

3    e-mail, we're talking about Stark Exhibit No. 6; is

4    that correct?

5         A    Yes.

6         Q    All right.  So who else did you send this

7    e-mail to besides -- besides the South Carolina

8    Black News?

9         A    An assortment of newspapers, radio

10   stations and TV stations in D.C., Atlanta, and South

11   Carolina.

12        Q    Okay.  Can you name some of those radio

13   and television stations?

14        A    Not off the top of my head.  I would have

15   to go back and look up what are the local stations

16   in those areas.

17        Q    How many separate organizations do you

18   estimate that you contacted?  How many television

19   stations in the Washington, D.C., area, for example?

20        A    The three big ones.

21        Q    Okay.  NBC, ABC --

22        A    NBC, ABC, CBS, yes.

23        Q    And here in Atlanta?

24        A    Same thing.

25        Q    Okay.  You sent them all the exact same

**Capital Reporting Company**

Page 53

1    e-mail?

2         A     Yes.

3         Q     Or more detailed?

4         A     Exact same.

5         Q     Okay.  And the only person to follow up

6    was McCarren?

7         A     Yes.

8         Q     Okay.  So McCarren called you.  What is

9    her first name?  I'm sorry.

10        A     I believe it's Andrea.

11        Q     Andrea McCarren.  Andrea McCarren called

12   you in response to this e-mail?

13        A     Yes.

14        Q     All right.  What happened then?

15        A     We discussed -- we discussed the e-mail

16   that I had sent.  She asked what proof I had.  I

17   told her that I had copies of the American Express

18   card statement.  She asked would I be willing to

19   share those with her.  I told her yes.

20        Q     Okay.  And did you forward copies of the

21   American Express statements to her?

22        A     Yes.

23        Q     Okay.  Did you forward any other

24   information pertaining to her?

25        A     No.

**Capital Reporting Company**

Page 54

1        Q      All right.  When you say you sent just the

2    American Express card records, this showed purchases

3    of items, you know, like pantyhose and wigs and

4    things of that nature; is that correct?

5        A      Yes.

6        Q      Amongst other things?

7        A      Yes.

8        Q      But did you provide Ms. McCarren or

9    anybody else with a narrative of how you had pieced

10   these things together?

11       A      No.

12       Q      Okay.  Did you do that orally over the

13   phone with her?  You know, this all began -- let me

14   tell you the story about Barbara Moore.  This all

15   began in 2002.  Did you do it that way?

16       A      I believe that I did.

17       Q      Okay.

18       A      I believe so.

19       Q      Okay.  Would you tell me that same story,

20   please, that, you know -- you learned of this in

21   2004.  That's what you have told me.

22       A      Yes.

23       Q      What was the story that you told

24   Ms. McCarren?

25       A      I do not recall my exact words, so --

Page 55

1       Q       I don't expect you would.

2       A       -- I would have to paraphrase.

3       Q       Please.

4       A       But what I would have said was that the

5   board became aware of this problem in January of

6   2004, that in the ensuing years the board has done

7   nothing to address the problem.  In January 2006

8   there was a vote of the board to basically cover it

9   up, to bury it, and that, you know, it was -- things

10  were now at a point that if we were to deal with

11  this and get it resolved, it was going to have to be

12  done through other means.

13      Q       And one of the means that you chose was to

14  contact the various media outlets; correct?

15      A       Yes.

16      Q       Now, didn't the board or Barbara Moore

17  enter into a promissory note to pay back a certain

18  sum of money?  Were you aware of that?

19      A       Yes.

20      Q       And wasn't that action ratified by the

21  board?

22      A       Yes.

23      Q       All right.  But you were not content with

24  that promissory note or with the ratification of

25  that action by the board?

Page 56

1      A      No.

2      Q      Had you stopped dealing with the sorority

3    leadership at this point in time, or did you have

4    anyone on the national executive committee -- am I

5    saying that -- the national executive board; right?

6    Did you have anybody that you were talking with

7    there who you shared your opinions with regards to

8    Barbara Moore?

9      A      Several people.

10     Q      Who were they?

11     A      All of them?

12     Q      Yeah, who on the board basically was not

13   satisfied --

14          MR. BELL:  Objection.  At what time

15       period?  What time period are we talking about?

16          MR. LYNCH:  Okay.  I will get that.

17     Q      (By Mr. Lynch)  At the time that you

18   learned that the board entered into -- or the

19   sorority entered into a promissory note agreement

20   with Ms. Moore, were there members of the board with

21   whom you were speaking that were dissatisfied with

22   that arrangement?

23     A      Yes.

24     Q      Who were they?

25     A      The national first anti, Kim Sawyer.

Page 57

1    Can't remember who was second.  Can't remember who

2    was third.  The past grand, Jylla Moore Foster.

3    The --

4         Q    I'm sorry, just let me get that down.  The

5    past grand?

6         A    Past grand.

7         Q    Jillian?

8         A    Jylla, J-y-l-l-a, Moore Foster.  The

9    second anti, Sheryl Williams.  The phylacter, Alma

10   Washington.  Legal counsel, Susan Dorsey.

11        Q    Now, did they all indicate to you or -- if

12   you know, if you know.  Did they all vote against

13   this settlement with Ms. Moore with regards to the

14   promissory note?

15        A    I don't know.

16        Q    But you believe that they were as upset

17   about Barbara Moore's activities as you were?

18        A    Yes.

19        Q    Fair for me to say?

20        A    Fair for you to say.

21        Q    Okay.  But nonetheless, the sorority via

22   the national executive board entered into this

23   agreement with Barbara Moore, and they wanted to

24   move on.  You made the determination that, well,

25   that's not good enough, I'm going to go out, and,

**Capital Reporting Company**

1    inurement.  The board was not in a legal position to

2    allow her to pay any money back.

3         Q    Okay.  I understand that, but at the time

4    that you sent out this e-mail to the Black News

5    Network and the other various networks, you hadn't

6    contacted any authorities; is that correct?

7         A    That is correct.

8         Q    Okay.

9              MR. BELL:  Are we talking about January

10    2006?

11             MR. LYNCH:  Correct.

12             MR. BELL:  Okay.

13             MR. LYNCH:  All right.  Okay.  I will have

14    this marked as -- I think I'm up to No. 9.

15             (Defendant's Exhibit Stark 9 was marked

16    for identification purposes.)

17        Q    (By Mr. Lynch)  Okay.  Ms. Stark, I'm

18    going to show you what I have marked as Exhibit No.

19    9 and ask if you have ever seen this.

20        A    Yes.

21        Q    Okay.  Would you identify the document for

22    me, please?

23        A    It is the transcript of the WJLA

24    investigative report.

25        Q    Okay.  Now, how many separate

## Capital Reporting Company

Page 63

```
1         A     Yes.

2         Q     So Dee Dee Wright was just as upset with

3    this whole thing as you were, I take it?

4         A     Yes.

5         Q     Do you still talk with Dee Dee Wright?

6         A     Yes.

7         Q     Does she live in Atlanta?

8         A     Not at this moment.

9         Q     Okay.  Did she live in Atlanta?

10        A     Yes.

11        Q     All right.  Is she still a member of the

12   sorority?

13        A     Yes.

14        Q     I asked you this question, but why is it

15   that you did not want to be identified?

16        A     Because I didn't want to be identified.

17        Q     What was your goal with regards to this

18   broadcast?

19        A     To have the financial dealings

20   investigated.

21        Q     Okay.  Further than they had been

22   investigated?

23        A     Yes.

24        Q     All right.  Were you shown the broadcast

25   before it was aired?
```

Page 64

1        A        No.

2        Q        You were not shown the broadcast before it

3    was aired?

4        A        No.

5        Q        Did you see it on the day that it was

6    aired?

7        A        No.

8        Q        You did not see it.  Now, let me mark this

9    as -- I will take that, Ms. Stark, just to keep

10   these things in order.  This will be Stark No. 10.

11               (Defendant's Exhibit Stark 10 was marked

12          for identification purposes.)

13       Q        (By Mr. Lynch)  I'm going to show you what

14   has been marked as Stark Exhibit No. 10, which is

15   entitled "I-Team: Sorority Spending Follow-Up,"

16   dated February 8, 2006.  Okay?

17       A        Yes.

18       Q        It purports -- it purports that the

19   sorority is now under the investigation of federal

20   law, the scrutiny of federal law.  Do you see that

21   sentence?  "International organization, known for

22   its good work in the community, is now under the

23   scrutiny of federal law enforcement."  Do you see

24   that?

25       A        Yes.

Page 69

1    March of Dimes on my behalf.

2         Q    How did the March of Dimes, if you know,

3    become aware of the situation surrounding the

4    financial matters of the sorority?

5         A    I don't know.

6         Q    You have no idea?

7         A    I don't know.

8         Q    All right.  Did Dee Dee Wright contact

9    them?

10        A    I do not know.

11        Q    Okay.  Did you come to find out that the

12   March of Dimes had become aware of the situation?

13        A    Yes.

14        Q    How did you learn that?

15        A    I was sent a copy of a letter from the

16   March of Dimes telling the sorority that they had

17   become aware of the situation.

18        Q    How did you get a copy of that?

19        A    It was sent to me via e-mail.

20        Q    By whom?

21        A    I don't know.

22        Q    Do you still have a copy of that e-mail?

23        A    No.

24             MR. LYNCH:  The letter -- let's mark it --

25        this will be marked as 11.

Page 70

```
 1              (Defendant's Exhibit Stark 11 was marked
 2         for identification purposes.)
 3         Q    (By Mr. Lynch)  I show you a copy of that,
 4    which has been marked as Stark Exhibit No. 11.  Is
 5    this a letter that you were sent via e-mail?
 6         A    Yes.
 7         Q    And you don't know who sent it to you?
 8         A    No.
 9         Q    All right.  And this is a letter dated
10    February 15th, 2006?
11         A    Yes.
12         Q    Directed to the attention of Ms. Sheryl
13    Underwood, and it shows copies to Ms. Lois Sylver.
14    Do you know who Ms. Lois Sylver is?
15         A    She used to be the national executive
16    director.
17         Q    Of the March of Dimes?
18         A    Of Zeta Phi Beta Sorority.
19         Q    And where is she now?
20         A    In Washington.
21         Q    Is she still a part of the sorority?
22         A    Yes.
23         Q    Okay.  In an emeritus position or --
24         A    I don't know.
25         Q    Okay.  Also a copy to R. Jonathan
```

Page 76

1       A       If a vote -- if a vote --

2       Q       Were taken?

3       A       -- were to be taken.

4       Q       Okay.  Then it would be -- majority would

5    rule; correct?

6       A       If a vote were to be taken.

7       Q       So if there were 30 members on the

8    committee and the vote was 16-14, the motion would

9    pass; correct?

10      A       If that was the vote count.

11              MR. LYNCH:  Okay.  Fine.  I can take that

12      back from you.  Thank you.  We will mark this

13      as Stark 13.

14              (Defendant's Exhibit Stark 13 was marked

15      for identification purposes.)

16      Q       (By Mr. Lynch)  Ms. Stark, I'm going to

17   show you what has been marked as Stark Exhibit No.

18   13 and ask you if you can identify that.

19      A       Yes.

20      Q       Okay.  And this letter is a letter dated

21   October 8th, 2006.  Can you further describe the

22   letter for me, please?

23      A       It is a letter from the state director of

24   Georgia, Chrislyn Turner, telling me that she was

25   suspending me.

Page 80

1  that indicates that those names with an asterisk are

2  not financial members?

3       A     I see that note.

4       Q     Okay.  Well, let's go through those names.

5  Do you know any of those people personally?  And if

6  you don't mind, let me just look over your shoulder

7  since I only have the one copy.  Was Latessa -- is

8  that her name? -- Hill a financial member?

9       A     In November of 2006, I do not know.

10       Q     Okay.  Do you recognize -- can you read

11  any of these other names?  Are there any names here

12  that you recognize?

13       A     I recognize all of the names.

14       Q     Okay.

15       A     I cannot speak to their financial status

16  in 2006.

17       Q     Okay.  At the time that this letter was

18  written?

19       A     At the time that this letter was written.

20       Q     Is it fair for me to say that if they were

21  not financial members, as we discussed earlier, then

22  they would not be voting members; is that correct?

23       A     That is correct.

24       Q     Okay.  I'm going to leave that copy with

25  you.

**Capital Reporting Company**

Page 81

1          MR. LYNCH:  Mark this as 15, please.

2          (Defendant's Exhibit Stark 15 was marked

3      for identification purposes.)

4      Q      (By Mr. Lynch)  I'm going to show you what

5  has been marked as Stark Exhibit No. 15 and ask if

6  you can identify that letter.

7      A      Yes.

8      Q      Okay.  What is it?

9      A      It is a letter from my attorney to Barbara

10  Moore.

11      Q      Okay.

12      A      In response to the letter Chrislyn Turner

13  wrote to me.

14          MR. BELL:  Objection.  Do you want to make

15      clear for the record what attorney she's

16      talking about?

17          MR. LYNCH:  Okay.  This is a letter dated

18  November 28th, 2006, from the law firm of

19  Deming Parker directed to Barbara C. Moore,

20  national president.

21          MR. BELL:  I just wanted to make sure the

22  record is clear.

23          MR. LYNCH:  Sure, I understand.

24          MR. BELL:  Thank you.

25          THE WITNESS:  This was written by attorney

**Capital Reporting Company**

Page 82

1          Ryan Goldstein of Deming, Parker, Hoffman,

2     Green & Campbell.

3          Q     (By Mr. Lynch) Right.  Okay.  Now, in

4     response to the letter from Ms. Turner, you went to

5     Deming Parker; is that correct?

6          A     Yes.

7          Q     Okay.  So you basically retained counsel

8     to now represent you in this matter, and they wrote

9     this letter on your behalf in response to the

10    charges brought by the letter, the previous letter;

11    correct?

12         A     Yes.

13         Q     All right.  Under No. -- on page 2, No. 2,

14    second full sentence, it says, "Mrs. Stark

15    acknowledges that she sent an e-mail to the South

16    Carolina Black News and that this is the e-mail that

17    was read during the Boule.  However, Mrs. Stark

18    denies any active participation in the WJLA

19    broadcast."  As we have turned out, that's not true;

20    is that correct?

21         A     That is correct.

22         Q     Okay.  It's your position that the

23    information you were disclosing was not sensitive

24    nor confidential in nature; is that correct?

25         A     Yes.

OF

# 𝔛𝔢𝔱𝔞 𝔓𝔥𝔦 𝔅𝔢𝔱𝔞 𝔖𝔬𝔯𝔬𝔯𝔦𝔱𝔶,
# 𝔍𝔫𝔠𝔬𝔯𝔭𝔬𝔯𝔞𝔱𝔢𝔡



## ELEVENTH EDITION
## 1997

Dr. Barbara West Carpenter, Grand Basileus

## Handbook Committee

Cassandra Black - National Phylacter - Chairman
T. Diane Phillips - Chairman of the Executive Board
Vercilla A. Brown - National Executive Director
Barbara West Carpenter - Grand Basileus - Ex-Officio



DEFENDANT'S
EXHIBIT

Stark 2

SMS 6/11/08

PENGAD 800-631-6989

# INTRODUCTORY STATEMENT

Every organization, from time to time, reviews or prepares its guidelines for updating its activities for operation. Time brings about changes and people must adjust to these changes if progress is to be made. We cannot afford to continue to operate successfully as we did a decade ago without accepting change. Zeta Phi Beta Sorority, Incorporated, exercises its privilege and the opportunity to review, revise, and update its operational procedures. This places the Sorority in focus with present day interests and demands and yet adheres to the aims, and actions developed by it during its history, without being in conflict with our National Constitution and By-Laws. These guidelines will serve as standardized Operational Procedures for Zeta Phi Beta Sorority, Inc.

# PURPOSE

The purpose of this book is to provide guidelines for effective functioning of the activities as they relate to Operational Procedures for Zeta Phi Beta Sorority, Inc. Specifically, it will guide the Chapters in operating according to official procedures. It is geared toward both the graduate and collegiate chapters.

It is hoped that the character and variety of forms and illustrations herein will enable chapters to cope adequately with the unusual situations with which they may be confronted. The materials which have been prepared will often answer many questions. "What shall I say?", "How shall I say it?" and will save numerous hours of anxious moments.

Every workman exercising or performing the role of leadership or fellowship should be provided with proper tools for implementation. Hopefully, this information will give generous amounts of guidance in each phase of its operation.

It is understood that each chapter will have circumstances unique to itself; yet, all chapters are expected to adhere to all parts of the ritual, as nearly as possible, as set forth by this handbook. Hence, it is strongly recommended that the entire book be read carefully with attention given to the changes as they appear.

2

# NATIONAL HEADQUARTERS

## 1734 New Hampshire Avenue, N.W.
## Washington, D.C.

The National Headquarters is a red brick building, decorated with gray stone. It has three stories and a basement. The first floor contains approximately 5,000 square feet of usable space including an entrance vestibule, a double staircase with a mezzanine balcony overlooking the master ballroom, two large parlors, two fireplaces, a powder room, large dining room and a large sun parlor. The floors are parquet.

The second floor consists of a conference room (25 feet by 18 feet) and five other large rooms which are used for the National Office and the National Educational Foundation. Other rooms are shared by the Grand Basileus and Executive Director for offices or living quarters. There are also two halls and two and a half bathrooms.

The third floor contains one bedroom, seven offices, a prayer room, kitchen, one storage room, two halls, and two and a half bathrooms. The basement contains a massive recreation room, a powder room, men's room, and several storage rooms.

Other features include a rathskeller room and patio leading from the recreation room, a four-car garage and an iron door, a lot containing 6,000 square feet and two large parking lots close by. Headquarters is accessible to the entire city and within close distance to the White House.

Because of its proximity to the White House, government offices, capitol, embassies, and the Metro Transportation System the National Headquarters continues to increase in value. The area has been designated as an historic section of our nation's capitol.

7

## IV. Establishment of Chapters

Chapters shall be officially established only after the Charter and proper forms are received from the Grand Basileus.

NOTE: All chapters shall pay fees as designated by the financial committee: their failure to pay national obligations for two consecutive years will subject them to chapter suspension. The chapter must pay the required fee plus national per capita for each soror for reinstatement.

# GRIEVANCE/COMPLAINT INVESTIGATION PROCESS

There is an increasing tendency for disagreements or complaints to arise between a soror or chapter and/or governing bodies within or outside the sorority. This process defines investigation steps, activities and officer or governing body roles at local, state, regional and national levels.

Complaints can arise from a soror, chapter, state, region, school official, law officer, attorney, or community member against another soror, chapter, state, region, school official, or community member.

