**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NATASHA STARK,<br><br>Plaintiff,<br><br>v.<br><br>ZETA PHI BETA SORORITY, INC.,<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Civil Action No. 07-0553 (JR) |

**MEMORANDUM**

Natasha Stark brought this suit against her sorority after she was expelled from the sisterhood. I dismissed Stark's claims for breach of contract and negligence at a September 11, 2008 status conference after hearing argument on Zeta Phi Beta's dispositive motion. Dkt. 17. What remains after that in-court dismissal is a defamation claim that concerns three statements made in a four-page letter disseminated to the entire ZPB sisterhood by Sheryl Underwood, the chair of ZPB's national executive board. The Underwood letter gave ZPB's perspective on the circumstances surrounding Stark's expulsion.

Upon further consideration of ZPB's motion, Stark's opposition and the whole record, I find that Stark made herself a limited public figure for the purposes of this case; that the statements in the Underwood letter of which she complains are covered by the "common interest" and "defense" privileges; and that no reasonable juror could find that the statements were

published with subjective or "actual" malice. Summary judgment will accordingly be granted for ZPB.

**Background**

Most of the relevant facts are undisputed. Stark was a member of ZPB as an undergraduate at Georgia State University. P. Opp. at 1. After her graduation she remained involved in the sorority and held a number of positions. *Id.* At some point, it was revealed that ZPB's "Grand Basileus" was using the sorority's American Express card to buy personal items such as wigs, jewelry, and clothing.[1] Pl. Opp. at 2. The sorority dealt with the situation by accepting a promissory note from the Basileus, Def, SMF at 2[2], but Stark, dissatisfied with this resolution, took it upon herself to inform other members of ZPB and the media about what had happened, first using her husband's email account, Def. MSJ ex. 7, and then, when ZPB demanded that her husband cease and desist, Def. MSJ exs. 8, 9, her email account at work. She sent an email to the South Carolina Black News, setting forth

[1]Why ZPB has a Grand Basileus and not a Grand Basilissa is a mystery not explained by the record. The only historical example we could find of a woman using the title Basileus was Empress Irene of Athens (752-803), who waged war on, defeated, blinded, and imprisoned her son Constantine VI but was later overthrown, exiled to the island of Lesbos, and forced to support herself by spinning for the rest of her life.

[2]Each page of the defendant's statement of material facts and motion for summary judgment is paginated as "8." I will refer to the pages of those documents as if they were paginated in correct numerical order.

her version of events and offering to provide documentation. Def. MSJ ex. 10. Then she sent a similar email to a variety of other news media outlets, including ABC, NBC, and CBS. Def. MSJ ex. 3, at p. 52. ZPB accused Stark of publishing a libel and demanded that she desist. Def. MSJ ex. 11. Stark persisted, however, and was the source of information for two television broadcasts on the Basileus's spending habits by the "I-Team" at ABC affiliate WJLA-TV, appearing on these programs disguised to conceal her identity. Def. MSJ exs. 23, 24.

In February 2006, ZPB was advised that a federal grand jury was investigating the Basileus's use of ZPB funds. Pl. Opp. at 2. Stark received a subpoena to testify before and provide documents to the grand jury, and she complied. Pl. Opp. ex. 3. The U.S. Attorney closed the case without indictment. Pl Opp. ex. 4.

In September 2006, certain sisters in ZPB's Epsilon Zeta chapter complained to ZPB's Georgia State Director that Stark's activities had been "designed to tear down versus build up Zeta Phi Beta" and demanded immediate action. Def. MSJ ex.14. In October 2006, the Georgia State Director informed Stark that she had conducted an investigation into the allegations, that Stark was suspended, and that she would recommend Stark's expulsion from the sorority. Def. MSJ ex. 15. Soon after, Stark

advised ZPB through her attorney that she wanted to contest the charges against her. Def. MSJ ex 17.

On February 8, 2007, the chair of ZPB's national executive board informed Stark by letter that she was expelled and that an appeals hearing would be held on March 9, 2007. Def. MSJ ex. 20. On February 17, 2007, one Edda Pittman published a "press release," in which Stark was thoroughly quoted about how she was "the member held responsible for circulating the documentation upon which the" WJLA-TV stories were based and had been expelled from ZPB. Pl. Opp. ex. 6. Stark's request to attend the appeals hearing via teleconference was refused. On the day before the hearing, Stark appeared on a follow-up broadcast by the WJLA-TV I-Team, revealing that it was she who had "outed" the story of the Grand Basileus's spending habits, that her expulsion hearing was scheduled for the next day, and that the whole thing felt "like a kick in the stomach." Def. MSJ ex 21. On March 9, 2008 Stark's expulsion was upheld. WJLA reported this event too, quoting Stark as warning that: "The question that members need to ask themselves is who's next." Def. MSJ ex. 24. The Underwood letter referred to at the beginning of this memorandum was sent to all ZPB sisters on March 17, 2006. Def. MSJ ex. 5.