Complaints can be made on the basis of a violation or noncompliance with chapter, state, regional or national Zeta Phi Beta Sorority, Inc. Constitutions or By-Laws, policies, procedures or customs, school policies, the Probate Bill of Rights, and/or applicable municipal, state or federal law. Complaints must be made within 45 days, as applicable, and in writing.

The current national Constitution and By Laws of Zeta Phi Beta Sorority, Inc., supercede all other sorority chapter, state and regional constitutions and By Laws, only to be superceded by municipal, state and/or federal law.

Complaint investigations will be conducted at different steps that reflect the organization of the sorority. It is the duty of all sorority officers and governing bodies to uphold the Sorority Constitution and By Laws. Activities at each step should take place within 30 days, as applicable.

Step 1 - Chapter Basileus and/or Chapter Executive Committee and/or Undergraduate Chapter Sponsor or Advisor
Step 2 - State Director or her designee
Step 3 - Regional Director or her designee



...um, no less than 3, no more than 5, to mediate final conflict review with outcomes reported to National Executive Board and Chapters. Final decisions binding on all parties concerned.

The investigation of complaints that arise against a soror or governing body at any one level will begin at the next step. The investigation of officers by the Executive Board will remain as detailed in the National Handbook.

At each step, an investigation or review of the complaint facts occurs to determine if governing rules, policies or laws have been followed or violated.

Investigation activities may include, but are not limited to: procuring statements, written or verbal: making telephone calls or on-site visits; convening meetings or hearings; and/or procuring and reviewing documents.

Expenses that arise from these or any other activities will be reimbursed only if they are authorized in advance, by the applicable soror or governing body with the authority to do so. Receipts will be required for all expenditures.

Resources that may be available to sorors or governing bodies in the investigation include the: Executive Director, National Phylacter or National Legal Counsel. Complaints involving attorneys will be referred to the National Legal Counsel through the Executive Director.

All determinations will be in writing. Records of complaints at Steps 3 - 5 should be filed at National Headquarters or with other officers as applicable.

Complaint determinations may include the following corrective actions at Steps 1-4, cease and desist orders, reversals of decisions, withholding membership privileges (voting, attending or participating in meetings/programs or holding office); and at Step 5. suspensions of sorors or chapters or revocation of membership.

... .... ..... .. ..... ...... ..... ... ...... .....

B.  All Undergraduate Chapters are subject to the rules and regulations of the school in which they are located. Failure to comply with such rules and regulations constitutes an act of misconduct for which a penalty may be invoked by the school authorities, and the chapter is then subject to suspension by the Grand Basileus who is the only officer empowered to suspend.

## MEMBER SUSPENSION

A.  A chapter through its Regional and State Directors may request suspension of members for nonpayment of the approved local, regional and national taxation, and for actions of misconduct and rules violations.

B.  The Executive Board may recommend removal or suspension of any officer for just cause and proof thereof.

## HAZING AND PENALTY

Physical and corporal punishment are emphatically prohibited during the membership intake process. If any chapter or soror engages in such acts or violates the Aspirant's Bill of Rights which may evoke lawsuits against Zeta Phi Beta Sorority, Inc.  The Sorority will take legal action against the chapter(s) and/or sorors who precipitated and participated in the act. (See Appendix "Aspirants.")

All undergraduate chapters must adhere strictly to the regulations of sponsoring graduate chapters and the National Constitution and By-laws. They must not sponsor any program or activity without the knowledge and approval of their sponsoring chapter and graduate advisor.

Undergraduate chapters or members that do not comply with the program and activities of the sponsoring graduate chapter or the National Constitution and By-laws may be placed on probation with the appropriate documentation and approval of the State and Regional Directors.

82

# EXHIBIT 5





**Zeta Phi Beta Sorority, Inc.**
INTERNATIONAL HEADQUARTERS
1734 New Hampshire Avenue, N.W.
Washington, D.C. 20009
(202) 387-3103 • Fax (202) 232-4593
E-MAIL: ZETANATLHQ@WORLDNET.ATT.NET

**Barbara C. Moore**
*INTERNATIONAL GRAND BASILEUS*
**Sheryl Underwood**
*CHAIR, NATIONAL EXECUTIVE BOARD*

*Established 1920*
TM

March 12, 2007

Dear Sorors:

Once again, our Sorority's internal matters have been disclosed to the public by individuals we know to be associated with Zeta Phi Beta Sorority, Inc. ("ZPB"). This time the disclosure of the Sorority's confidential business information involves the expulsion of Natasha Y.W. Stark from the Sorority. It is not the policy of ZPB to disclose information pertaining to disciplinary proceedings involving a Soror. Unfortunately, the facts and circumstances involving the disciplinary action taken against Mrs. Stark have been misrepresented or misunderstood and requires clarification to protect the Sorority.

The recommendation to expel Mrs. Stark was properly made by members of Epsilon Zeta Chapter (Atlanta, Georgia), the Georgia State Director and Southeastern Regional Director. See Natasha Y.W. Stark website at www.mediamax.com/nywilliams, StarkSuspensionLetter-1.pdf. The request to expel Mrs. Stark was then presented to the National Executive Board ("NEB") for actions of misconduct and rules violations, all in accordance with (i) Article XIV, Section 2 of the Bylaws of Zeta Phi Beta Sorority, Inc.; (ii) Article II, Section 2 of the Constitution of Zeta Phi Beta Sorority, Inc. ("Constitution"); (iii) the Grievance/Complaint Investigation Process of the Handbook of Zeta Phi Beta Sorority, Inc. (11th ed.); and (iv) Section 61 of Robert's Rules of Order Newly Revised (10th ed.) ("Robert's Rules").

Mrs. Stark was notified of the charges against her by letter dated February 8, 2007 ("Notice"). The Notice was delivered to Mrs. Stark by Federal Express on February 10, 2007 and requested that she notify the Appeals Team as to whether she intended to participate in the hearing on or before February 20, 2007. She was also notified that the hearing would proceed in her absence if she failed to appear. Mrs. Stark did not respond to the Notice until March 8, 2007 at which time she advised the Appeals Team that she was unable to attend the hearing and requested permission to participate in the hearing by telephone. Due to the sensitivity of the hearing and the recommendation by Robert's Rules that the hearing be held in executive session, the request to participate by telephone was not allowed.

The Appellate Hearing was held in executive session on March 9, 2007 before the Appeals Team consisting of six (6) Sorors in accordance with the formal trial procedures set forth in Robert's Rules to determine the validity of the charges against Mrs. Stark. *See* Constitution, Article II, Section 2; Robert's Rules § 61, pp. 638-641. Based upon the testimony of witnesses and evidence presented, the Appeals Team, in a unanimous vote, found Mrs. Stark guilty of the charges and specifications detailed in the Notice.

Letter from Sheryl Underwood
Chair, National Executive Board
Zeta Phi Beta Sorority, Inc.
March 12, 2007
Page 2

While ZPB has endeavored not to make known to nonmembers of ZPB any information obtained through its investigation or trial of the charges against Mrs. Stark, she appears to have made every effort to publicly disclose these internal matters. In the Sorority's notice to Mrs. Stark dated February 8, 2007, she was advised that **"ZETA DOES NOT AUTHORIZE OR DIRECT ANY OF ITS OFFICERS, DIRECTORS OR MEMBERS TO MAKE PUBLIC THE CHARGES OF WHICH AN EXPELLED MEMBER IS FOUND GUILTY OR DISCLOSE ANY OTHER DETAILS CONNECTED TO THE CASE."** Notwithstanding, Mrs. Stark published and disseminated the Notice on the internet. It is important to note that the only person that was given a copy of this Notice was Mrs. Stark. Distribution of the letter was intentionally limited to Mrs. Stark to avoid the risk of any disclosure of the Notice, or of the charges contained therein. Equally important, was the effort of the Sorority to protect Mrs. Stark's privacy.

On March 8, 2007 and again on March 9, 2007, WJLA-TV 7 in Washington, DC broadcast stories regarding matters pertaining to the expulsion of Mrs. Stark from the Sorority. WJLA-TV 7 reported on March 8, 2007 that Mrs. Stark was the source of the stories broadcast last year on WJLA-TV 7 stating that *"Natasha Stark did not want her face shown in this report that ABC 7 aired in February 2006."* (Mrs. Stark appeared in the broadcast in disguise to conceal her identity). See www.wjla.com/news/stories/0307/403930.html. Interestingly, Mrs. Stark's attorney stated by letter to ZPB dated November 28, 2006 that Mrs. Stark *"denies any knowledge"* with respect to last year's WJLA broadcasts regarding ZPB. Mrs. Stark's lawyer further stated that *"Mrs. Stark denies any active participation in the WJLA broadcast."* Based upon the most recent report of WJLA-TV 7, the statement made by Mrs. Stark's lawyer on her behalf is clearly <u>false</u>. As I stated in my letter to you dated February 13, 2006, a member of the Sorority secretly communicated with various media, falsely accusing the NEB of being involved in a criminal cover-up regarding as a result of resolutions of the NEB made at the January 2006 Board meeting with respect to the handling of certain charges made to the Sorority's American Express Card. The Soror being referred to was Mrs. Stark. These reckless and defamatory allegations were made even though the NEB deliberations regarding the American Express Card were conducted in an <u>open</u> meeting and heard by all Sorors in attendance at the NEB meeting.

As previously stated, Mrs. Stark's lawyer <u>admits</u> that Mrs. Stark sent an email to the South Carolina Black News, which email was read during the 2006 Boule'. The email to the South Carolina Black News dated January 7, 2006 sent by Mrs. Stark stated as follows:

*"I am a member of Zeta Phi Beta Sorority, Inc., a 501(c)(7) organization headquartered in Washington, DC. I have in my possession information and documentation showing that the national president, Barbara C. Moore, has embezzled more than $300K of the organization's money via misuse of the sorority's corporate AMEX card. Efforts to resolve this matter internally have failed miserably. <u>17 members of the national executive board, under the leadership of comedienne Sheryl Underwood who serves as chair of the board,</u>*

Letter from Sheryl Underwood
Chair, National Executive Board
Zeta Phi Beta Sorority, Inc.
March 12, 2007
Page 3

*are conspiring to assist Barbara Moore with covering up this outrage so that she can remain national president (and avoid going to jail).* *The information that I have is contained in a 44 MB winzip file and is too large to email in one shot. However, if this story interests you, I will be happy to provide one of your reporters with a series of emails (about 9) with the information that I have. I can be reached at 770-722-0979 anytime or at the contact information below M-F 8:30-5-15. Thank you. Natasha W. Stark ICD Project Coordinator, Department of Criminal Justice, College of health and Human Sciences, Georgia State University, 1273 Urban Life Building Atlanta, Georgia 30303 (404) 651-3921 – phone (404) 651-3658 – fax."*

It is important to point out that at the time Mrs. Stark disclosed the Sorority's confidential business information to the South Carolina Black News, WJLA-TV 7 and in various internet chatrooms, the issue involving the use of the American Express Card by the Grand Basileus had already been widely discussed within the Sorority, had been the subject of deliberations by the NEB, and a lawful resolution had already been reached by the NEB through acceptance of a promissory note from the Grand Basileus.

The broadcasts by WJLA-TV 7 also impacted the Sorority's long-standing relationship with the March of Dimes. According to the March of Dimes, they received information from an individual (who we have reason to believe was Mrs. Stark and which belief is supported by affidavit) regarding the American Express Card issue. In its February 15, 2006 letter to ZPB, the March of Dimes stated as follows:

*"[a]fter the airing of the ABC television story last week, we have also decided not to make any new financial grants and awards or further cash disbursements on existing grants, pending receipt of satisfactory assurances to the aforementioned requests."*

While we were able to successfully resolve the concerns of the March of Dimes, the longstanding relationship between ZPB and the March of Dimes was needlessly impacted.

You may recall from my previous communications that the Executive Committee of the NEB met in Crystal City, Virginia on April 15, 2005 to discuss the American Express related issues. A motion was made and properly carried by the Executive Committee that the Sorority accept the proposal of a promissory note from the Grand Basileus to resolve the matter of repayment. Although the Grand Basileus chairs the Executive Committee, this motion was carried with Soror Kim D. Sawyer, former First Anti-Basileus, acting as Chair. The action taken by the Executive Committee was ratified by a majority of the NEB by ballot on April 21, 2005. During a session of the NEB meeting open to all Sorors in attendance which occurred on January 6 through January 7, 2006, a motion was properly carried to ratify the ballot action taken by the NEB on April 21, 2005 which lawfully resolved the issue involving the use of the American

*ZETA: A Community Conscious, Action Oriented Organization*

Letter from Sheryl Underwood
Chair, National Executive Board
Zeta Phi Beta Sorority, Inc.
March 12, 2007
Page 4

Express Card by the Grand Basileus. These actions preceded Mrs. Stark's disclosures to the various media outlets.

It is clear that the intent behind Mrs. Stark's actions has been and continues to be to embarrass the Sorority and its leaders, and to impose the political will of a few upon the whole. Her disclosure of confidential business information of the Sorority did not provide information to the members of the Sorority that was otherwise unknown. As previously stated, information regarding the use of the American Express Card was already widely known within the Sorority. Mrs. Stark's decision to publicly disclose the Sorority's confidential business through disclosures to the media did not further any legitimate interest of the Sorority. Rather, in her zeal to discredit the leadership of ZPB, she risked irreparable damage to ZPB's global reputation and strategic alliances that have taken over 85 years to build.

In an unauthorized press release issued by Soror Edda R. Pittman on February 15, 2007 and entitled "*Zeta Phi Beta Sorority, Inc. Expels Whistleblower*," Mrs. Stark's quoted statements disregard the truth and the confidentiality of Sorority business records. Contrary to the assertions of Mrs. Stark and others, Mrs. Stark is not a whistle-blower as that term is defined by federal law. A whistle-blower is a person who provides truthful information to a law enforcement officer relating to the commission or possible commission of a federal offense. Mrs. Stark's disclosure of confidential business information to the media, publication of confidential business records on the internet, and disclosure of such information in internet chatrooms does not qualify for whistle-blower protection.

As stated on numerous occasions, an individual Soror has a right to question what goes on within our Sorority. However, she does not have the right to act with reckless disregard to the consequences her actions might have on the Sorority and its members. The proper course for Mrs. Stark to have voiced her concern would have been to raise these issues through normal Sorority protocols, including NEB meetings and Boulés.

As we move forward, I will keep you informed of important developments within our Sorority. I ask that you periodically check the members' only section of ZPB's official website for updates. I urge you to share this communication with other Sorors.

Sisterly,

*Sheryl Underwood*

Sheryl Underwood, Chair
National Executive Board

SU/

*ZETA: A Community Conscious, Action Oriented Organization*

EXHIBIT 6



**Ζeta Φhi Βeta Ṡororitp, Ꝥnc.**
INTERNATIONAL HEADQUARTERS
1734 New Hampshire Avenue, N.W.
Washington, D.C. 20009
(202) 387-3103 • Fax (202) 232-4593
E-MAIL: ZETANATLHQ@WORLDNET.ATT.NET

TM
*Established 1920*

**Barbara C. Moore**
*INTERNATIONAL GRAND BASILEUS*
**Sheryl Underwood**
*CHAIR, NATIONAL EXECUTIVE BOARD*

March 16, 2006

Dear Soror:

In my letter to Sorors dated February 13, 2006, I pledged to keep you informed of important developments within our Sorority. This letter is in keeping with my pledge to you.

### National Executive Board Meeting

I would like to begin with a report to you of the actions taken at the recent meeting of the National Executive Board ('Board") which was held on January 7th and 8th in accordance with the Sorority's Constitution and Bylaws. Twenty-Eight Board members and a host of Sorors were in attendance at the Board meeting. Only one Board member was not present at the meeting. The Board members in attendance included the following:



Grand Basileus Barbara C. Moore, Chair Sheryl P. Underwood, and Sorors Kim D. Sawyer, Cheryl Williams, Michelle L. Greene, Grammateus Erna M. Foushee, National Tamias Cynthia Elliot, Alma Washington, , Dr. Barbara West Carpenter, Dr. Jylla Moore Foster, Dr. Eunice S. Thomas, Barbara Henderson, Dr. Rosalind P. Hale, Melissa Jackson, Connie Carr-Jones, Laura Wilkins, Kimberly Smith-Tann, Dreamer Patterson, Edwina Lindsey, Nikeya Veney, Dawn Edwards, Jacqueline Lemon-Denton, Ira Ebbs, Zola Drain, Stacye Montez, Sharon Fletcher, Scarlet Black, and Mary Wright.

The following actions were taken upon motions properly made:

1.  Ratification of appointment of The Charleston Group as Legal Counsel
2.  Ratification of ballot Action taken by National Executive Board in April 2005 to authorize acceptance of Promissory Note (dated April 15, 2006) from Grand Basileus in the amount of $158,000.00
3.  Ratification of appointment of Thompson, Cobb, Bazilio & Associates, Inc. as external auditors

In addition, the Board received reports and engaged in discussion regarding matters including, among other things: (1) the use of the American Express Card by the Grand Basileus; (2) National Headquarters renovation project (Board resolved to give special recognition in the National Headquarters building to Project Manager for outstanding work on the National Headquarters renovation project); (3) Report from Grant Business Strategies, Inc. regarding the loan and loan modification from Carolina First Bank regarding the National Headquarters renovation project (Board resolved to give special recognition in the National Headquarters



Letter from Sheryl Underwood
Chair, National Executive Board
Zeta Phi Beta Sorority, Incorporated
March 16, 2006
Page 2

building to Anthony T. Grant, CEO of Grant Business Strategies, Inc. for outstanding work in connection with the favorable financing obtained to renovate National Headquarters); (4) Tamias Report; (5) Boulé budget report; (6) Regional Directors report; and (7) Grand Basileus' report. Minutes of the Board meeting are being completed and will be made available for review.

Regarding discussion of the American Express card by the Grand Basileus, you may recall from my earlier communication that steps were taken to resolve the American Express almost a year ago. The charges questioned by the former auditor total $168,000.00 rather than the $400,000.00 which has been rumored. In June 2005, the Grand Basileus executed a promissory note in the amount of $158,000 and has been making payments. Months prior to executing the promissory note in June 2005, the Grand Basileus had already paid $10,000 for charges made to the American Express card. At regional and state meetings held in 2005, the Grand Basileus publicly addressed the American Express issue, apologized to Sorors, and acknowledged that she had reached agreement with the Board on a repayment plan. As I have previously stated, I do <u>not</u> seek to excuse what has transpired with respect to the American Express card usage by the Grand Basileus, but rather intend to tell the facts as I know them to be.



## Media Issues

As you may recall, WJLA-TV 7 in Washington, DC broadcast stories regarding the use of the Sorority's American Express card by the Grand Basileus. As Chair of the Board, I authorized a statement to be issued after consulting with legal counsel regarding the content of the statement. The key portion of the statement is as follows:

> The subject of media inquiries is a claim that Zeta has suffered from inadequate internal controls in its financial operations. The National Executive Board recognizes that Zeta has needed to improve internal financial controls.