## Analysis

Stark's claim is that three statements in the Underwood letter are defamatory: (1) that "the recommendation to expel Ms. Stark was 'properly' made by members of the Epislon Zeta Chapter"; (2) that Stark "made statements with 'disregard for the truth'"; and (3) that Stark "was not a whistle-blower because a whistle blower is a person who provides truthful information to a law enforcement officer [in] relation to the commission or possible commission of a federal offense." Compl. at ¶ 20.

ZPB's motion for summary judgment argues that these statements are covered by the "defense" and "common interest" privileges; that Stark is a limited public figure for the purposes of this case; and that Stark has failed to identify a genuine issue of material fact bearing on the propositions that (1) the statements are true and (2) they were made and published without "actual" or subjective malice.

**Legal Standards For Defamation**

"A plaintiff bringing a defamation action . . . must show: (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of

special harm or that its publication caused the plaintiff special harm."[3] *Beeton v. District of Columbia*, 779 A.2d 918, 923 (D.C. 2001) (internal citation and quotations omitted). "In the District of Columbia, a statement is defamatory if it tends to injure [the] plaintiff in his [or her] trade, profession or community standing or lower him in the estimation of the community." *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 594 (D.C. 2000) (internal quotations and citation omitted). A "publication must be taken as a whole, and in the sense in which it would be understood by the readers to whom it was addressed." *Afro-American Pub. Co. v. Jaffe*, 366 F.2d 649, 659 (D.C. Cir. 1966). But "[a] court's power to hold as a matter of law that a statement is not capable of a defamatory meaning is limited to those cases where it is beyond doubt that a reasonable juror could find no defamatory meaning in the published statement." *Joseph v. Xerox Corp.*, 594 F.Supp. 330 (D.C. Cir. 1984) (citation omitted). "Truth is a complete defense to a claim of defamation." *Farrington v. Bureau of Nat. Affairs, Inc.*, 596 A.2d 58, 60 (D.C. 1991).

[3]The parties do not dispute that District of Columbia law is applied in this case.

**The Statements Were Protected By The "Defense" And "Common Interest" Privileges**

Whether the "defense" and "common interest" privileges apply is a question of law. *Novecon Ltd. v. Bulgarian-American Enterprise Fund*, 190 F.3d 556, 566, 568 fn. 5 (D.C. Cir. 1999). The privilege of "defense" arises when "the author of a libel writes . . . for the protection of his own rights or interests," *Novecon*, 190 F.3d 556, "if the circumstances induce a correct or reasonable belief that (a) there is information that affects a sufficiently important interest of the publisher, and (b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest," *Washburn v. Lavoie*, 437 F.3d 84, 91 (D.C. Cir. 2006), "unless the writer [is] actuated by malice." *Novecon*, 190 F.3d 556 In this context, malice requires proof of "bad faith and evil motive . . . without just cause or excuse, with such a conscious indifference or reckless disregard as to its results or effects upon the rights or feelings of others as to constitute ill will." *Novecon*, 190 F.3d at 567 (internal citations omitted). "[U]nless the statement itself is 'so excessive, intemperate, unreasonable, and abusive as to forbid any other reasonable conclusion than that the defendant was actuated by express malice,' malice must be proven by extrinsic evidence." *Id.*

The "defense privilege" has been used when a defendant was attacked "in letters to Congress and articles in the press."

*Id*. Here, Stark complained about ZPB and revealed damaging information about its internal workings to numerous media outlets, and her statements generated four news broadcasts. The Underwood letter was written to the sisterhood as a direct response to these public statements. Stark indeed does not dispute the application of the defense privilege to the assertedly defamatory statements - nor could she. When she said "folks hard earned money has been stolen and the law has been broken," Pl. Opp ex. 6, a public denial by ZPB and a response that her that her "quoted statements disregard the truth," Def. MSJ ex. 5, directed to the sisterhood are surely privileged.

The "common interest" privilege "protects otherwise defamatory statements made "(1) ... in good faith, (2) on a subject in which the party communicating has an interest, or in reference to which he has, or honestly believes he has, a duty to a person having a corresponding interest or duty, (3) to a person who has such a corresponding interest." *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 858 (D.C. Cir. 2006). This privilege is foreclosed by "excessive publication, defined as publication to those with no common interest in the information communicated, . . . publication not reasonably calculated to protect or further the interest . . . and . . . publication with malice" under the same standard as for the privilege of defense. *Mastro,* 447 F.3d at 858 (internal citations and quotations

omitted). Stark does not contest the application of this privilege either, and offers neither facts nor argument that ZPB's profession of its duty to inform the sisterhood was insincere, that there was no shared interest between the sisters in her very public expulsion, or that the Underwood letter was excessively published.