> Our National Executive Board took steps to resolve this issue months ago and has supported a series of measures to strengthen Zeta's operations and internal controls. A law firm with experience representing national service organizations was retained, as well as a nationally recognized audit firm. To ensure that Zeta strengthens its operations and internal controls, the Blue Ribbon Task Force on the Future of Zeta was established to conduct a comprehensive review of our headquarters operations and present specific recommendations this summer at Zeta's national meeting.

No other media statements have been issued or authorized. Unfortunately, a Soror has suggested that the statement referenced above contains misleading and inaccurate representations without identifying the statements purported to be inaccurate or misleading. This conduct is not in the best interest of the Sorority and only results in further confusion.

Letter from Sheryl Underwood
Chair, National Executive Board
Zeta Phi Beta Sorority, Incorporated
March 16, 2006
Page 3

As I stated in my letter to you dated February 13, 2006, a member of the Sorority who has identified herself in various chatrooms on the internet was secretly in communication with the media, falsely accusing the Board of being involved in a criminal cover-up regarding the American Express charges by virtue of actions taken by the Board at the January 2006 Board meeting. These reckless and defamatory allegations were made even though the discussions regarding the American Express card were conducted in an <u>open</u> meeting and heard by all Sorors in attendance at the Board meeting. We have also learned that a Soror has sought to encourage other media to publish negative stories about our Sorority. No other print media have published stories regarding this matter. However, it should come as no surprise to us if other stories are published given the enormous efforts of a few Sorors to have negative stories published regarding our Sorority.

As stated in an earlier communication to Sorors, an individual Soror has a right to question what goes on within our Sorority. However, she does not have the right to act with reckless disregard to the consequences her actions might have on the Sorority and its members. Like many of you, I question the leaking of internal information to the media. The proper course would have been to raise these issues through normal Sorority protocols, including the January 2006 Board meeting and 2006 Boulé, where the leadership of the Sorority will stand for election. Again, raising these issues through a television station that has little or no concern whatsoever for Zeta was simply irresponsible.

Regarding media and other inquiries, I have attached sample questions and proposed responses. Of course, my request is that all media inquiries be directed to the Executive Director at National Headquarters. The telephone number at National Headquarters is (202) 387-3103.

## March of Dimes Issue

The March of Dimes' National Office, by letter dated February 15, 2006, has requested assurances that grants awarded by the March of Dimes have been deployed as agreed as a condition to further disbursements of grant monies. According to the March of Dimes, they received information from an individual regarding the American Express card issue. Specifically, the March of Dimes stated in their February 15, 2006 letter that

> [a]fter the airing of the ABC television story last week, we have also decided not to make any new financial grants and awards or further cash disbursements on existing grants, pending receipt of satisfactory assurances to the aforementioned requests.

It is important to note that the Board's legal counsel received a communication from Harry Capell in late January 2006 regarding information that had been disclosed to the March of Dimes regarding the Grand Basileus' use of American Express issued to her. That communication was followed by a conference call on January 24, 2006 among the Sorority's legal counsel and the March of Dimes, whose participants were Mr. Capell, Rich Mulligan and

Letter from Sheryl Underwood
Chair, National Executive Board
Zeta Phi Beta Sorority, Incorporated
March 16, 2006
Page 4

Lisa Bellsey, General Counsel. During the conference call, the March of Dimes inquired as to whether grants to the Sorority and its chapters had been used in a manner consistent with the Memorandum of Understanding among the March of Dimes and the Sorority. An inquiry was made on behalf of the Sorority as to what amount of money did the March of Dimes contend to be in question and, of the amount questioned, how much had been given directly to the Sorority's National Headquarters. On or about February 7, 2006, the General Counsel for the March of Dimes sent a letter to the Sorority's legal counsel indicating that the only grant to National Headquarters in question is the $45,000 awarded in 2005. At the request of legal counsel, Executive Director Lois Sylver has compiled documents and bank records which indicate that the $45,000 grant from the March of Dimes remains on deposit in a bank in Washington, D.C. This information, along with other information requested, is being compiled for purposes of reporting the same to the March of Dimes.

It is also important to note that our National Headquarters was never advised that the March of Dimes intended to suspend grants to the Sorority's chapters prior to the February 15, 2006 letter referenced above. Equally important, I was not informed of this matter until I received an email sent to the entire Board from Past Grand Basileus Barbara Carpenter attaching the February 15th letter from the March of Dimes (the actual letter addressed to me from the March of Dimes was not received in my office in California from National Headquarters until March 13, 2006). Soror Carpenter is a member of a board affiliated with the national March of Dimes. As you can imagine, I was very disappointed to learn that the March of Dimes would take such an action without first extending the courtesy to the Sorority to address their concerns and alert our Sorors. However, I am optimistic that this matter can be favorably resolved within a short period of time.

## Federal Investigation

With respect to the federal investigation pertaining to the use of the Sorority's American Express card being conducted by the United States Attorney in Washington, DC, Board members and certain other individuals have been instructed to preserve any and all documents and records of any kind and for any purpose relating to financial transactions of the Sorority. This request covers those documents created, dated, sent, or received from January 1, 2002 through the present. Matters relating to the federal investigation have been fully disclosed. The Board was advised of this federal investigation by the Board's legal counsel on February 2, 2006. By letter dated February 13, 2006, I provided further information regarding this matter to the Board. Specifically, I advised the Board that a federal investigation was being conducted by the United States Attorney in Washington, DC pertaining to the use of the Sorority's American Express card. Further, I advised the Board that these type of investigations are conducted in secret and that I was not aware of the scope of the inquiry. Finally, I advised the Board that the Sorority should assume that the inquiry will be broad in scope and time.

*ZETA: A Community Conscious, Action Oriented Organization*

Letter from Sheryl Underwood
Chair, National Executive Board
Zeta Phi Beta Sorority, Incorporated
March 16, 2006
Page 5

Contrary to rumors which I understand have been circulated regarding this matter, the Sorority has not been notified, and is not aware of, any other pending legal proceedings pertaining in any way to the use of the Sorority's American Express card.

### Boulé

The 85th Grand Boulé will be held in Hollywood, Florida July 20-26, 2006 at The Westin Diplomat Resort and Spa. The hotel property is beautiful and the response from Sorors has been tremendous. A search is now underway with other hotels for overflow accommodations. Gospel icon Bobby Jones is the emcee and will perform at the opening program. Grammy nominated gospel artist Ann Nesby will perform at the Interfaith Breakfast. The Hallelujah Singers will perform during the Sunday Evening Cultural Night. Registration information will be mailed to Sorors, and the registration deadline will be extended. Please refer to the Sorority's website (www.zphi1920.org) for more information.

### Blue Ribbon Task Force on the Future of Zeta

You may recall that the Grand Basileus established the Blue Ribbon Task Force on the Future of Zeta at the Board meeting in January 2006. The mission of the task force is to: (1) review the Sorority's governing documents, manuals and procedures to assess consistency and conformity with applicable law; and (2) to examine the adequacy of the Sorority's current structure and operations with respect to the executive leadership and headquarters staff to meet the needs of a national nonprofit service organization. The Task Force will provide the Grand Basileus and the Board with findings and recommendations for proposed actions by the Board and membership to meet the Sorority's needs. The recommendations will assist in the Sorority's delivery of services to members, growth, compliance with applicable law and best nonprofit corporate practices. Soror Issie L. Jenkins, Esq., has agreed to chair this important initiative. The additional members of the Task Force will be announced soon.

### Conclusion

Sometimes when you have not heard from the Chair, it means that I am taking time to carefully address Zeta matters. In many instances, I have to carefully consider what can be communicated to the body given the current legal environment in which we find ourselves. I truly appreciate your patience during this process, and I strongly encourage your attendance and participation at the 85th Anniversary Grand Boulé in Hollywood, Florida, where Sorors will use the democratic process to set the future course for Zeta. I also urge you to continue your support of your chapter at the local, state and regional levels.

*ZETA: A Community Conscious, Action Oriented Organization*

Letter from Sheryl Underwood
Chair, National Executive Board
Zeta Phi Beta Sorority, Incorporated
March 16, 2006
Page 6


As we move forward, I will continue to keep you informed of important developments affecting our Sorority. I ask that you frequently check the members-only section of Zeta's official website for critical updates.

Sisterly,

Sheryl Underwood, Chair
National Executive Board


SU/
Attachment



Letter from Sheryl Underwood
Chair, National Executive Board
Zeta Phi-Beta Sorority, Incorporated
March 16, 2006
Page 7

## PROPOSED RESPONSES TO MEDIA AND OTHER INQUIRIES REGARDING ZETA

1.    **How should we respond to the media if this story begins to generate interest in my community?**

All media inquiries should be directed to the National Headquarters Office of the Executive Director at (202) 387-3103. Zeta will release official statements or provide media interviews regarding this national issue. On occasion, local media affiliates may attempt to localize a story by seeking out a local chapter or its members. Please do not respond to any questions regarding this issue. Even comments related to your personal feelings can be damaging not only to your chapter's work in the local community but also to the national organization.

You may respond in this manner. "Yes, I am aware of the news reports but I do not have any additional information. You may contact the Executive Director at our National Headquarters at (202) 387-3103."

2.    **Should we defend Zeta when questioned by others?**

Your good work in the local community and our national and international service are the best defense we have. This is an issue being handled at the highest levels. Respectfully tell others that you have no information that has not been reported and that the issue is being addressed at the National Headquarters.

3.    **How will the Amicae receive information?**

Graduate chapter Amicae sponsors should share ALL official communication with the Auxiliary.

4.    **Is it okay to participate in discussions about this issue?**

Casual conversation in electronic discussion boards or chat forums or in person should be done with extreme caution to avoid communicating inaccurate information, spreading rumors and causing damage to Zeta. As members of Zeta, your statements may be deemed official statements by those who wish to publish your statements to the detriment of our Sorority. Chapter, state, regional and national meetings are the places to handle Zeta business.



Letter from Sheryl Underwood
Chair, National Executive Board
Zeta Phi Beta Sorority, Incorporated
March 16, 2006
Page 8

5.      **When will we have more information addressing the media's allegations?**

The Sorority is cooperating with the investigative authorities.  Pertinent information will be posted on Zeta's website at <u>www.zphi1920.org</u>

6.      **Can we continue to secure sponsorships at the local level?**

Yes. Your chapters should continue to work with local sponsors and partner organizations.

7.      **Do we continue with our Finer Womanhood activities, etc.?**

Yes.  Our chapter activities are local--benefiting your chapter scholarship initiatives and/or general operating budgets.  Therefore, you should feel assured that you can move forward with your local programs.



8.      **Will all communication be placed on the web site?**

All communications directed to the financial members will be placed in the members-only section.   Sorors will need a valid membership identification number. Please do not share information contained in the members-only section with anyone who would not normally have access to it.  Appropriate information will be placed on the website in areas open for viewing by the general public.

9.      **Can we conduct MIP?**

MIP will be conducted as usual. MIP is continuing until April 30, 2006, at which time it will shut down to prepare for 85th Anniversary Grand Boulé in Hollywood, Florida.

10.     **What do I say to potential aspirants that we are inviting into our organization?**

The Sorority's MIP will continue until April 30, 2006 (see question above).  If a prospect has any concern regarding our sisterhood, we must graciously understand if they would like to revisit this decision and join Zeta at a later date.

11.     **Will there be a Boulé?**

Yes, the 85th Anniversary Grand Boulé will take place in Hollywood, Florida. The hotel room block opened on February 17, 2006.

*ZETA: A Community Conscious, Action Oriented Organization*

# EXHIBIT 7

| Subj: | **Information on Barbara Moore Please Read First!!** |
|-------|------------------------------------------------------|
| Date: | 8/1/2005 11:52:19 AM Eastern Daylight Time |
| From: | jdstarkii@hotmail.com |
| To: | mspee58@aol.com |

Good morning to you.

My name is James Stark, and my wife is Soror Natasha Stark.  She requested that I send you the information concerning Barbara Moore.  You will receive several emails from me as I have had to split the large documents up.  If you have any questions, please call Natasha at home 770-994-7042 or on her cell 770-722-0979.

Thank you.

Br. James Stark, II
Phi Beta Sigma Fraternity, Inc.
Secretary, Southern Region
Phi Beta Sigma Sigma Chapter
Atlanta, Georgia

The Phenom

Friday, September 09, 2005 America Online: Ms pee 58

# EXHIBIT 8



# THE CHARLESTON GROUP
### LAWYERS

R. JONATHAN CHARLESTON
DIRECT DIAL (910) 485-2500 EXT 224
jcharleston·tcglawyers.com

201 HAY STREET, SUITE 2000
POST OFFICE BOX 1762
FAYETTEVILLE, NC 28302-1762
TELEPHONE: (910) 485-2500
TELECOPIER: (910) 485-2599

November 16, 2005

**VIA ELECTONIC MAIL AND**
**CERTIFIED MAIL RETURN RECEIPT REQUESTED**
James Stark, II
2820 Sapphire Street
College Park, GA 30349

Dear Mr. Stark:

This law firm is counsel to Zeta Phi Beta Sorority, Inc. ("ZPB"). We are in receipt of your electronic communications to various individuals regarding the business affairs of ZPB dated August 1, 2005 and September 7, 2005, respectively. (See Exhibits "A" and "B") In this communication, you forwarded proprietary and confidential information concerning ZPB, including but not limited to internal communications of the sorority and American Express account statements containing the sorority's corporate account number. We believe the possession of and unauthorized dissemination of ZPB's proprietary and confidential business records to be unlawful. Moreover, your unauthorized dissemination of the aforementioned business records appears calculated to directly and improperly damage ZPB. In addition, we are investigating whether you were acting individually or in your capacity as Secretary of the Southern Region of Phi Beta Sigma Fraternity, Inc. A copy of this letter is being forwarded to the Phi Beta Sigma Fraternity's International President, Paul L. Griffin, Jr.

You are hereby advised that ZPB intends to hold you responsible for damages resulting from any misuse or misappropriation of the aforementioned information by any intended or unintended recipient of your electronic communication. Further, we demand that you immediately cease and desist from publishing, distributing or otherwise communicating any proprietary and confidential information pertaining to ZPB. We respectfully request and demand that you provide us with written correspondence by **TEN (10) BUSINESS DAYS** from the date of this letter confirming that you have ceased publication, distribution or communication of any proprietary and confidential information pertaining to ZPB. By that same date, please provide us with a list of all individuals to whom the aforementioned information was disseminated.

Should you reject or fail to respond to this letter, you may be assured that ZPB will pursue its rights and seek all available relief. In any event, this letter is without prejudice to any

James Stark, II
November 16, 2005
Page 2

other claims or defenses ZPB may hold.   Should you have any questions or concerns, please do
not hesitate to contact me

With kind regards,

R. Jonathan Charleston

RJC/emm

cc:    Sheryl Underwood, Chair - Zeta Phi Beta Sorority, Inc. National Executive Board
       Barbara C. Moore, International Grand Basileus - Zeta Phi Beta Sorority, Inc.
       Paul L. Griffin, Jr., International President - Phi Beta Sigma Fraternity, Inc.
       Freddie Lane, Jr., Esq.

# EXHIBIT 9

LAW OFFICE

# DEMING, PARKER, HOFFMAN, GREEN & CAMPBELL

MICHAEL D. DEMING, P.C.
FRANKLIN E. PARKER, P.C.
JIM R. GREEN, P.C.
RICHARD A. CAMPBELL, P.C.
PAUL M. HOFFMAN, P.C.
CHRISTOPHER W. T. DALY, P.C.

KEVIN T. ALMEROTH
ROBERT A. LEONARD
JOAN S. PEPE
IRENATA S. DUNCAN
DENISE J. DAVIS
J. BENJAMIN STEWART
BRIDGET N. SUMMEROUR
HELEN J. MEDLIN
JAMMIE TAIRE
DAVID M. LEWIS
WILLIAM R. PIKE
HERMAN R. TUNSIL
RYAN D. GOLDSTEIN
NAN DEEGAN PUTNAM
CLYDE A. WHITE

A LIMITED LIABILITY COMPANY
4851 JIMMY CARTER BOULEVARD
NORCROSS, GEORGIA 30093
TELEPHONE (770) 564-2600
FACSIMILE (770) 564-2267
EMAIL: Mail@Deminglaw.com

A.L. MULLINS, JR.
MATTHEW P. GGOFMAN
QUENTIN C. JONES
RUSSELL J. PARKER
FRANK G. CARDILLO
BRANDON A. CLINE
STUART B. BAGLEY
ROBERT D. MURPHY
CATHERINE CARTER SEMLER
BEVERLY RUTH ADAMS
JENNIFER FAVORS
TIFFANY S. ROWE
GRAHAM GILMER McMURRAY
LARA E. SMITH
CHYVAUN J. FERGUSON
RONDA COLVIN-LEARY

OF COUNSEL
RICHARD K. VALLDEJULI
LAWRENCE DELAN
KEITH A. CARNESALE
STEPHEN R. YEKEL
LISA SMITH FLAGG
DAVID C. COLE
E. NICOLE HARRISON

January 11, 2006

The Charleston Group
R. Jonathan Charleston
201 Hay Street, Suite 2000
P.O. Box 1762
Fayetteville, NC 28302-1782

**RE:    James Stark**
**Response To Cease and Desist Letter**
**Our File: 591741**

Dear R. Jonathan Charleston:

Please be advised that Mr. James Stark contacted our office regarding a cease and desist letter he received from your office. **Our representation is limited to providing you with a response to your letter, dated November 16, 2005.**

Mr. James D. Stark II, has advised that he has ceased publication, distribution, or communication of any proprietary and confidential information concerning Zeta Phi Beta Sorority, Incorporated

Mr. James D. Stark II has further advised that he has disseminated the aforementioned information to the following individual: mspee58@aol.com.

**I invite you to forward any and all communications to Mr. Stark II directly at the address indicated below.**

We thank you for your immediate attention to this matter.

Sincerely,

Ronda Colvin-Leary, Esq.