Nor does Stark provide any argument for finding that the Underwood letter was published with subjective malice. There is no facially vitriolic language in the letter, and there is no extrinsic evidence of bad faith in the record. There may well have been dislike between feuding sorority sisters, but the "mere existence of ill will on the part of the publisher toward the subject of the publication does not defeat the publisher's privilege if the privilege is otherwise established by the occasion and a proper purpose." *Novecon*, 190 F.3d at 568. Because "no reasonable factfinder could find that the language of the communication and the circumstances attending its publication by the defendant were not at least as consistent with the nonexistence of malice as with its existence, there is no issue for the jury." *Novecon*, 190 F.3d at 571, 568 fn. 5; *Mastro*, 447 F.3d at 859.

**Stark Does Not Show "Actual Malice"**

In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974), the Supreme Court held that a person may inject himself

or be drawn into a particular public controversy sufficiently to become a "public figure" for a limited range of issues. A limited public figure can prevail in a defamation suit only by proving publication with "actual malice" under *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). "Actual malice" is "publication with knowledge that a statement was false or with reckless disregard as to whether it was false," *Novecon*, 190 F.3d 556 (D.C. Cir. 1999), and must be proven by clear and convincing evidence. *Moss v. Stockard*, 580 A.2d 1011, 1027 n.29 (D.C. 1990) Whether Stark was a limited purpose public figure is a matter of law for the court. *Clampitt v. American University*, --- A.2d ----, 2008 WL 4346424 * 14 (D.C. 2008). The D.C. Circuit has "formulated a three-part test for identifying a limited-purpose public figure, requiring (1) that there have been a public controversy; (2) that the plaintiff have played a sufficiently central role in the controversy; and (3) that the alleged defamatory statement have been germane to the plaintiff's participation in the controversy." *Clyburn v. News World Communications, Inc.*, 903 F.2d 29, 31 (D.C. Cir. 1990) (internal citations and quotations omitted).

Here, the four news broadcasts by the ABC affiliate's I-Team on the Basileus's spending and Stark's expulsion make the controversy public. Stark purposefully thrust herself into the public eye on these issues, not only by appearing undisguised on

two broadcasts, but also by sending the information out in the first place. She also willingly provided quotes for Pittman's press release. The allegedly defamatory statements arose directly from the controversy, and Stark therefore satisfies all three parts of the *Clyburn* test.

Stark does not dispute that she is a limited public figure, but instead attempts to show "actual malice" by arguing that the defendants published the Underwood Letter knowing that the contested statements were false. Stark claims that ZPB knew that the "recommendation" was not "properly made" because, pursuant to the ZPB Bylaws, only "[a] chapter through its Regional and State Directors may request suspension of members for . . . actions of misconduct and Rules violations" and ZPB knew that the Epsilon Zeta Chapter had disavowed the complaint made against Stark. Pl. Opp. at 11. That claim is refuted by ZPB's citation of a ZPB Handbook that expressly allows for individual ZPB sisters to make complaints. *See* Def. MSJ ex. 4 at 80. Stark has made no effort to rebut that citation or to explain why ZPB should not have relied on it.

Stark next argues that ZPB knew that the whistle blower comment was false because she was in fact contacted by the U.S. Attorney's office about the grand jury investigation. ZPB's response - that the whistle blower statement in the Underwood Letter had to do with Stark's disclosure of information <u>to the</u>

media, is unrefuted. Statements to the media do not enjoy whistle blower protection under the law. *See* 18 U.S.C. 1513(e).

Stark last asserts the presence of “actual malice” in the Underwood Letter’s statement that her “quoted statements” in the Pittman press release “disregard the truth” because the quotes “were, in fact, true.” Stark’s quotes include: (1) “The bottom line here is that folks hard earned money has been stolen and the law has been broken”; (2) “Expelling me from the sorority for fulfilling my fiduciary duty . . . will not change the fact that money has been stolen and the law has been broken”; and (3) “If I’ve got to choose between being [in the sorority] . . . and doing time in a federal prison for aiding and abetting the commission of a felony, that’s pretty much a no-brainer.” The defense argues that no crime was committed or indictment handed up, that Stark had no actual “fiduciary duty” towards ZPB, and that Stark did not qualify any of her accusations with words like “it is my belief.” Def. Rpl. at 7-8. These points are well taken.

Although there is no formula to show “actual malice,” this Circuit has pointed to a few examples, including when a publication is “fabricated” or “so inherently improbable that only a reckless man would have put [it] in circulation.” *Tavoulareas v. Piro*, 817 F.2d 762, 790 (D.C. Cir. 1987). Stark has not produced evidence of anything remotely similar. No

reasonable juror could find that the defendant published the Underwood letter or any of the three contested statements with "actual malice." *Clyburn*, 903 F.2d at 35.

JAMES ROBERTSON
United States District Judge