RCL/bl

cc:    James Stark II, 2820 Sapphire Street, College Park, GA 30349

RECEIVED
JAN 13 2006
BY:_____

# EXHIBIT 10

Contents of file dwwwroottempscblacknews_1084.tmp
From: info@scblacknews.com
Sent: Saturday, January 07, 2006 10:47 AM
To: info@scblacknews.com
Subject: Contents of file: d://wwwroot//temp//scblacknews_1084.tmp

From: "Natasha Stark" <crinyw@langate.gsu.edu>
Reply-To: "Natasha Stark" <crinyw@langate.gsu.edu>
To: info@scblacknews.com
Subject: Feedback Form
Owner_email    = info@scblacknews.com
Subject    = SCBMG Website Comments
redirect    = http://www.scblacknews/thankyou.htm
redirect    = http://www.scblacknews.com
User_name    = Natasha Stark
Phone    = 770-722-0979
User_email    = crinyw@langate.gsu.edu
Comment    = Gentlemen,    I am a member of Zeta Phi Beta Sorority, Inc., a 501(c)7
organization headquartered in Washington, DC.    I have in my possession information
and documentation showing that the national president, Barbara C. Moore, has
embezzled more than $300K of the organization's money via misuse of the sorority's
corporate AMEX card.        Efforts to resolve this matter internally have failed
miserably.    17 members of the national executive board, under the leadership of the
comedianne Sheryl Underwood who serves as chair of the board, are conspiring to
assist Barbara Moore with covering up this outrage so that she can remain national
president (and avoid going to jail).        The information that I have is contained in
a 44MB winzip file and is too large to email in one shot.    However, if this story
interests you, I will be happy to provide one of your reporters with a series of
emails (about 9) with the information that I have.    I can be reached at
770-722-0979 anytime or at the contact information below M-F 8:30-5:15.      Thank
you.    Natasha W. Stark  ICD Project Coordinator  Department of Criminal Justice
College of Health and Human Sciences  Georgia State University  1273 Urban Life
Building  Atlanta, Georgia 30303  (404) 651-3921 - phone  (404) 651-3658 - fax  ICD
Project: www.cjgsu.net/initiatives/ICD.htm
Submit    = Submit Comment
--------------------------------------------------------------
This CGI expires in  days
See http://www.netdor.com/ to register.
--------------------------------------------------------------

TOTAL P.01

# EXHIBIT 11



# THE CHARLESTON GROUP
L A W Y E R S

R. JONATHAN CHARLESTON
DIRECT DIAL: (910) 485-2500 EXT. 224
jcharleston@tcglawyers.com

201 HAY STREET, SUITE 2000
POST OFFICE BOX 1762
FAYETTEVILLE, NC 28302-1762
TELEPHONE: (910) 485-2500
TELECOPIER: (910) 485-2599

January 10, 2006

<u>**VIA ELECTRONIC MAIL, TELECOPIER (404) 651-3658 AND**</u>
<u>**CERTIFIED MAIL RETURN RECEIPT REQUESTED**</u>
Natasha W. Stark, ICD Project Coordinator
Department of Criminal Justice
College of Health and Human Services
Georgia State University
1273 Urban Life Building
Atlanta, Georgia 30303

AND

Natasha W. Stark
2820 Sapphire Street
College Park, GA 30349

Dear Ms. Stark:

As you know, this law firm is counsel to Zeta Phi Beta Sorority, Incorporated ("ZPB"). We are in receipt of your electronic communication dated January 7, 2006 sent over the Georgia State University ("University") electronic messaging system to info@scblacknews.com. in your capacity as the ICD Project Coordinator within the Department of Criminal Justice in the College of Health and Human Services. See Exhibit A. We believe the aforementioned communication constitutes libel pursuant to O.C.G.A. § 51-5-1, <u>et seq.</u>, as the false, malicious statements published tend to injure the reputation of the parties identified in the written communication and exposes them to public hatred, contempt or ridicule. As publisher of the defamatory statements, you are responsible not only for the actual words published, but for the inuendo that may arise from such words. See <u>Montgomery v. Pacific & Southern Co.</u>, 206 S.E.2d 631. We are appalled by your reckless conduct, especially in light of the warning previously issued to your husband, James Stark, for similar conduct. Our client has instructed us to do that which is necessary to have you immediately discontinue your unlawful conduct.

Natasha W. Stark
January 10, 2006
Page 2

You are hereby advised that ZPB intends to hold you and the University responsible for damages resulting from your defamatory statements. We demand that you immediately cease and desist from publishing, distributing or otherwise communicating any further defamatory statements pertaining to ZPB or its officers and directors. We request and demand that you immediately provide us with written correspondence confirming that you have ceased publication, distribution or communication of any defamatory statements pertaining to ZPB. We further demand that you immediately comply with the requirements of O.C.G.A. § 51-5-1, et seq.

Should you reject or fail to respond to this letter, you may be assured that ZPB will pursue its rights and seek all available relief. In any event, this letter is without prejudice to any other claims or defenses ZPB may hold.

With kind regards,

R. Jonathan Charleston

RJC/emm

cc:    Carl V. Patton, President - Georgia State University
       John D. Marshall, Esq., General Counsel - Georgia State University
       Frances B. Stone, Assistant to the President
       Ethel Brown, Administrative Specialist to the President
       Natasha W. Stark, ICD Project Coordinator
       Sheryl Underwood, Chair-National Executive Board, Zeta Phi Beta Sorority, Inc.
       Barbara C. Moore, International Grand Basileus - Zeta Phi Beta Sorority, Inc.
       Freddie Lane, Jr., Esq.

# EXHIBIT 12(A)

**From ABC 7 News:**

# I-Team: Sorority Spending

Reporter: Melinda Mayo
Posted: February 07, 2006 5:25 PM EST
URL: http://www.wjla.com/news/stories/0206/300856.html



-WJLA Script-

Anchor:
TONIGHT, A MONTH-LONG ABC 7 INVESTIGATION UNCOVERS AN ALLEGED FINANCIAL SCANDAL AT A SORORITY BASED IN D.C.

UNDER SCRUTINY: THE EXTRAVAGANT SPENDING HABITS OF ITS INTERNATIONAL PRESIDENT AND AN EXECUTIVE BOARD THAT MAY HAVE BEEN COMPLICIT.

INVESTIGATIVE REPORTER ANDREA MCCARREN IS HERE WITH MORE.

Andrea McCarren on set:
ZETA PHI BETA SORORITY INC. HAS MORE THAN 125,000 MEMBERS WORLDWIDE AND ENJOYS TAX-EXEMPT STATUS AS A SOCIAL CLUB.

REVELATIONS OF LAVISH SPENDING HAVE NOT ONLY OUTRAGED SOME MEMBERS... THEY RAISE SERIOUS LEGAL AND ETHICAL QUESTIONS... INCLUDING WHAT, IF ANYTHING, THE SORORITY'S LEADERSHIP REPORTED TO THE IRS.

Story:
FOUNDED IN 1920, ZETA PHI BETA HAS A LONG TRADITION OF HELPING THE COMMUNITY. BUT IT APPEARS ITS INTERNATIONAL PRESIDENT BARBARA MOORE MAY HAVE BEEN HELPING HERSELF - TO DESIGNER CLOTHING, FINE JEWELRY, FUR COATS, HIGH-END HOME FURNITURE AND EVEN LINGERIE... ALL CHARGED TO THE SORORITY'S CORPORATE CREDIT CARD.

Sorority Member #1: "It's really like a kick in the stomach. It's like being married to somebody for 17 years and then finding out they're having an affair."

Sorority Member #2: "This is sick behavior. This is not normal behavior. I am not going to allow her to do this to me. I feel a personal betrayal because I'm a member in good standing.

OVER A TWO-YEAR PERIOD, MOORE RACKED UP NEARLY $400,000 IN CREDIT CARD CHARGES BILLED TO THE SORORITY... MANY FOR ITEMS THAT APPEAR TO BE PERSONAL.

Woman #1: "$129 worth of pantyhose. Wilson's leather. Designer sportswear. Ladies shoes. Daywear. St. John. St. John. St. John."

Woman #2: "Why would you buy wigs? I've never seen her in a wig. That makes me wonder who was benefitting from all of this. Who are the wig-wearers?"

WE REVIEWED HUNDREDS OF PAGES OF DOCUMENTS: INTERNAL SORORITY E-MAILS, MINUTES OF EXECUTIVE BOARD MEETINGS, COPIES OF CANCELLED CHECKS AND DOZENS OF AMERICAN EXPRESS BILLS.

ZETA PHI BETA'S OWN FINANCIAL PROCEDURES MAKE IT CLEAR: THE SORORITY CREDIT CARDS ARE NOT FOR PERSONAL USE.

AND AS A TAX-EXEMPT ORGANIZATION, THE INTERNAL REVENUE SERVICE MAKES IT CLEAR TOO: NO INDIVIDUAL MAY BENEFIT UNDULY FROM THEIR CONNECTION TO THE SOCIAL CLUB.

Andrea McCarren: "Here's a woman who's the president of an international sorority and she's buying men's and boy's clothing."

Michael Sanders/D.C. Tax Attorney: "It's very significant. It just isn't right."

WE SHARED OUR DOCUMENTS WITH MICHAEL SANDERS, A PROMINENT D.C. TAX ATTORNEY WITH A SPECIALTY IN TAX-EXEMPT ORGANIZATIONS.

Michael Sanders/D.C. Tax Attorney: "You need to consider termination very seriously because again, you're going to have to prove to the IRS that you are responsible and you're not going to let this happen again.

BARBARA MOORE MAINTAINS AN OFFICE AT THE SORORITY'S D.C. HEADQUARTERS FOR HER UNPAID POSITION, BUT SHE LIVES IN COLUMBIA, SOUTH CAROLINA. THERE, SHE IS THE VICE PRESIDENT FOR INSTITUTIONAL ADVANCEMENT AT BENEDICT COLLEGE.

MOORE OFTEN USED THE CORPORATE CREDIT CARD IN COLUMBIA, SPENDING TENS OF THOUSANDS OF DOLLARS.

Woman #1: "Certainly someone who resides in Columbia, SC should not need hotel rooms and rental cars in the city, certainly not to that extent."

Woman #2: "I think if the sisterhood could see the documents, they too would feel the same type of betrayal."

THOSE DOCUMENTS ALSO REVEAL THAT ZETA PHI BETA'S EXECUTIVE BOARD WAS WELL AWARE THAT MOORE'S SPENDING WAS SPINNING OUT OF CONTROL.

Michael Sanders/D.C. Tax Attorney: "That would be egregious. That would get the attention of the IRS if they knew about this."

AND SOURCES SAY LAST MONTH, THE BOARD RECOGNIZED THEIR FINANCIAL PROBLEM BY APPROVING A PLAN FOR MOORE TO PAY BACK SOME OF THE MONEY ON A MONTHLY BASIS FOR THE NEXT FIVE YEARS.

THAT RAISES ANOTHER SERIOUS QUESTION: HOW, IF AT ALL, DID THE SORORITY REPORT THIS TO THE INTERNAL REVENUE SERVICE?

RECORDS WE OBTAINED INDICATE THE BOARD WAS STRUGGLING TO COME UP WITH A PLAN TO PROTECT THEMSELVES AND MOORE FROM POTENTIAL CRIMINAL PROSECUTION.

Andrea McCarren on set:

AFTER WEEKS OF WAITING, ZETA PHI BETA ISSUED A STATEMENT THIS AFTERNOON ADMITTING THAT IT NEEDS TO IMPROVE ITS INTERNAL FINANCIAL CONTROLS.

BUT THE SORORITY STILL FAILED TO PROVIDE US WITH THEIR TAX RETURNS, AS REQUIRED BY LAW, BUT WE OBTAINED THEM THROUGH OTHER SOURCES.

AND THESE RECORDS INDICATE THE LAST YEAR FOR WHICH THEY FILED WAS 2002.

LIVE FOR THE I-TEAM, ANDREA MCCARREN, ABC 7 NEWS

TM & ©2006 WJLA/NewsChannel 8, a division of Allbritton Communications Company

previous page



EXHIBIT 12(B)

ABC 7 News                                                    Page 1 of 2

**From ABC 7 News:**
# I-Team: Sorority Spending Follow-Up
Reporter: Melinda Mayo
Posted: February 08, 2006 5:30 PM EST
URL: http://www.wjla.com/news/stories/0206/301191.html

 **-WJLA Script-**

Anchor:
WE HAVE A MAJOR NEW DEVELOPMENT TO REPORT
FOLLOWING THE MONTH-LONG ABC7 INVESTIGATION WE
BROUGHT YOU LAST NIGHT.

THE I-TEAM REVEALED HOW THE LEADERSHIP OF A NATIONAL SORORITY
BASED IN D.C. ALLEGEDLY MISMANAGED HUNDREDS OF THOUSANDS OF
DOLLARS.

INVESTIGATIVE REPORTER ANDREA MCCARREN IS HERE WITH THE LATEST.

Andrea McCarren on set:
IT TURNS OUT WE WEREN'T THE ONLY ONES INVESTIGATING ZETA PHI BETA
SORORITY INCORPORATED.

THE INTERNATIONAL ORGANIZATION, KNOWN FOR ITS GOOD WORK IN THE
COMMUNITY, IS NOW UNDER THE SCRUTINY OF FEDERAL LAW
ENFORCEMENT.

Story:
THE FBI WON'T COMMENT ABOUT PENDING INVESTIGATIONS, BUT THE I-TEAM
HAS LEARNED THE BUREAU HAS BEEN LOOKING INTO ZETA PHI BETA... AND IS
WORKING WITH THE U.S. ATTORNEY'S OFFICE, WHICH ALSO DOES NOT
CONFIRM OR DENY INVOLVEMENT IN PENDING CASES. adding machine/lots of
documents/barbara moore photo

THE FEDERAL SCRUTINY RUNS PARALLEL WITH THE I-TEAM'S MONTH-LONG INVESTIGATION,
UNCOVERING QUESTIONABLE SPENDING BY THE SORORITY'S INTERNATIONAL PRESIDENT
BARBARA MOORE.

RECORDS INDICATE THAT MOORE USED ZETA PHI BETA'S CORPORATE CREDIT CARD TO PURCHASE
TENS OF THOUSANDS OF DOLLARS OF ITEMS THAT APPEAR TO BE PERSONAL.

DESIGNER CLOTHING. FINE JEWELRY. MENS AND BOYS CLOTHING. EVEN LINGERIE...
EXTRAVAGANT PURCHASES THAT ANGERED ONE SORORITY SISTER TO THE POINT OF
EXAGERATION.

Sorority member #1: "If it could be bought, it's on there. If it could be rented, it's on there. If it
could be paid for with a credit card. It's on there."

(financial procedures manual)

THAT'S NOT ONLY A VIOLATION OF THE SORORITY'S FINANCIAL PROCEDURES, IT APPEARS TO BE A
CLEAR VIOLATION OF THE IRS TAX CODE, WHICH PROHIBITS ANY INDIVIDUAL FROM BENEFITTING
FROM THEIR CONNECTION TO A NON-PROFIT.

Sorority member #2: "This is wrong. You can't paint it with any other brush. It's wrong. It's illegal."

Michael Sanders/Tax Attorney: "Every one of these items needs to be reviewed by an independent
professional."

D.C. TAX ATTORNEY MICHAEL SANDERS.

Michael Sanders/Tax Attorney: "This is highly unusual. Obviously."

ABC 7 News                                                                    Page 2 of 2

ALSO UNUSUAL AND POTENTIALLY ILLEGAL IS THE BOARD'S DECISION TO ALLOW MOORE TO PAY BACK SOME OF THE MONEY SHE SPENT... OVER THE NEXT FIVE YEARS.

Sheryl Underwood, Chair, National Executive Board: "THE BOARD'S ONLY COMMENT SO FAR: AN ADMISSION THAT "ZETA -HAS- NEEDED TO IMPROVE INTERNAL FINANCIAL CONTROLS."

Andrea McCarren on set:
ALTHOUGH THE IRS WON'T DISCUSS ANY OF ITS INVESTIGATIONS, SOURCES TELL US THE TAX AGENCY IS NOW TAKING A CLOSE LOOK AT ZETA PHI BETA AND WHETHER IT'S PAID WHAT IT OWES TO THE FEDERAL GOVERNMENT.

ALSO MONITORING THIS SITUATION IS BARBARA MOORE'S EMPLOYER, BENEDICT COLLEGE IN SOUTH CAROLINA... WHERE SHE SUPERVISES ALL OF THE SCHOOL'S FUNDRAISING.

LIVE FOR THE I-TEAM, ANDREA McCARREN, ABC7 NEWS

TM & ©2006 WJLA/NewsChannel 8, a division of Allbritton Communications Company

previous page



EXHIBIT 13

TO:   Soror Chrislyn Turner,
      Georgia State Director

FROM:   Ladies of Epsilon Zeta Chapter (Ad Hoc Committee)
      Atlanta, GA

DATE:   September 27, 2006

RE:    Suspension and Removal of Soror Natasha Stark from Epsilon Zeta
      Chapter, effective immediately!

We the ladies of Epsilon Zeta Chapter in Atlanta, GA – the oldest chapter in the Southeastern Region and among the most respected chapters in all of Zeta Phi Beta Sorority – are extremely appalled, ashamed, angry, embarrassed, and disheartened by the series of events that have taken place over the past year specifically involving two members of this chapter, particularly Soror Natasha Stark.

What does a chapter of 83 years, with a sterling record, and a membership composed of trailblazers desire of our State, Regional, and National Bodies? The answer is simple: We have NEVER written a letter of complaint. Yet, this chapter is displeased, distressed, disturbed, offended, and disappointed with the behavior and demeanor of Soror Natasha Stark.

Epsilon Zeta Chapter, Zeta Phi Beta Sorority, Inc., is appealing to the State, Regional, and National bodies for help. We are requesting that every reasonable effort is made for suspension and removal of Soror Natasha Stark from Epsilon Zeta Chapter, effective immediately! In our opinion she has displayed acts of misconduct and rules violations (Zeta Phi Beta Sorority, Inc. Constitution, p.23).

This memo recounts, to the best of our ability, the personal campaign of an unwarranted character assassination against our International Grand Basileus by Sorors Natasha Stark and Dee Dee Wright. This campaign has been a major distraction for EZ Chapter for the past twelve months and more. It has been very destructive not only for our chapter, but for Zeta Phi Beta Sorority, Inc. There is no way of knowing what the overall negative ramifications might be for ZETA in the near or distant future.

## TIMELINE OF INCIDENTS AND ACTIVITIES

### March 2005

Epsilon Zeta Chapter received a memo from Southeastern Regional Director, Soror Scarlet H. Black indicating allegations against International Grand Basileus Barbara Moore for alledged misuse of Zeta Phi Beta Sorority, Incorporated funds. Primarily, Epsilon Zeta decided it was a National issue and should be treated as such. Thus, Epsilon Zeta Chapter voted to hold its course until further notification from the Southeastern Regional Director and/or the Chair of the National Executive Board.

**September 2005**
Soror N. Stark came to the general meeting and publicly disrupted the meeting. She openly accused the Basileus of stealing the chapter's Virtual Volunteer funds. A few days later, she placed this allegation in an e-mail to some chapter sorors. Please be mindful that the chapter does not have an account for Virtual Volunteer. The Basileus pays for this out of her bank account and the chapter reimburses the Basileus. [See the attached e-mail]

**October 2005**
Epsilon Zeta Chapter received a correspondence from the National Chair of the Executive Board stating that Soror Dee Dee Wright publicly stated that she was contacting the IRS to report that International Grand Basileus Barbara Moore has been misusing the Sorority American Express Card. [See the attached letter]

Two of the chapter sorors were asked by the Basileus to conduct an information session for the chapter on this matter. Soror Natasha Stark sneaked a rebuttal letter from Soror Wright to the chapter secretary to be read to the chapter. She did this underhanded deed although the chapter had agreed to read no correspondence to the chapter regarding this matter unless it came from the Southeastern Regional Director or the National Chair of the Executive Board.

After the meeting Soror Stark followed one of the sorors-a judge -to her car. Soror Stark was yelling and cursing, at the soror about the information session conducted for the chapter about the letter concerning Soror Dee Dee Wright. After this confrontation, the Basileus contacted Soror Stark to privately speak with her about this incident. The Basileus wanted to get to the bottom of what was going on with Soror Stark. She [Stark] refused to meet with the Basileus.

**November 2005**
During the general meeting, Soror Dee Dee Wright came demanding to read her rebuttal letter to the chapter. During the meeting, she offered to share information regarding allegations against International Grand Basileus Soror Barbara Moore. Soror Dee Dee Wright offered a very large gold envelop of information to the Basileus to read. Soror Dee Dee Wright indicated the information included receipts and other material showing where the International Grand Basileus had allegedly made charges on the American Express card. The Basileus refused to allow Soror Dee Dee Wright to give her [the Basileus] the information. At this point, Soror Wright openly accused the Basileus of "buying into the Grand's program." Then, she threatened the Basileus and told her she [Wright] had an attorney! The chapter Basileus did not waiver in the presence of Soror Wright's emotionalism.

Following the chapter meeting, Soror Stark called the home of the chapter tamais demanding that she turn over the chapter financial records and budget to her. This demand was out of order. Soror Stark is not an officer in Epsilon Zeta Chapter. The tamais dismissed herself from the telephone. Later that evening, Soror Stark sent an irate e-mail to the tamais. She demanded that the tamais turn over the records or she would contact the Ga. Licensing Board to have the soror's CPA license revoked. On Monday of the next week, she [Stark] contacted the Licensuring Board and secured the soror's CPA



license number. Soror Natasha Stark wrote a second very harsh letter-via e-mail-to the tamais, giving the tamais a deadline to submit the chapter financial information to her or she would contact the National Licensing Board for CPA and request the revoking of her license. Further, Soror Natasha Stark threatened to contact the National Licensing Board for CPAs regarding the Tamais CPA license. [See e-mails dated November 2005]. Following this incident a few of the Epsilon Zeta Executive Board members began to complain of Stark sharing information with them regarding allegations against Internatinal Grand Basileus Soror B. Moore.

**February 2006**
The story regarding Zeta and alleged misuse of funds by the Grand aired on WJLA.

**March 2006**
The issue was discussed in the Executive Board meeting. Soror Stark came to the general meeting interrupting, filibustering and grinning down the meeting. A failed attempt to show WJLA televised broadcast on ZETA to the chapter was hampered due to technical difficulites. Soror Natasha Stark jumped up and ran out of the meeting when she discovered that the broadcast was going to be shown to the chapter.

**April 2006**-Epsilon Zeta Chapter March minutes were placed on the internet accompanied by an audio of the March chapter meeting.

Epsilon Zeta Executive Board voted to invite Soror Natasha Stark to a called meeting of the Board the following week to discuss all matters of concern. One of the Board members violated protocol and thus enabling Soror Stark to be informed of what the Board wanted to discuss with her. It appears Soror Stark telephoned several chapter members and indicated that the Executive Board wanted to meet with her to take her membership.

The following day the one of the Executive Board member contacted the chapter Basileus, yelling and screaming. The Board member stated that Soror Natasha Stark had telephoned her house between 16-20 times. The Board member informed the Basileus that she was not going to tolerate Soror Stark disturbing her and her family at home. The Board member was so irate she said she was going to go down to Georgia State University-where Stark is employed-and cut her! The Board member added that her husband was going to cut Soror Stark, too. Frantically, the Basileus worked to prevent such a scandal that had apparently been caused by Soror Natasha Stark inaccurate account of Epsilon Zeta Executive Board intentions.

**May 2006**
Because of pressure coming from the different levels of hierarchy of ZETA, the Basileus issued a statement to the National Board Chair stating Epsilon Zeta Chapter's position on the recent events involving the International Grand Basileus. [Please see the letter dated 31 May 2006.]



**9 June 2006**

Soror Natasha Stark mailed the first certified letter to the Board of Education of the Basileus place of employment. The letter had Georgia State University stamps all on the front of the envelope. [See the attachment]

**13 June 2006**

Epsilon Zeta Executive Board held a secret called meeting, summoned by the Chair of the Executive Board, at a board members' church to plan the impeachment of the chapter Basileus. Please note, <u>Zeta By-Laws</u> only allow the Basileus to summon a called meeting, not the chair of the Board. Neither does the <u>Constitution/By-Laws</u> allow for the impeachment of a Basileus simply because the Basileus changed the delegates' names for attendance at a national conference.

As background information, in May the Basileus removed Soror Natasha Stark and one other soror's name from the Boule delegate's list for the National Conference. The registration company informed the chapter Basileus that Soror Stark- and later the Chairman of the EZ Executive Board, called and attempted to change the chapter registration information. However, the registration company would not allow her to do so. The registration company directed them to contact the chapter Basileus. However, neither of these sorors contacted the chapter Basileus regarding this matter.

**17 June 2006**

Soror Natasha Stark came to Epsilon Zeta Chapter June meeting-with ballots already printed-to impeach the chapter Basileus. When the impeachment attempt failed, Soror Stark began to cursing and fussing with everyone within hearing. She entered the foyer of the Sorority House getting in the face of the Basileus. The Basileus asked Soror Stark to leave to allow the Basileus to secure the alarm and lock the Sorority House. Two of the sorors remained with the Basileus and asked her to go to her car and drive off ahead of them. As the Basileus walked down the drive way to her car, Soror N. Stark yelled and cursed at the Basileus and made a scene.

**19 July 2006**

On 19 July 2006, Soror Natasha Stark approached the Basileus in front of the Westin Diplomat and Spa Hotel in Hollywood, Florida, which was the site of Zeta Phi Beta Sorority, Incorporated Grand Boule. She charged down the steps of the hotel, yelling, screaming, and issuing an ultimatum at the chapter Basileus. At the time of this incident, the Athens, GA delegation was chatting with Epsilon Zeta Chapter Basileus. One of the delegates from Athens, GA – actually the Southeastern Regional Coordinator for Life Members – asked Epsilon Zeta Chapter Basileus to go into the hotel and don't say anything to Soror Natasha Stark. [See the attached statement]

During the 85th Grand Boule, the National Chair of the Executive Board read the letter written to WJLA by Soror Natasha Stark alledging International Grand Basileus Barbara Moore's mishandling of ZETA's funds. Also, the letter written by Soror Stark's husband alledging misdeeds by International Grand Basileus Moore was read, also. [See attached letters]

4

**5 September 2006**

Soror Stark attended Epsilon Zeta Chapter Executive Board meeting camcording the Ad Hoc Committee members and the chapter Basileus. She placed the camcorder directly in the face of the chapter Basileus. When Soror Natasha Stark was asked to turn off the camcorder, she refused. Soror Stark jumped up, began shouting at the chapter Basileus. [See the attached statement]

**5 September 2006**

Soror Stark mailed a second letter to the Basileus place of employment, and faxed a copy of the letter to the principal. The principal's copy of the letter was faxed from the Criminal Justice Department at Georgia State University. Later the chapter Basileus discovered that Soror Stark sent the letter to the State and Regional Directors, the National Chair of the Executive Board and the National Executive Board. [See the attached letters] As a result of the various incidents, the chapter Basileus frequented the Magistrate Court and filed papers for a restraining order against Soror Natasha Stark. [See copy of Magistrate Court filing]

**16 September 2006**

Soror Natasha Stark attended Epsilon Zeta Chapter general meeting. Again, she attempted to secure the removal of the chapter Basileus, to no avail. Then, Soror Stark went to the parking lot of the Sorority House and caused a scene. Later, chapter sorors reported to the Basileus that Soror Stark went to the parking lot and sped out very fast. This was quite dangerous in light of the fact that the parking lot was double-and triple-parked.

Then she sped back into the parking lot and blocked cars trying to depart. It was reported to the chapter Basileus that one of the elderly (80s) sorors kindly asked Soror Stark to allow her to depart. At which time, Soror Natasha Stark yelled at the elderly soror, profusely. One of the soror-a judge-intervened to help the elderly soror. Then Soror Stark began yelling at the judge and attempted a spiritual situation with the soror (judge). The chapter Basileus was informed that several sorors and the Georgia State Director for Zeta Phi Beta Sorority, Incorporated witnessed this scene. Following this parking lot incident, the chapter Basileus frequented the Magistrate Court to add this incident to the complaint against Soror Natasha Stark, too. [See four witnesses attached statements]

To summarize, Soror Stark has engaged in several unacceptable and unauthorized activities that were designed to **tear down** versus build up Zeta Phi Beta Sorority, **Incorporated and Epsilon Zeta Chapter.**

These activities include but are not limited to:

- Sending e-mails and using the United States Postal Service to distribute correspondence around the world about Zeta's business as an unauthorized officer.

- E-mailing documents to Columbia, S. C's. Black News newspaper accusing the International Grand Basileus of misappropriation of Sorority funds.

- Sending the same information to WJLA in Washington, D.C. in order to smear the name of the International Grand Basileus. This served as an impetus for the TV broadcasts on Zeta. This type of behavior is misleading and inaccurate. Again, this conduct is not in the BEST interest of the Sorority! More importantly, it has resulted in **further confusion and division within the organization.** [Please reference Soror Stark's letter read by the National Chair of the Executive Board at the Grand Boule 2006.]

- Prior to the TV broadcast, Soror Stark called the March of Dimes office several times and e-mailed their office in New York three different times to give information that was not true. Both her conduct and misconduct led to the suspension of the $45,000 March of Dimes grant to the Sorority for the families who were victims of Hurricane Katrina.

- Writing and delivering letters-via e-mail- in an attempt to have Epsilon Zeta Chapter Tamais' CPA license revoked. [See attached two e-mail letters to the chapter tamais]

- Mailed letters (one certified) to the chapter Basileus employer in an attempt to embarrass and make her lose employment, only as a ploy to oust her as the Basileus of Epsilon Zeta Chapter.

- Yelling and shouting incidents with chapter members!

- The 16 September 2006 parking lot incident following Epsilon Zeta Chapter Sorority meeting was the ultimate! This was the determining point that the situation had gotten way out of hand.

Finally, suffice it to say that the last 18 to 20 months outlined above substantiates our case why the chapter is making the decision to request her [Soror Stark] removal from Epsilon Zeta Chapter, Zeta Phi Beta Sorority, Incorporated. Soror Natasha Stark's behavior is damaging to the Sorority! She took internal matters public without the National Board's approval of her comments being made as a public announcement. At the same time, she continuously harrassed chapter members as well as the chapter Basileus—indicative that she is irrational and can't be trusted. Thus, several Epsilon Zeta members have indicated they WILL NOT attend chapter meetings in the future, if Soror Natasha Stark is in attendance.

For the sake of Epsilon Zeta Chapter, the entire Sorority, and the rich heritage and strong reputation that so many upstanding women have worked hard to establish and maintain for nearly 100 years, we ask your immediate attention to and your immediate action with this matter! We remain

Sisterly,
The Ladies of Epsilon Zeta Chapter (Ad Hoc Committee)
*Zeta Phi Beta Sorority, Incorporated*
Atlanta, Georgia

*EPSILON ZETA CHAPTER*
# Zeta Phi Beta Sorority, Inc.
*Ad Hoc Committee*
22 September 2006

## Agenda

►     Welcome

►     Moments of Mediation and Prayer

►     Purpose of the Meeting

►     Discussion Session

►     Concerns

►     Closing Prayer

## AD HOC COMMITTEE

*Soror Myra F. Reese*     *Soror Myra F. Reese*

| Name | Signature |
|---|---|
| Soror Averett Shannon | *(absent)* |
| Soror Barbara Hill-Robinson | |
| Soror Lucy Pennington | |
| Soror Jeanette C. Patterson | |
| Soror Evelyn Brown | *E. A. Brown* |
| Soror Judge Crystal Gaines-Bond | *(absent)* |
| Soror Dr. Julia Glass | *J. M. G.* |
| Soror Ernestine Pickens-Glass | *(absent)* |
| Soror Dr. Ioma Glover | |

*Florence McCamey*

(31 Aug. 2006)     **AD HOC COMMITTEE**     (9.5.06)

| | | |
|---|---|---|
| Soror Averett Shannon | *absent* | |
| Soror Barbara Hill-Robinson | | |
| Soror Lucy Pennington | | |
| Soror Jeanette C. Patterson | (later) *Jeannette Patterson* JP. | |
| Soror Evelyn Brown | *E.D Brown* | E.D.Br |
| Soror Judge Crystal Gaines-Bond | (late) | |
| Soror Dr. Julia Glass | *J. G.* | J.G. |
| Soror Ernestine Pickens-Glass | (absent) | |
| Soror Dr. Ioma Glover | | |
| Soror Mabel Green | *M. G.* | M.G. |
| Soror Adiel Lisbon | *A. C. L.* | |
| Soror Dr. Carrie Johnson | *C.J.* | |
| Soror Pearl J. Logan | | |
| Soror Jacqueline Terry | *J.E.T.   J.E.T.* | |

| | |
|---|---|
| Soror Adiel Lisbon | |
| Soror Dr. Carrie Johnson | |
| Soror Pearl J. Logan | *PJL* |
| Soror Jacqueline Terry | |

- *Soror Caroline Terry*
- *Mabel Green    (absent)*

# EXHIBIT 14

*Zeta Phi Beta Sorority, Incorporated*
*State of Georgia*



*Soror Barbara C. Moore*
*22nd International Grand Basileus*

*Soror Christyn Turner*
*Georgia State Director*

*Soror Scarlet H. Black*
*Southeastern Regional Director*

October 8, 2006

Mrs. Natasha Y.W. Stark
2820 Sapphire Street
College Park, Georgia 30349
Membership ID# 22109

Dear Mrs Stark:

On September 30, 2006, members of Epsilon Zeta Chapter, Atlanta, Georgia filed a formal complaint against you for conduct unbecoming a soror. As a result of your actions over the course of the past eighteen (18) months, the ladies of Epsilon Zeta Chapter have formally expressed their dismay. These members have provided strong documentation for your immediate suspension from their chapter and from the Sorority.

Between the September 30, 2006 and October 8, 2006 a thorough investigation has been conducted to ascertain the validity and merit of their charges. Since that time, it has been determined that their charges are valid and warrant further scrutiny by our Regional Director, Soror Scarlet H. Black and Zeta Phi Beta Sorority Incorporated's National Executive Board.

Per the correspondence presented, you have been charged with engaging in repeated and severely disruptive behavior that has proven to be divisive and detrimental on both the local and national levels. Per Article XIV, Section 2. MEMBERSHIP SUSPENSIONS, subsection a of the Sixth Edition, 2001 of the Constitution and Bylaws:

"A chapter through its Regional and State Directors may request suspension of members for non-payment of the approved Local, State (where applicable), Regional and National taxation, and for actions of misconduct and rule violations."

The charges levied against you, while numerous, were not limited to the following:

1. Attempting to jeopardize a nationally awarded March of Dimes grant and our thirty (30) year relationship with the March of Dimes;
2. Actively participating in the WJLA, Washington D.C airing of what was perceived to be the airing Zeta's "financial dirty laundry;"
3. Circulating sensitive and confidential sorority documents via the internet, particularly after the National Chair of the Executive Board, Soror Sheryl Underwood has sent official correspondence instructing otherwise;
4. Attempting to jeopardize and endanger the employment and livelihood of sorors, i.e., Epsilon Zeta Basileus and Epsilon Zeta Tamias, by sending letters to places of employment and threatened to have professional licenses revoked;
5. Attempting to intimidate and harass chapter members;
6. Threatening chapter members;
7. Displaying unsisterly conduct in the Chapter and Executive Board meetings of Epsilon Zeta Chapter; and
8. Use of profane language against other Sorors in public settings.

*Zeta Phi Beta Sorority, Incorporated*
*State of Georgia*



*Soror Barbara C. Moore*                    *Soror Chrislyn Turner*                    *Soror Scarlet H. Black*
*22ⁿ International Grand Basileus*           *Georgia State Director*                   *Southeastern Regional Director*

The aforementioned allegations are supported by the fact that the Basileus of Epsilon Zeta Chapter has taken out a restraining order against you in an effort to take precautionary measures to ensure the safety of the chapter members and herself when members of Epsilon Zeta Chapter assembled together at the Sigma/Zeta Foundation on Delowe Drive in East Point, Georgia. Other Epsilon Zeta Sorors have provided written accounts of the verbal altercation between you and Soror Helen Threat that took place on September 16, 2006. Also, Epsilon Zeta Chapter has provided damaging emails addressed to the March of Dimes and to the Epsilon Zeta Chapter Tamias. Last, your participation in the WJLA TV airing was supported by a letter written by you and read aloud to the national body during Boule' by the National Executive Chairman, Soror Sheryl Underwood, July 2006, in Hollywood, Florida.

As the result of an investigation into these claims and my own personal account of the exchange between you and Soror Helen Threat following the Epsilon Zeta Chapter Retreat, **I am hereby suspending all of your Zeta activities effective immediately and indefinitely.** I am also recommending to Southeastern Regional Director Soror Scarlet H. Black that you be recommended for expulsion from Zeta Phi Beta Sorority, Incorporated. This recommendation for removal from the sorority has been forwarded to the Regional Director along with a notice of your immediate suspension of Zeta activities.

Therefore:

1.  You are hereby placed on immediate and indefinite suspension.
2.  Your suspension will preclude you from participating in all professional and social activities pertaining directly or indirectly to Zeta Phi Beta Sorority, Inc. This means that you are not to associate with, participate in, or represent in any form, fashion or manner your association with Zeta Phi Beta Sorority, Inc.
3.  You will be responsible for repayment of any fines or restitution placed upon you issued by internal or external sources.
4.  You not be supported by the Sorority in the event of any civil or criminal proceedings.

I wholeheartedly support a financial soror's right to speak on issues and question the status quo; differing opinions are the very foundation of democracy and provides checks and balance in our organization. However, once deliberate acts of unkindness are employed to help convey one's point of view, it is time for not only sisterly correction, but in this case sisterly reprimands that will set a precedent. Our sisterhood is a great sisterhood and must not be exploited, exposed nor exaggerated in such a way as to bring about irreparable damage and harm to our members or our Sorority's very existence.

In the name of Zeta,

Soror Chrislyn D. Turner
Georgia State Director

CC: .
Sheryl Underwood, Zeta Phi Beta Sorority, Inc. Chair of the National Executive Board
Scarlet H. Black, Zeta Phi Beta Sorority, Inc. Southeastern Region, Director
Myra F. Reese, Zeta Phi Beta Sorority, Inc. State of Georgia Chair of the Executive Board/Epsilon Zeta Chapter, Basileus

# EXHIBIT 15

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATASHA STARK,                            )
                                          )
              Plaintiff,                  )
                                          )
       v.                                 )    CIVIL ACTION FILE NO.:07 CV 00553
                                          )
ZETA PHI BETA SORORITY, INC.              )
                                          )
              Defendant.                  )
_____       )

<u>AFFIDAVIT OF CHRISYLYN TURNER</u>

I, Chrislyn Turner, depose and say as follows:

1.      I am above the age of 18 and in all ways competent to provide sworn statements.

2.      I am a resident of the State of Georgia.

3.      I am an active member of Zeta Phi Beta Sorority.  From April 2005 through the present, I have served Zeta Phi Beta Sorority as the Georgia State Director.

4.      By letter dated September 27, 2006,  members of the Epsilon Zeta Chapter of Zeta Phi Beta Sorority made a formal written complaint to me, in my capacity as Georgia State Director, regarding certain acts committed by the Natasha Stark, that were alleged to be against the interests of the sorority and constituted conduct unbecoming a member of the sorority.

5.      Beginning on or about September 30, 2006 through October 6, 2006, I conducted an investigation of the allegations made by members of the Epsilon Zeta Chapter of the Zeta Phi Beta Sorority against Ms. Stark.  My investigation included (1) reviewing the complaint letter dated September 27, 2006; (2) reading various documents

and correspondence relating to the alleged conduct of Ms. Stark; and (3) interviewing members of Epsilon Zeta Chapter of Zeta Phi Beta Sorority.

6.    On or about October 6, 2006, I completed by investigation into the complaints made by members of the Epsilon Zeta Chapters of the Zeta Phi Beta Sorority against Ms. Stark. At that time, I concluded that the complaints made against Natasha Stark by members of the Epsilon Zeta Chapter of the Zeta Phi Beta Sorority against Ms. Stark were valid and warranted further scrutiny.

7.    By letter dated October 8, 2006, I advised Ms. Stark of the charges levied against her and of the results of my investigation. Pursuant to my position as Georgia State Director for Zeta Phi Beta Sorority, I further notified Ms. Stark that of the suspension of all her sorority activities pending further investigation. These actions were taken pursuant to, and in full compliance with, the Zeta Phi Beta Sorority Constitution, Bylaws and Handbook, and were within my authority as Georgia State Director for Zeta Phi Beta Sorority.

8.    Pursuant to the Zeta Phi Beta Handbook Grievance/Complaint Investigation Process, I referred this matter, via written correspondence dated October 8, 2005, to the Southeastern Regional Director, Scarlet H. Black for further investigation. These actions were taken pursuant to, and in full compliance with, the Zeta Phi Beta Sorority Constitution, Bylaws and Handbook, and were within my authority as Georgia State Director for Zeta Phi Beta Sorority.

9.    The statements in this affidavit are made on my own personal knowledge.

10.    At all relevant times I acted in good faith and with the best interests of the sorority in mind.

11.     I declare under penalty of perjury that the foregoing is true and correct.


[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

FURTHER AFFIANT SAITH NOT.

This is the _____ day of July, 2008.


Chrislyn Turner


COUNTY OF _____

STATE OF GEORGIA

Sworn to and subscribed before me,
this the _____ day of August, 2008.


NOTARY PUBLIC _____


My Commission Expires: _____


:

EXHIBIT 16

LAW OFFICE

# DEMING, PARKER, HOFFMAN, GREEN & CAMPBELL

A LIMITED LIABILITY COMPANY
4851 JIMMY CARTER BOULEVARD
NORCROSS, GEORGIA 30093
TELEPHONE (770) 564-2600
FACSIMILE (770) 564-2267
EMAIL: Mail@Deminglaw.com

MICHAEL D. DEMING, P.C.
FRANKLIN E. PARKER, P.C.
JIM R. GREEN, P.C.
RICHARD A. CAMPBELL, P.C.
PAUL M. HOFFMAN, P.C.
CHRISTOPHER W. T. DALY, P.C.

KEVIN T. ALMEROTH
ROBERT A. LEONARD
JOAN S. PEPE
IRENATA S. DUNCAN
DENISE J. DAVIS
J. BENJAMIN STEWART
BRIDGET N. SUMMEROUR
HELEN F. MEDLIN
JAMMIE TABB
DAVID M. LEWIS
WILLIAM R. PIKE
HERMAN R. TUNSIL
RYAN D. GOLDSTEIN
NAN DEEGAN-PUTNAM
CLYDE A. WHITE

A.L. MULLINS, JR.
MATTHEW P. GOODMAN
QUENTIN C. JONES
RUSSELL J. PARKER
FRANK G. CARDILLO
BRANDON A. CLINE
STUART B. BADLEY
ROBERT D. MURPHY
CATHERINE CARTER SEMLER
BEVERLY RUTH ADAMS
JENNIFER FAVORS
TIFFANY S. ROWE
GRAHAM GILMER McMURRAY
LARA R. SMITH
CHYVAUN J. FERGUSON
RONDA COLVIN-LEARY

OF COUNSEL
RICHARD E. VALLDEJULI
LAWRENCE DELAN
KEITH A. CARNESALE
STEPHEN R. YEKEL
DAVID C. COLE
E. NICOLE HARRISON

November 28, 2006

Mrs. Barbara C. Moore, National President
Zeta Phi Beta Sorority, Inc.
237 Swindale Drive
Columbia, South Carolina 29203

RE:   Natasha Stark
       Membership ID# 22109
       Our File No. 665412

Dear Mrs. Moore:

Please be advised that I am writing on behalf of Natasha Stark in regard to a matter involving a letter she recently received from Chrislyn D. Turner, Georgia State Director for Zeta Phi Beta Sorority, Inc.

On or about October 19, 2006, Mrs. Stark received the enclosed letter from Ms. Turner. As you can see, in her letter, Ms. Turner makes numerous allegations against Mrs. Stark which are not only untrue, but also libelous. Further, it is my understanding that Ms. Turner has suspended Mrs. Stark from participating in Zeta Phi Beta Sorority activities and has threatened to pursue Mrs. Stark's expulsion from the organization.

Please be advised that Mrs. Stark not only denies each and every allegation set forth in Ms. Turner's letter, but has reason to believe that the action Ms. Turner has taken violates the constitution and bylaws of the Zeta Phi Beta Sorority. Mrs. Stark first learned of Ms. Turner's unfounded allegations when she received the referenced letter. Mrs. Stark was never previously informed of any type of investigation against her by the Zeta Phi Beta Sorority. Furthermore, upon receipt of the referenced letter, Mrs. Stark requested information as to the identity of the person or persons who made the allegations against her; however, she has not been provided that information, nor has her Chapter, which also requested the individuals identify themselves at the October 21, 2006, meeting, been provided with any information.

November 28, 2006
Page 2

Mrs. Stark would like to not only address the allegations presented by Ms. Turner, but also to find out why she was never previously notified about those allegations. Ms. Turner apparently attempts to support her allegations against Mrs. Stark by the "fact" that Ms. Reese (associated with the Basileus of Epsilon Zeta Chapter), took out a restraining order against Mrs. Stark; however, on October 12, 2006, four days after the letter was drafted and six days before it was mailed, the Magistrate Court dismissed Ms. Reese's allegations as frivolous. Consequently, contrary to the information contained in Ms. Turner's letter, there was no restraining order issued against Mrs. Stark. In fact, it is Mrs. Stark who has been harassed by Ms. Reese during Chapter meetings. Ms. Reese has also displayed physical aggression towards Mrs. Stark to the point that the latter was forced to file a police report with the East Point Police Department for an incident that occurred on September 6, 2006.

In the referenced letter dated October 8, 2006, the following specific charges were noted as being levied against Mrs. Stark:

1.  Attempting to jeopardize a nationally-awarded March of Dimes grant, about which Mrs. Stark denies any knowledge.

2.  Actively participating in the airing of Zeta Phi Beta Sorority's "financial dirty laundry" on WJLA in Washington, DC. Again, Mrs. Stark denies any knowledge of this incident. Mrs. Stark acknowledges that she sent an email to the South Carolina Black News and that this is the email that was read during the Boule. However, Mrs. Stark denies any active participation in the WJLA broadcast.

3.  Circulating sensitive and confidential sorority documents via the internet, particularly after the National Chair of the Executive Board, Soror Sheryl Underwood, sent official correspondence instructing otherwise. Again, Mrs. Stark denies any wrongdoing, as the information she disclosed was not neither sensitive nor confidential in nature. (see TAB 18)

4.  Attempting to jeopardize and endanger the employment and livelihood of Sorors, i.e. Epsilon Zeta Basileus and Epsilon Zeta Tamias, by sending letters to places of employment and threatening to have professional licenses revoked. Mrs. Stark denies attempting to jeopardize employment of other sorority members. Mrs. Stark feels specifically that it was not she but others in the sorority that attempted to do this to her. She acted in the chapter's best interests by sending a notice to Janet Mays, a licensed CPA, regarding inconsistencies in the financial records of Epsilon Zeta Chapter. Mrs. Starks asked Ms. Mays to verify that they were correct since she was responsible for these records and is a licensed CPA.

November 28, 2006
Page 3

5.        Attempting to intimidate and harass chapter members. Again, Mrs. Stark denies making any attempts to intimidate and harass chapter members.

6.        Threatening chapter members. Mrs. Stark denies threatening any chapter member.

7.        Displaying un-sisterly conduct in the Chapter and Executive Board meetings of Epsilon Zeta Chapter. Mrs. Stark denies displaying an un-sisterly conduct at any meetings for Zeta Phi Beta Sorority, including the Epsilon Zeta Chapter.

8.        Use of profane language against other Sorors in public settings. Mrs. Stark acknowledges she may have used profane language in the aftermath of the September 16, 2006, meeting, but she was certainly not the only one to do so.

Based on the foregoing, it seems apparent that the allegations against Mrs. Stark have, not only been grossly exaggerated, but, in the worst case scenario, were outright lies. Mrs. Stark believes that these allegations stem from a coordinated effort by Ms. Reese, Ms. Turner, and other individual members of the sorority to create a hostile environment within the sorority against her, and to harass her out of the organization in retaliation for her vocal opposition to the admitted financial misfeasance that has occurred at the top levels of the organization. At no time has Mrs. Stark engaged in any behaviors to encourage or escalate the hostilities that have been expressed towards her, and believes that Ms. Myra Reese has fabricated the incidents in an attempt to slander Mrs. Starks' name and provide those Sorors seeking to retaliate against her with reasons to expel her from the sorority. As such, we feel that further investigation should be made into this matter so that Mrs. Stark can be cleared of all allegations that have been levied against her.

Furthermore, it is our opinion after reviewing the constitution and bylaws for Zeta Phi Beta Sorority that Ms. Turner was not within her rights to send the enclosed letter suspending Mrs. Stark. The constitution and bylaws provide that the Regional or State Director may request a suspension of members. Pursuant to the constitution and bylaws, however, the suspension must come directly from the National President, and only after all parties involved have been afforded their rights to due process and after a thorough investigation by the National President.

It is our hope that the ongoing issues can be resolved and that the Executive Board for Zeta Phi Beta Sorority will investigate this matter and come to the appropriate decision regarding an appropriate final disposition. Accordingly, we request that you immediately withdraw Mrs. Stark's suspension until an investigation can be completed to determine the accuracy of the allegation levied against Mrs. Stark.

November 28, 2006
Page 4


Thank you for your prompt attention to, and anticipate cooperation in, this matter. Should you have further questions or need any additional information, please do not hesitate to contact me directly at the address and telephone number noted above or, if you prefer, you may contact Mrs. Stark, as well.

Sincerely,

Ryan Goldstein
Attorney at Law

RG:klw
Enclosure
cc:      Mrs. Natasha Stark
         2820 Sapphire Street
         College Park, GA  30349-8459

         Ms. Sheryl Underwood, Chairman
         National Executive Board
         Zeta Phi Beta Sorority, Inc.
         9200 Sunset Blvd, Ste 701
         West Hollywood, CA  90069

         Mrs. Scarlet Black
         Director Southeastern Region
         Zeta Phi Beta Sorority, Inc.
         233 Covington Road
         Greenville, SC  29617

         Ms. Chrislyn Turner,
         Director State of Georgia
         Zeta Phi Beta Sorority, Inc.
         2607 Windage Drive, SW
         Marietta, GA  30008-8109

         Ms. Myra Reese
         President Epsilon Zeta Chapter
         Zeta Phi Beta Sorority, Inc.
         1916 Sheldon Lane
         Conyers, GA  30094

# EXHIBIT 17



## The Southeastern Region
## Zeta Phi Beta Sorority, Incorporated

Phone: 864-246-7371
Fax: 864-294-1637
E-mail: sblacksedirector@aol.com

233 Covington Road • Greenville, South Carolina 29617-2007

**Soror Scarlet H. Black**
*Regional Director*

November 15, 2006

Mrs. Natasha Y. W. Stark
2820 Sapphire Street
College Park, Georgia 30349
Membership ID# 22109

Dear Mrs. Stark,

Please be advised that a formal recommendation for your immediate removal/expulsion from Zeta Phi Beta Sorority, Incorporated has been sent on behalf of the International Grand Basileus, Soror Barbara C. Moore, to the Chair of the National Executive Board, Soror Sheryl Underwood.

Pending the outcome of this recommendation, your immediate suspension remains in effect and you are not to participate in any professional or social activities pertaining directly or indirectly to Zeta Phi Beta Sorority, Incorporated. You are also not to represent in any form, fashion, or manner your association with Zeta Phi Beta Sorority, Incorporated.

Cordially,

Soror Scarlet H. Black
Southeastern Regional Director

C: Soror Barbara C. Moore, International President, Zeta Phi Beta Sorority, Inc.
   Soror Sheryl Underwood, Chair-National Executive Board
   Soror Chrislyn Turner, Georgia State Director
   Soror Myra Reese, Basileus-Epsilon Zeta Chapter (Atlanta, Georgia) and
   Chair-State of Georgia Executive Board





EXHIBIT 18

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATASHA STARK,                          )
                                        )
            Plaintiff,                   )
                                        )
      v.                                 )     CIVIL ACTION FILE NO.:07 CV 00553
                                        )
ZETA PHI BETA SORORITY, INC.             )
                                        )
            Defendant.                   )
_____ )

AFFIDAVIT OF SHERYL UNDERWOOD

I, Sheryl Underwood, depose and say as follows:

1.      I am above the age of 18 and in all ways competent to provide sworn statements.

2.      I am a resident of the State of California.

3.      I am an active member of Zeta Phi Beta Sorority.  From July 2004 through July 2008, I served Zeta Phi Beta Sorority as Chair of the National Executive Board ("NEB").

4.      At its meeting in January 2007 in Los Angeles, California, the National Executive Board considered the recommendation of Scarlet H. Black, Southeastern Region Director for Zeta Phi Beta Sorority, to expel Natasha Stark from the sorority.  Ms. Black's recommendation was supported by the request from Chrislyn Turner, Georgia State Director for Zeta Phi Beta Sorority, to expel Ms. Stark.  Based upon the information presented at the meeting of the NEB in January 2007, the board voted to recommend that the International Grand Basileus expel Ms. Stark from the sorority for misconduct and rules violations.  The International Grand Basileus recused herself and designated the

Chair of the NEB to follow Zeta Phi Beta Sorority's guidelines and procedures for expulsion of a member in accordance with the authority granted by the Zeta Phi Beta Sorority Handbook.

5.    I reviewed information submitted by the Epsilon Zeta Chapter, Chrislyn Turner, Georgia State Director, and Ms. Black. Based upon my review, I determined that it was appropriate to accept the recommendation of the NEB and expel Ms. Stark from membership in Zeta Phi Beta Sorority. Ms. Stark was notified of my decision pursuant to the Notice of Expulsion and Notice of Right to Appeal ("Notice") dated February 8, 2007, which notice detailed each charge and specification alleged. Ms. Stark was given notice of her right to appeal her expulsion and to appear for an appellate hearing scheduled for March 9, 2007 at 9:00 am at the International Headquarters of Zeta Phi Beta Sorority located at 1734 New Hampshire Avenue, NW, Washington, DC 20009.

6.    On March 9, 2007, a hearing was held before the Appeals Team regarding Ms. Stark's expulsion from the sorority. The Appeals Team considered the testimony of witnesses and evidence other evidence presented and, by unanimous vote, found Ms. Stark guilty of the charges and specifications detailed in the Notice. Ms. Stark was notified of the decision of the Appeals Team by letter dated March 9, 2007.

7.    In connection with the expulsion of Ms. Stark from the sorority, Zeta Phi Beta Sorority followed its guidelines and procedures for expulsion of a member in accordance with the authority granted by the Zeta Phi Beta Sorority Handbook.

9.    The statements in this affidavit are made on my own personal knowledge.

10.    At all relevant times I acted in good faith and with the best interests of the sorority in mind.

11.    I declare under penalty of perjury that the foregoing is true and correct.


[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

FURTHER AFFIANT SAITH NOT.

This is the ___ day of July, 2008.

Sheryl Underwood

COUNTY OF _____

STATE OF CALIFORNIA

Sworn to and subscribed before me,
this the ___ day of August, 2008.



NOTARY PUBLIC

My Commission Expires: _____

ARTHUR ONO
COMM. #1688377
NOTARY PUBLIC CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires Sep. 15, 2010

4

# EXHIBIT 19



**Zeta Phi Beta Sorority, Inc.**
INTERNATIONAL HEADQUARTERS
1734 New Hampshire Avenue, N.W.
Washington, D.C. 20009
(202) 387-3103 • Fax (202) 232-4593
E-MAIL: ZETANATLHQ@WORLDNET.ATT.NET

TM
*Established 1920*

**Barbara C. Moore**
*INTERNATIONAL GRAND BASILEUS*
**Sheryl Underwood**
*CHAIR, NATIONAL EXECUTIVE BOARD*

---

## CONFIDENTIAL COMMUNICATION

February 8, 2007

**Via Federal Express and
Certified Mail – Return Receipt Requested**
Natasha Y. W. Stark
2820 Sapphire Street
College Park, Georgia  30349

Re:   Natasha Y. W. Stark, Member No. 22109
Notice of Expulsion from Zeta Phi Beta Sorority, Inc. and
Notice of Right to Appeal

Dear Mrs. Stark:

The National Executive Board ("NEB") of Zeta Phi Beta Sorority, Inc. ("ZPB") has recommended that you be expelled from the Sorority based upon the request by members of Epsilon Zeta Chapter (Atlanta, Georgia), the Georgia State Director and the Southeastern Regional Director for actions of misconduct and rules violations. *See* Bylaws, Art. XIV, § 2.a. The International Grand Basileus has recused herself and designated the Chair of the NEB to follow ZPB's guidelines and procedures for expulsion of a member from the Sorority in accordance with the authority granted by the Grievance/Complaint Investigation Process of the Handbook of ZPB to act upon the charges brought against you and to determine appropriate disciplinary action.

Based upon the foregoing, I have determined that it is appropriate to accept the recommendation of the NEB and to expel you from membership in ZPB effective <u>immediately</u>. Your expulsion means that you are no longer a member of ZPB and that you no longer enjoy the rights and privileges of a member of ZPB, including participation in any ZPB activities, association of yourself with ZPB, or other representation of ZPB in any form, fashion, or manner. You are not permitted to wear paraphernalia bearing the Sorority's name, symbols, crest, trademarks or tradenames in Greek letters or English alphabet. You will be treated as any other nonmember of the Sorority.

If you desire to appeal your expulsion from the Sorority, you are hereby instructed to appear for an appellate hearing ("Appellate Hearing") on March 9, 2007 at 9:00 a.m. at the International Headquarters of Zeta Phi Beta Sorority, Inc., 1734 New Hampshire Avenue, N.W.,

CONFIDENTIAL COMMUNICATION
Natasha Y. W. Stark
February 8, 2007
Page 2

Washington, DC 20009. At the Appellate Hearing, you will be afforded an opportunity to show cause why you should not be expelled from Zeta on the following charges and specifications:

**CHARGE NO. 1:**     Conduct violating the duty of loyalty to Sorority

**Specification No. 1:** Participating in the public broadcast by WJLA in Washington, DC of Sorority information which should be maintained confidential by members of the Sorority and disclosed only in accordance with applicable law.

**Specification No. 2:** Attempting to jeopardize a nationally awarded March of Dimes grant and 30-year relationship between the Sorority and the March of Dimes.

**Specification No. 3:** Circulating and/or posting sensitive and confidential Sorority documents and proceedings via the internet in contravention of notice to the contrary.

**Specification No. 4:** Publishing sensitive and confidential sorority information in the form of an electronic communication to the South Carolina Black News.

**CHARGE NO. 2:**     Conduct injurious to the Sorority or its purposes, including but not limited to conduct tending to hold the Sorority up to ridicule or contempt or tending to bring discredit upon the Sorority.

**Specification No. 5:** Participating in the public broadcast by WJLA in Washington, DC of Sorority information which should be maintained confidential by members of the Sorority and disclosed only in accordance with applicable law

**Specification No. 6:** Attempting to jeopardize a nationally awarded March of Dimes grant and Zeta's 30-year relationship with the March of Dimes.

**Specification No. 7:** Circulating and/or posting sensitive and confidential Sorority documents and proceedings via the internet in contravention of notice to the contrary.

**Specification No. 8:** Publishing sensitive and confidential sorority information in the form of an electronic communication to the South Carolina Black News.

**CHARGE NO. 3:**     Unsisterly conduct and other conduct unbecoming of a soror.

**Specification No. 9:** Forwarding or causing to be forwarded sensitive and confidential information to the places of employment of Sorors, such communications having a substantial likelihood of jeopardizing or endangering the employment and livelihood of Sorors.

**Specification No. 10:** Threatening to cause the professional license of a Soror to be revoked.

*ZETA: A Community Conscious, Action Oriented Organization*

CONFIDENTIAL COMMUNICATION
Natasha Y. W. Stark
February 8, 2007
Page 3

**Specification No. 11:** Attempting to intimidate and harass members of Epsilon Zeta Chapter.

**Specification No. 12:** Threatening members of Epsilon Zeta Chapter.

**Specification No. 13:** Displaying unsisterly conduct in meetings of the Epsilon Zeta Chapter.

**Specification No. 14:** Use of profane language against Sorors in public settings.

The disciplinary proceedings shall be conducted pursuant to: (i) Article XIV, Section 2 of the Bylaws of Zeta Phi Beta Sorority, Incorporated (hereinafter cited as "Bylaws"); (ii) Article II, Section 2 of the Constitution of Zeta Phi Beta Sorority, Incorporated (hereinafter cited as "Constitution"); (iii) Section 61 of Robert's Rules of Order Newly Revised (10th ed.) (hereinafter cited as "Robert's Rules"); and (iv) the Grievance/Complaint Investigation Process of the Handbook of Zeta Phi Beta Sorority, Incorporated (11th ed.) (hereinafter cited as "Handbook").

Pursuant to the Grievance/Complaint Investigation Process set forth in the Handbook, the following steps have occurred:

| | |
|---|---|
| Step 1 | Investigation and recommendation of the Chapter Basileus |
| Step 2 | Investigation and recommendation of the State Director |
| Step 3 | Investigation and recommendation of the Regional Director |
| Step 4 | Investigation and recommendation of the National Executive Board |

As previously stated, it has been determined at each such step that disciplinary action is appropriate under Article XIV, Section 2 of the Bylaws of ZPB and Article II, Section 2 of the Constitution of ZPB.

At Steps 1-4 of the Grievance/Complaint Investigation Process set forth in the Handbook, the following disciplinary actions may be taken: (i) cease and desist orders; (ii) reversal of decisions; and (iii) withholding membership privileges, such as voting, attending or participating in meetings and programs, or holding office. *See* Handbook, p. 81. At Step 5, the Grand Basileus (or her designee) may suspend or expel a member. *See* Handbook, p. 81.

Prior to suspension or expulsion of a member, an organization must prefer charges against the member and conduct a formal hearing before the appropriate committee or assembly. *See* Handbook, p. 81; Robert's Rules § 61, p. 630, 636. In the case of ZPB, such a hearing is held before the Appeals Team. *See* Handbook, p. 81. A member has no right to present evidence or to otherwise be heard prior to the Grand Basileus or her designee acting upon a recommendation of the National Executive Board to take disciplinary action against a member. *See* Handbook, p. 81.

*ZETA: A Community Conscious, Action Oriented Organization*

CONFIDENTIAL COMMUNICATION
Natasha Y. W. Stark
February 8, 2007
Page 4

The Appellate Hearing will be conducted in accordance with the formal trial procedures set forth in <u>Robert's Rules</u> to determine the validity of the charges. <u>See</u> <u>Constitution,</u> Article II, Section 2; <u>Robert's Rules</u> § 61, pp. 638-641. Although the Appellate Hearing will not be conducted in accordance with any federal or state rules of evidence, the Appeals Team may seek guidance from the Federal Rules of Evidence in determining the admissibility of certain evidence. At the Appellate Hearing, you have a right to be represented by counsel and to speak and produce witnesses in your own defense. <u>See</u> <u>Robert Rules</u> § 61, p. 638. Although such counsel need not be a licensed attorney, your counsel must be a member in good standing of ZPB. <u>Robert's Rules</u> § 61, p. 638. If you desire to be represented by a licensed attorney who is a nonmember of ZPB, you must request permission within thirty (30) days of the date of this Notice. The decision whether to grant leave for representation by a nonmember of ZPB will be decided by a vote of the Appeals Team.

The Appellate Hearing will commence in executive session with a reading of the charges and specifications. You will be afforded an opportunity to plea *guilty* or *not guilty* to the charges and specifications. If you plea *guilty*, the meeting will proceed directly to the determination of the appropriate disciplinary action after a hearing a brief statement of the facts; however, if you plea *not guilty*, the trial will proceed in the following sequence: (i) opening statements by both sides with ZPB proceeding first; (ii) presentation of evidence by ZPB; (iii) presentation of evidence by the defense; (iv) rebuttal witnesses on behalf of ZPB, and then on behalf of the defense (if any); and (v) closing arguments by both sides. Up until the completion of the closing arguments, no one is entitled to the floor except the parties or their attorneys. Cross examination, re-direct examination, and re-cross examination will be permitted, and witnesses can be recalled for further testimony as the occasion may dictate. When closing arguments have been completed, the accused and defense counsel (if any) must leave the room. The Appeals Team will deliberate on the charges and specifications and vote *guilty* or *not guilty*. <u>See</u> <u>Robert's Rules</u> § 61, pp. 638-39. The charges or the specifications may be amended to conform to the evidence presented at the hearing. <u>See</u> <u>Robert's Rules</u> § 61, p. 638.

Before testifying, every witness will be required to declare that the witness will testify truthfully by affirmation administered in a form calculated to awaken the witness' conscience and impress the witness' mind with the duty to do so. *See* Fed. R. Evid. 603. Contrary to the Federal Rules of Evidence, witnesses are not sworn. *See* <u>Robert Rules</u> § 61, p. 631.

A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony. *See* Fed. R. Evid. 602. The persons with first-hand knowledge may be nonmembers of Zeta. *See* <u>Robert Rules</u> § 61, p. 631. Nonmembers of ZPB who consent to testify can be introduced as witnesses at the hearing but are only allowed in the hearing room while testifying. *See* <u>Robert Rules</u> § 61, p. 631. A member can be required to testify at the hearing on pain of expulsion. *See* <u>Robert Rules</u> § 61, p. 631. **IF YOU FAIL TO APPEAR AT THE APPELLATE HEARING, THE HEARING WILL PROCEED IN YOUR ABSENCE.** *See* <u>Robert Rules</u> § 61, p. 638. The final decision of the

*ZETA: A Community Conscious, Action Oriented Organization*

CONFIDENTIAL COMMUNICATION
Natasha Y. W. Stark
February 8, 2007
Page 5

Appeals Team is binding on all parties concerned. *See* <u>Handbook</u>, p.81.

All relevant evidence is admissible, and evidence which is not relevant is not admissible. *See* FED. R. EVID. 402. "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *See* FED. R. EVID. 401. Although relevant, evidence may be excluded if its probative value is outweighed by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. *See* FED. R. EVID. 403. Contrary to the Federal Rules of Evidence, hearsay evidence is admissible and may be relied upon in making a decision. *See* <u>Robert Rules</u> § 61, p. 631.

ZPB will endeavor not to make known to nonmembers of ZPB any information obtained through its investigation or trial of the charges against you. If you are expelled at the Appellate Hearing, ZPB may disclose the fact that you are no longer a member of ZPB. Notwithstanding, such information will be circulated only to the extent necessary to protect the Sorority. *See* <u>Robert Rules</u> § 61, p. 630. **ZETA DOES NOT AUTHORIZE OR DIRECT ANY OF ITS OFFICERS, DIRECTORS OR MEMBERS TO MAKE PUBLIC THE CHARGES OF WHICH AN EXPELLED MEMBER IS FOUND GUILTY OR DISCLOSE ANY OTHER DETAILS CONNECTED TO THE CASE.**

As a membership organization, ZPB has the right to make and enforce its own rules and to require its members to refrain from conduct injurious to the organization or its purposes, including but not limited to conduct tending to hold the organization up to ridicule or contempt or tending to bring discredit upon the organization. *See* <u>Robert's Rules</u> § 61, p. 624. Likewise, ZPB has the right to punish misconduct and violation of its rules. *See* <u>Robert's Rules</u> § 61, p. 624; <u>Bylaws</u>, Art. XIV, § 2.a. No membership organization is obligated to allow any person to remain a member if such person's retention has a tendency to result in harm to the organization. *See* <u>Robert's Rules</u> § 61, p. 624. If a member of ZPB is found guilty of such misconduct, the Sorority may impose any of the following disciplinary measures: (i) reprimand; (ii) suspension; or (iii) expulsion. *See* <u>Handbook</u>, p. 81; <u>Robert's Rules</u> § 61, p. 624-25.

Pending the outcome of the Appellate Hearing, your status shall be that of a person expelled from membership in the Sorority. As previously stated, expulsion means that you are no longer a member of ZPB and that you no longer enjoy the rights and privileges of a member of ZPB, including participation in any ZPB activities, association of yourself with ZPB, or other representation of ZPB in any form, fashion, or manner. You are not permitted to wear paraphernalia bearing the Sorority's name, symbols, crest, trademarks or tradenames in Greek letters or English alphabet. You will be treated as any other nonmember of the Sorority. In the event that the outcome of the Appellate Hearing is to reverse your expulsion, a condition to reinstatement of your membership to ZPB may be the payment of any fines or restitution issued or ordered by ZPB or any external source with competent jurisdiction. You will not be supported by ZPB in any civil or criminal proceedings that arise out of your conduct.

*ZETA: A Community Conscious, Action Oriented Organization*

CONFIDENTIAL COMMUNICATION
Natasha Y. W. Stark
February 8, 2007
Page 6

If you intend to participate in the Appellate Hearing in accordance with the Grievance/Complaint Investigation Process of the Handbook of ZPB, please notify me in writing by certified mail within ten (10) days of your receipt of this letter. Please respond to:

Sheryl Underwood, Chair
National Executive Board
Zeta Phi Beta Sorority, Inc.
1734 New Hampshire Avenue, NW
Washington, DC 20009

If you fail to appear at the Appellate Hearing, the hearing will proceed in your absence. Should you have any questions regarding this matter or the Appellate Hearing, please submit such questions to me in writing at the address set forth above.

Sincerely,

Sheryl Underwood, Chair
National Executive Board

SU/

cc:    National Executive Board
       Southeastern Regional Director
       Georgia State Director
       Basileus, Epsilon Zeta Chapter
       R. Jonathan Charleston, Esq.

*ZETA: A Community Conscious, Action Oriented Organization*

# EXHIBIT 20

2820 Sapphire Street
College Park, Georgia 30349
March 6, 2007

Soror Sheryl Underwood
Chairman, National Executive Board
Zeta Phi Beta Sorority, Incorporated
1734 New Hampshire Avenue, NW
Washington, DC 20009

Dear Soror Underwood:

This letter is to inform you, and the National Executive Board, that I am unable to attend the proposed March 9, 2007 hearing in Washington, DC due to the hardship that trying to accommodate a last minute trip to Washington would cause both myself and my family.

Is it possible for the hearing to be conducted via teleconference?  I will await your response.

Sincerely,

*Natasha Stark*

Soror Natasha Stark

cc:    Soror Barbara C. Moore, Grand Basileus
       Mr. R. Jonathan Charleston, General Legal Counsel
       Members, National Executive Board

# EXHIBIT 21

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NATASHA STARK,                     :
Plaintiff,                         :
v.                                 : Civil Action No. 07cv00553JR
ZETA PHI BETA SORORITY, INC.       :
Defendants                         :
                                   :

Pursuant to Rules of this Court, Plaintiff, by and through counsel Jimmy A. Bell, Esq.

and the Law Office of Jimmy A. Bell, P.C., hereby responds to Defendant's First Set

Interrogatories.  This response to Defendant's First Set of Interrogatories furnishes

knowledge, facts, and information presently available and, as requested, if subsequent or

different information is obtained before trial, this Response to Defendant's Requests for

Production will be appropriately supplemented, either formally or informally, by

communicating the information to all parties.

## GENERAL OBJECTIONS

A. The Plaintiff objects to the Defendant's First Set of Interrogatories to the extent that

it is not designed to lead to relevant discovery in this case.

B. Plaintiff's investigation is continuing and to the extent further information,

responsive to these Interrogatories becomes known to this Plaintiff, these answers will be

supplemented.

C. In addition to these General Objections, which apply to each Response below, the

Plaintiff has noted certain additional specific objections in response to the various requests for

production.

## RESPONSES

1.      State your full name, your residence addresses for the past five (5) years, your social security

number, your date and place of birth, your present and past marital status, and if currently married the

1

On November 10, 2006 ZPB was sent a letter from Epsilon Zeta Chapter which stated that

"those members of Epsilon Zeta Chapter" that formed that basis of your actions against Ms.

Stark "did so without the knowledge, authorization, approval or vote of Epsilon Zeta Chapter."

The letter went on to state that "Epsilon Zeta Chapter has <u>NOT</u> requested the suspension of

Soror Stark"…and any attempt to suspend or expel Plaintiff though the use of the chapter's

name does not have the approval or sanction of the chapter. " Furthermore, ZPB  Bylaws state

in  Article XIV, Section 2, Clause a: *"A chapter through its Regional and State Directors my*

*request suspension of members for non-payment of the approved Local, State (where*

*applicable), Regional and National taxation, and for actions of misconduct and rule violations."*

ZPB had knowledge that recommendation to expel Mrs. Stark was <u>NOT</u> 'properly' made by

members of Epsilon Zeta Chapter (Atlanta, Georgia)."

- Failure by Epsilon Zeta Chapter, and Ms. Myra Reese, chapter president, to properly conduct a confidential investigation by committee to determine if plaintiff engaged in misconduct and whether further action, including the preferring of charges if necessary, is warranted. (RONR, 10th edition, pg. 632-633)
- Failure by Epsilon Zeta chapter, and Ms. Myra Reese, chapter president, to properly report the results of the confidential committee investigation, and to properly prefer charges if warranted by said investigation (RONR, 10th edition, pg. 633-636).
- Failure by Epsilon Zeta chapter, and Ms. Myra Reese, chapter president, to properly affix the date, hour and place of trial for plaintiff to answer charges preferred (RONR, 10th edition pg. 633-636).
- Failure by Epsilon Zeta chapter, and Ms. Myra Reese, chapter president, to formally notify the plaintiff of the date, hour, and place of the trial, to present plaintiff with an exact copy of the charges preferred, and to direct plaintiff to appear before the chapter and/or investigating committee to answer said charges (RONR, 10th edition. pg. 636-637).
- Failure by Epsilon Zeta chapter, and Ms. Myra Reese, chapter president, to hold a formal trial hearing on the validity of the charges (RONR, 10th edition, pg. 638-639).
- Failure by Epsilon Zeta chapter, and Ms. Myra Reese, chapter president, to request the suspension/expulsion of the plaintiff through the Regional and State Director ( ZPB C&B, 6th edition, pg. 23).

24.     Please set forth in detail all facts on which you intend to rely to support your allegation that your

publication of confidential ZPB information to the media, on the internet, and in internet chatrooms

qualifies for whistle-blower status under the law.

Response:

Plaintiff informed the media and the United States Attorney for the District of Columbia of

Barbara Moore's actions. On or about February 13, 2006 Assistant United States Attorney

Thomas Zeno sent ZPB a letter regarding a Federal Grad Jury Investigation involving ZPB. Mr.

Zeno requested records from the organization. On February 14, 2006 Alma Washington, ZPB

National Parliamentarian emailed Plaintiff information of the Federal Grand Jury Investigation.

Ms. Washington asked plaintiff to start gathering and saving the information that the Grand jury

will want to review because the Grand Jury investigation covered the period of 2002 when

plaintiff was a National Board member. On February 16, 2006, plaintiff was subpoenaed to

testify before the Federal Grand Jury and provide documents and tape recordings which related

to ZPB and a possible violation of 18 USC section 1341, a federal criminal statute. Plaintiff

complied with the Federal Grand jury Subpoena.

- Plaintiff contends that information published to the media, and to law enforcement authorities, is not confidential as ZPB is a tax-exempt social club under Internal Revenue Code section 501(c)(7), and is required to publicly report financial information to the IRS, its board, its members and to the general public upon request. ZPB is additionally required to publicly file financial reports in the states of incorporation (IL and DC).
- Plaintiff further contends that as a 501(c)7 organization, ZPB is subject to the whistleblower provisions of the Sarbanes-Oaxley Act, Section 1107, that specifies that it is a felony to retaliate against an individual for providing law enforcement authorities with truthful information relating to the commission, or possible commission, of any federal offense.
- Plaintiff has not participated in any internet chatroom discussions. Plaintiff does, however, assert her First Amendment right to openly and freely discuss any subject matter of her choosing as protected by the First Amendment to the Constitution of the United States of America.

25.     Provide an itemization of the specific financial damage/loss you claim that you incurred as a

result of the alleged acts and/or omissions of the Defendants as set forth in your Complaint.

Response:

Plaintiff had had to pay $5,000 in attorney's fees to begin this litigation and legal fees and expenses are

still adding up to this very day.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this _____ day of June 10, 2008, a copy of the foregoing Response to Defendant's Requests for Interratories was emailed and mailed, first-class postage pre-paid to:

> John C. Lynch
> 1629 K Street, NW
> Suite 1150
> Washington, DC 20006
> (202) 785-0123
> (202) 393-3390 (Fax)
> Attorneys for Defendant

> Jimmy A. Bell, Esq.

20

# EXHIBIT 22(A)



SHARE    PRINT    EMAIL    RSS    AIM

share this story:

related stories:

- **I-Team: Fluoride Controversy**
- **I-Team: Plumber Lawsuit**

Leslie Cook on set:

ZETA PHI BETA SORORITY INCORPORATED HAS BEEN HELPING RAISE MONEY FOR CHARITIES FOR MORE THAN 80 YEARS.

 NOW THE SORORITY MEMBER WHO THOUGHT SHE WAS HELPING HER SISTERS BY REVEALING SECRETS ABOUT ALLEGED MISUSE OF THE ORGANIZATION'S MONEY.. HAS BEEN KICKED OUT.

**Post Your Comments**

Story:

Natasha Stark: "It's like a kick in the stomach.. It's like being married to someone for 17 years and find out they're having an affair."

NATASHA STARK DID NOT WANT HER FACE SHOWN IN THIS REPORT THAT ABC7 AIRED IN FEBRUARY 2006.

SHE WAS THE WHISTLEBLOWER - THE ONE WHO OUTED BARBARA MOORE, THE INTERNATIONAL PRESIDENT OF HER SORORITY, ZETA PHI BETA.

OUR I-TEAM INVESTIGATION FOUND THAT MOORE SPENT NEARLY 400,000 DOLLARS ON WHAT APPEAR TO BE PERSONAL ITEMS.

DESIGNER CLOTHING, FINE JEWELRY, FUR COATS, HIGH END HOME FURNITURE, EVEN LINGERIE....ALL CHARGED TO A SORORITY CORPORATE CREDIT CARD -AN APPARENT VIOLATION OF THE IRS TAX CODE

PROHIBITING ANY INDIVIDUAL FROM BENEFITTING FROM CONNECTION TO A NONPROFIT.

"129 dollars on panty hose, wilson's leather, designer sportswear, ladies' shoes, day wear, St. John's, St. John's, St. John's."

OUR STORY RESULTED IN A FEDERAL INVESTIGATION INTO THE SORORITY'S FINANCIAL TRANSACTIONS.

ONE YEAR LATER, MOORE IS STILL IN CHARGE, AND THE WHISTLEBLOWER, NATASHA STARK, HAS JUST BEEN EXPELLED.

THIS LETTER THE SORORITY'S BOARD SENT TO STARK OUTLINES THE CHARGES -VIOLATING THE DUTY OF LOYALTY, UNSISTERLY CONDUCT IN PART, BECAUSE SHE PARTICIPATED IN OUR STORY.

ZETA PHI BETA WAS FOUNDED AT HOWARD UNIVERSITY IN 1920 AND IT WAS CLEAR THE UNDERGRADUATE MEMBERS TODAY DID NOT WANT TO TALK ABOUT THE CONTROVERSY.

Member: "There's mixed feelings, but I don't know what to say."

BUT MEMBERS OF OTHER SORORITIES HERE HAD LOTS TO SAY ABOUT IT.. AND QUESTIONS ABOUT THE ALLEGED LAVISH SPENDING.. ON THINGS LIKE RENTAL CARS.. AND HOTELS.

"Are they trying to cover it up.. Are they trying to get rid of it.. Are they trying to pretend it didn't happen."

Marcia Smith: "If you're trying to make your organization better . I don't think it's right to expel the person trying to make it better."

Kourtney Wilson: "Thinking about the history of black organizations like that and the principles that they're founded upon. Sisterhood, scholarship, community service. That's definitely not an example for younger african american women in the community to be misusing funds like that."

Leslie Cook on set:
ZETA PHI BETA LEADERS HAVE SCHEDULED A HEARING FOR NATASHA STARK TO APPEAL HER EXPULSION. THAT WILL BE TOMORROW HERE IN WASHINGTON.

BUT STARK TELLS US SHE DID NOT HAVE TIME TO REARRANGE HER LIFE IN ATLANTA IN ORDER TO GET HERE IN THE 3 WEEK NOTICE SHE WAS GIVEN.

HER SUPPORTERS...WHO WERE AFRAID TO TALK TO US ON CAMERA.. ARE
PLANNING ON ATTENDING.

ZETA PHI BETA REFUSED OUR REQUEST FOR AN INTERVIEW.. BUT
INSTEAD ASKED US TO FAX THEM QUESTIONS IN ADVANCE.. THAT WE DO
NOT DO.

## You need to be a registered member of
## ABC 7 News to leave comments on news stories.
## Not a member yet? Click Here to sign up.

**Username or Email Address**

**Password**

**Please leave your comments below:**

Add Your Comments or Opinion

**Messages that harass, abuse or threaten other members; have obscene or
otherwise objectionable content; have spam, commercial or advertising
content or inappropriate links may be removed and may result in the loss of
your posting privileges. Please do not post any private information unless you
want it to be available publicly. Never assume that you are completely
anonymous and cannot be identified by your posts.**

© 2007 WJLA-TV

All rights reserved. This material may not be published, broadcast, rewritten
or redistributed.

The 'RUNNING MAN' icon is a registered trademark of America Online,
Inc.

**We want your comments on the new look of ABC 7 News!**

Your Email

EXHIBIT 22(B)

I-Team: Sorority Spending Follow-Up 2
posted 5:30 pm Fri March 09, 2007 -
tags: i-team • jennifer donelan • sorority spending
- **WJLA Script** -

Anchor:
NEW DEVELOPMENTS TONIGHT IN A STORY FIRST REPORTED BY THE ABC
7 NEWS I-TEAM.

A MEMBER OF ZETA PHI BETA SORORITY RAISED QUESTIONS ABOUT
ALLEGED MISUSE OF THE ORGANIZATION'S MONEY. SHE WAS KICKED OUT
OF THE SORORITY.



SHARE    PRINT    EMAIL    RSS    AIM

share this story:

related stories:

- I-Team: Sorority Spending Follow-Up
- I-Team: Church Money

JENNIFER DONELAN IS HERE WITH TODAY'S NEW DEVELOPMENTS.

Jennifer Donelan on set:
TODAY THERE WAS A HEARING AT THE ZETA PHI BETA S HEADQUARTERS
IN NORTHWEST. THE ONE MEMBER WHOSE SAYS HER NAME HAS BEEN
DRAGGED THROUGH THE MUD BECAUSE SHE SPOKE OUT IS NO LONGER
ALONE. HER FELLOW MEMBERS SHOWED UP TODAY WITH QUESTIONS
BUT THEY GOT ABOUT AS FAR AS WE DID. THE FRONT DOOR.

MyFRAGST
POST YOUR COMMENTS

Story:

Yvette Jardine: "It's bigger than zeta phi beta sorority. It's about right and what's honest."

OUTSIDE OF ZETA PHI BETA INTERNATIONAL HEADQUARTERS IN NORTHWEST. A CROWD OF SORORITY MEMBERS LOCKED OUT OF THEIR OWN HOUSE.

Narkai Kamara-Tate: "I think it's ridiculous, if you have nothing to hide then why can't the members participate in the hearing."

INSIDE A HEARING CONCERNING THE EXPULSION OF NATASHA STARK, A FORMER SORORITY MEMBER OR SOROR FOR 20 YEARS. A FORMER BOARD WHO OUTED INTERNATIONAL PRESIDENT BARBARA MOORE FOR REPORTEDLY CHARGING NEARLY 400,000 DOLLARS ON A CORPORATE CREDIT CARD. OUR I-TEAM INVESTIGATION REVEALED MOORE BOUGHT EVERYTHING FROM DESIGNER CLOTHING TO FURNITURE, EVEN LINGERIE. IT WAS AN APPARENT VIOLATION OF THE IRS TAX CODE, PROHIBITING ANY INDIVIDUAL FROM BENEFITTING FROM CONNECTION TO A NON PROFIT. STARK WAS THE WHISTLEBLOWER.

Natasha Stark: "At the end of the day crimes have been committed, money has been stolen and the law has been broken."

STARK, IN GEORGIA TAKING CARE OF THREE SMALL CHILDREN, WASN'T AT THE HEARING. A FEW WEEKS AGO, SHE GOT A LETTER INFORMING HER SHE WAS EXPELLED FROM ZETA PHI BETA FOR UNSISTERLY CONDUCT, VIOLATING THE DUTY OF LOYALTY AND, IN PART, FOR TALKING TO US.

Natasha Stark: "The questions that members need to ask themselves is who's next."

WHEN OTHERS HEARD THE NEWS THEY CAME HERE FOR ANSWERS BUT, EVEN ELDER SORORS...

"No, not allowed to go in."

WERE TURNED AWAY.

Dr. Freeda Thompson: "We came here to be supportive and to find out what was going on with our sorority and we had no idea when we left home that we would not be allowed to get in."

Narkai Kamara-Tate: "This is sending a chilling message to the rest of my sorority members. How dare we stand up and speak for what is right."

ON THIS DAY ONLY DELIVERIES AND LUNCH WERE ALLOWED PAST THE

FRONT DOOR. NO ONE INSIDE WOULD TALK TO US. AS FOR NATASHA STARK SHE'S PROUD OF THOSE WHO STOOD OUTSIDE.

Natasha Stark: "The future of Zeta is the hands of those sorors who had that courage to come out in freezing weather and take a stand for what was right."

Jennifer Donelan on set:
OUR ORIGINAL REPORT BACK IN 2006 LED TO A FEDERAL INVESTIGATION OF BARBARA MOORE AND HER ALLEGED ACTIVITIES. ACCORDING TO THIS LETTER TO THE SORORITY, EVEN THE U.S. ATTORNEY'S OFFICE F FOR THE DISTRICT HAD PROBLEMS GETTING INFORMATION. AN ASSISTANT ATTORNEY WROTE RARELY HAVE ENCOUNTERED THE KIND OF RESISTANCE SHOWN BY ZETA PHI BETA TO DISCLOSING WHAT HAS OCCURRED. THEY HAD TO CLOSE THE CASE BUT THAT DOES NOT STOP THE IRS, THE FBI OR ANY OTHER FEDERAL, STATE, OR LOCAL PROSECURTOR FROM PURSUING CHARGES.

# EXHIBIT 23

Aug 05 2008 12:53p    Cherrydale ES
AUG-05-2008  13:36    The Charleston Group                8643553361                           p.2
                                                                          9104862599    P.02

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATASHA STARK,                          )
                                        )
                 Plaintiff,             )
                                        )
        v.                              )    CIVIL ACTION FILE NO.:07 CV 00553
                                        )
ZETA PHI BETA SORORITY, INC.            )
                                        )
                 Defendant.             )
————————————————————                    )

## AFFIDAVIT OF SCARLET H. BLACK

I, Scarlet H. Black, depose and say as follows:

1.      I am above the age of 18 and in all ways competent to provide sworn statements.

2.      I am a resident of the State of South Carolina.

3.      I am an active life member of Zeta Phi Beta Sorority.  From November 2002 through July 2008, I served Zeta Phi Beta Sorority as the Southeastern Regional Director.

4.      By letter dated September 27, 2006, members of the Epsilon Zeta Chapter of Zeta Phi Beta Sorority made a formal written complaint to Chrislyn Turner, Georgia State Director, regarding certain acts committed by the Natasha Stark, that were alleged to be against the interests of the sorority and constituted conduct unbecoming a member of the sorority.

5.      Pursuant to the Zeta Phi Beta Handbook Grievance/Complaint Investigation Process, Chrislyn Turner referred this matter to me by memorandum dated October 8, 2005 [sic].  In the memorandum, Ms. Turner recommended that Ms. Stark be

expelled from Zeta Phi Beta Sorority based upon Ms. Turner's investigation of Ms. Stark's conduct.

6.     In accordance with the Zeta Phi Beta Sorority Constitution, Bylaws and Handbook, I reviewed the recommendation of Chrislyn Turner and documents attached to her memorandum referred to in paragraph 5 above. I also consulted with Ms. Turner and members of Epsilon Zeta Chapter of Zeta Phi Beta Sorority.   Based upon my investigation, I recommended to the National Executive Board of Zeta Phi Beta Sorority that Ms. Stark be expelled from the sorority. I notified Ms. Stark of my recommendation by letter dated November 15, 2006. My actions were taken pursuant to, and in full compliance with, the Zeta Phi Beta Sorority Constitution, Bylaws and Handbook, and were within my authority as Southeastern Regional Director for Zeta Phi Beta Sorority.

7.     At its meeting in January 2007 in Los Angeles, California, the National Executive Board considered my recommendation to expel Natasha Stark from the sorority.  My recommendation to expel Ms. Stark from the sorority was supported by Chrislyn Turner, Georgia State Director for Zeta Phi Beta Sorority.  Based upon the information presented at the meeting of the NEB in January 2007, the board voted to recommend that the International Grand Basileus expel Ms. Stark from the sorority for misconduct and rules violations.

8.     The statements in this affidavit are made on my own personal knowledge.

9.     At all relevant times I acted in good faith and with the best interests of the sorority in mind.

10.     I declare under penalty of perjury that the foregoing is true and correct.

2

Aug ... ........... Cherrydale ES                    8643553361              p.4
AUG-05-2008  15:43        The Charleston Group                 9104852599    P.02

FURTHER AFFIANT SAITH NOT.

This is ___5___ day of August, 2008.

_Scarlet H. Black_
Scarlet H. Black

COUNTY OF _Greenville_

STATE OF SOUTH CAROLINA

Sworn to and subscribed before me,
this the 5th day of August, 2008.

_Ellen Bracken_
NOTARY PUBLIC

My Commission Expires: _February 26, 2017_

:

3

TOTAL P.02

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATASHA STARK,                        )
                                      )
            Plaintiff,                )
                                      )
      v.                              )    CIVIL ACTION FILE NO.:07 CV 00553
                                      )
ZETA PHI BETA SORORITY, INC.          )
                                      )
            Defendant.                )
_____)

AFFIDAVIT OF CHRISYLYN TURNER

I, Chrislyn Turner, depose and say as follows:

1.      I am above the age of 18 and in all ways competent to provide sworn statements.

2.      I am a resident of the State of Georgia.

3.      I am an active member of Zeta Phi Beta Sorority.  From April 2005 through the present, I have served Zeta Phi Beta Sorority as the Georgia State Director.

4.      By letter dated September 27, 2006,  members of the Epsilon Zeta Chapter of Zeta Phi Beta Sorority made a formal written complaint to me, in my capacity as Georgia State Director, regarding certain acts committed by the Natasha Stark, that were alleged to be against the interests of the sorority and constituted conduct unbecoming a member of the sorority.

5.      Beginning on or about September 30, 2006 through October 6, 2006, I conducted an investigation of the allegations made by members of the Epsilon Zeta Chapter of the Zeta Phi Beta Sorority against Ms. Stark.  My investigation included (1) reviewing the complaint letter dated September 27, 2006; (2) reading various documents

and correspondence relating to the alleged conduct of Ms. Stark; and (3) interviewing members of Epsilon Zeta Chapter of Zeta Phi Beta Sorority.

6.     On or about October 6, 2006, I completed by investigation into the complaints made by members of the Epsilon Zeta Chapters of the Zeta Phi Beta Sorority against Ms. Stark.  At that time, I concluded that the complaints made against Natasha Stark by members of the Epsilon Zeta Chapter of the Zeta Phi Beta Sorority against Ms. Stark were valid and warranted further scrutiny.

7.     By letter dated October 8, 2006, I advised Ms. Stark of the charges levied against her and of the results of my investigation.  Pursuant to my position as Georgia State Director for Zeta Phi Beta Sorority, I further notified Ms. Stark that of the suspension of all her sorority activities pending further investigation.  These actions were taken pursuant to, and in full compliance with, the Zeta Phi Beta Sorority Constitution, Bylaws and Handbook, and were within my authority as Georgia State Director for Zeta Phi Beta Sorority.

8.     Pursuant to the Zeta Phi Beta Handbook Grievance/Complaint Investigation Process, I referred this matter, via written correspondence dated October 8, 2005, to the Southeastern Regional Director, Scarlet H. Black for further investigation. These actions were taken pursuant to, and in full compliance with, the Zeta Phi Beta Sorority Constitution, Bylaws and Handbook, and were within my authority as Georgia State Director for Zeta Phi Beta Sorority.

9.     The statements in this affidavit are made on my own personal knowledge.

10.     At all relevant times I acted in good faith and with the best interests of the sorority in mind.

11.    I declare under penalty of perjury that the foregoing is true and correct.


[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

FURTHER AFFIANT SAITH NOT.

This is the _06_ day of ~~July~~, 2008. *August -@*

_Chrislyn Turner_
Chrislyn Turner

COUNTY OF _Henry_

STATE OF GEORGIA

Sworn to and subscribed before me,
this the _6th_ day of August, 2008.

_Donna M. Allen_
NOTARY PUBLIC

My Commission Expires: _____

DONNA M. ALLEN
MY COMMISSION EXPIRES
~~FEBRUARY 23, 2010~~

4